731 A.2d 1000

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. DAVID COOPER, DEFENDANT–APPELLANT.

Argued September 15, 1998—Decided June 3, 1999.

58

*Mordecai D. Garelick* and *Linda Mehling* Assistant Deputy Public Defenders, argued the cause for appellant (*Ivelisse Torres*, Public Defender, attorney; *Mr. Garelick, Ms. Mehling, Claudia Van Wyk* and *Matthew Astore*, Deputy Public Defenders, II and *Michael B. Jones*, Assistant Deputy Public Defender, of counsel; *Mr. Garelick, Ms. Mehling*, and *Ms. Van Wyk*, on the briefs).

*Catherine A. Foddai*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

STEIN, J.

In May 1995, defendant David Cooper was convicted by a Monmouth County jury of the purposeful or knowing murder, by his own conduct, of L.G., a six-year-old girl. The jury also convicted him of the related charges of kidnapping, two counts of aggravated sexual assault, and felony murder. On the capital murder conviction, the jury sentenced defendant to death. For the non-capital convictions, the trial court sentenced defendant on the kidnapping count to fifty years' imprisonment with twenty-five years of parole ineligibility, and on the aggravated sexual assault convictions to twenty-five years' imprisonment with ten years of parole ineligibility, both sentences to be served consecutively to the sentence imposed for purposeful or knowing murder. The

felony-murder conviction was merged with the conviction for purposeful or knowing murder.

This Court affirmed defendant's conviction for capital murder and his death sentence. *State v. Cooper*, 151 *N.J.* 326, 406–07, 700 *A.*2d 306 (1997). We also affirmed his conviction and sentence on the kidnapping charge. We vacated defendant's conviction and sentence for aggravated sexual assault and held that that conviction must merge with the kidnapping conviction. *Id.* at 406, 700 *A.*2d 306.

Defendant requested proportionality review for his death sentence. See *N.J.S.A.* 2C:11–3e. We granted that request and now find no disproportionality in defendant's death sentence.

## I

The detailed facts are described in *Cooper, supra*, 151 *N.J.* at 341–47, 700 *A.*2d 306, and we repeat here only those facts that are material to our proportionality review.

On July 18, 1993, L.G., the six-year-old victim, her two sisters, and her mother, R.G., were at the Asbury Park home of R.G.'s sister-in-law, M.W. R.G. sat on the front porch of the house with her youngest daughter while M.W. was at the supermarket. The victim, her sister, and M.W.'s daughter played in the front yard and eventually moved to the fenced-in back yard.

While the children were in the backyard, defendant lured L.G. away from the other children, lifted her over the fence, and walked away with her. The other children informed R.G. that defendant had taken L.G. R.G. and M.W., who by now had returned from the supermarket, searched for and called out to L.G. Neighbors joined in the search. Their efforts proved to be fruitless.

The Asbury Park Police Department was notified of L.G.'s disappearance, and police officers commenced a search for L.G. A few hours after her abduction, police officers found L.G.'s body under the porch of an abandoned home in Asbury Park. Defendant

had been living under that porch. L.G. was found on her back lying on a mattress; her shirt was pulled up, her panties were at her ankles, and a pair of boxer shorts covered her face. Her vaginal area was exposed and bloodied.

Next to L.G.'s body the police found clothing and a bloodstained paper towel. Nearby, they recovered defendant's gym bag that contained his wallet, and inside the wallet was defendant's social security card. Other documents identifying defendant were found in the area, as well as a paper bag and beer bottle that contained defendant's latent fingerprints.

Police apprehended defendant the next day and took him to police headquarters for interrogation. Defendant waived his *Miranda* rights but initially denied any involvement in L.G.'s death. After being confronted with the incriminatory evidence already gathered and informed that a court order would be sought to obtain additional evidence from his person, defendant acknowledged responsibility for L.G.'s death.

Defendant stated, however, that L.G.'s death was accidental and that he was drunk when he strangled her. According to defendant, he saw L.G. playing in the backyard of M.W.'s house, lifted her over the fence, and led her to the area under the porch of the abandoned house. Using a condom, he forcibly engaged in sexual intercourse with L.G., and then strangled her, leaving her body underneath the porch. He discarded the condom in a nearby field. Defendant then signed a written statement acknowledging that while lying on top of L.G., with his hands on her neck, he penetrated her vaginally causing her to bleed and resulting in blood stains on his clothes.

An autopsy demonstrated that L.G. died of asphyxiation. The medical examiner concluded that she had been strangled for between four and six minutes. The autopsy also revealed injuries to L.G.'s vagina, cervix, and anal canal.

Substantially on the basis of those facts, a Monmouth County jury convicted defendant of kidnapping, aggravated sexual assault, felony murder, and capital murder.

At the ensuing penalty phase before the same jury, the State relied on three aggravating factors: (1) that the murder was outrageously or wantonly vile, horrible, or ·inhuman in that it involved depravity of mind, *N.J.S.A.* 2C:11–3c(4)(c); (2) that the murder occurred during the commission of an aggravated sexual assault or kidnapping, *N.J.S.A.* 2C:11–3c(4)(g); and (3) that the purpose of the murder was to escape detection or apprehension, *N.J.S.A.* 2C:11–3c(4)(f).

Defendant presented substantial mitigating evidence focusing on his tragic childhood and resulting emotional disturbance. Pursuant to the "catch-all" mitigating factor, defendant submitted evidence of eighteen mitigating circumstances relating primarily to his flawed upbringing and its effect on his emotional development and behavior.

Defendant's mitigating evidence demonstrated that his sixteen-year-old mother drank heavily during her pregnancy. Defendant was born with heart and respiratory ailments, and he spent the fifty-four days following his birth in the hospital. During that period his parents allegedly visited him only three times. Because of infectious and other congenital conditions, defendant was hospitalized on nine other occasions before his first birthday and required heart surgery when he was two. Defendant's father was addicted to alcohol and drugs and was a diagnosed schizophrenic. He often abused defendant's mother and once broke her arm in defendant's presence. When defendant was two years old, his father was imprisoned for raping two of defendant's older cousins.

Defendant's mother, also an alcoholic, apparently was incapable of providing defendant with normal maternal affection. She disclaimed her maternity, referring to defendant as the child of his paternal grandmother. She was violent and abusive to defendant, on one occasion dangling him out of an apartment window.

When defendant was eight years old, he told his social worker that he wanted to be removed from his home. When he was nine years old, his mother died in an automobile accident. By age eleven, defendant had lived with at least ten different caregivers,

including various relatives and foster parents. In many of those placements defendant was exposed to violence and substance abuse.

Several experts testified on defendant's behalf that his sickly and unstable childhood, his exposure to violence, abuse and neglect, and the lack of any affectionate relationship with his mother had reduced his ability to understand cause and effect, limited his capacity to empathize with others, and rendered him hostile, aggressive, and prone to violence. In addition, expert testimony was presented relating defendant's emotional disturbance as an adult to his flawed and oppressive childhood.

The jury unanimously determined that defendant had committed the murder to escape detection, *N.J.S.A.* 2C:11–3c(4)(f), and had done so in the course of committing aggravated sexual assault and kidnapping, *N.J.S.A.* 2C:11–3c(4)(g). The jury rejected the State's contention that the murder had involved torture or an aggravated battery. *N.J.S.A.* 2C:11–3c(4)(c).

### Concerning the mitigating factors proffered by defendant:

Some or all of the jurors found the following mitigating factors: (1) that defendant had been denied nurturing as an infant (6 jurors); (2) that he had been born to drug and alcohol-dependent parents (12 jurors); (3) that drinking by his mother during pregnancy had contributed to defendant's physical and developmental disabilities (2 jurors); (4) that his father had abused members of the family when defendant was an infant, thereby exposing him to violent and abusive behavior (8 jurors); (5) that his mother had abandoned him with relatives throughout his youth (3 jurors); (6) that his mother had neglected and abused him because of her own upbringing and dependence on alcohol (10 jurors); (7) that throughout his childhood, he had been exposed to excessive amounts of domestic violence and substance abuse (10 jurors); (8) that he had suffered through multiple placements and periodically had attended 11 different schools (10 jurors); (9) that he had been denied consistent treatment throughout childhood despite identification of emotional and psychological problems (3 jurors); (10) that his background had increased significantly his risk of engaging in substance abuse and antisocial behavior (8 jurors); (11) that he had been allowed to abuse drugs and alcohol at an early age (6 jurors); (12) that he had begun acting out during his childhood because of unresolved and untreated emotional disturbances (6 jurors); (13) that during his childhood, he had been exposed periodically to an unstable father (6 jurors); (14) that he had been deprived of a stable nurturing home throughout his childhood (5 jurors); (15) that he had not been provided with recommended and necessary

therapy (4 jurors); and (16) that the sudden death of his mother had left him with unresolved grief issues that were not addressed through therapy (6 jurors).

[*Cooper, supra,* 151 *N.J.* at 346, 700 *A.*2d 306.]

The following two mitigating factors were unanimously rejected by the jury: (1) that defendant had been denied exposure to proper role models during his childhood; and (2) the "any other reasons not mentioned" factor.

The jury unanimously found that the two aggravating factors together outweighed the mitigating factors beyond a reasonable doubt. Accordingly, defendant was sentenced to death.

As noted above, this Court affirmed defendant's conviction for capital murder and his death sentence, and also affirmed his kidnapping conviction and sentence. We vacated his conviction for aggravated sexual assault, ordering that that conviction must merge with the kidnapping conviction. *Cooper, supra,* 151 *N.J.* at 406, 700 *A.*2d 306. This Court also ordered the Administrative Office of the Courts (AOC) to update its database to facilitate proportionality review in this case, as well as in *State v. Harvey,* and *State v. Chew.* On December 3, 1997, the AOC issued its revised statistical report (*CCH Report*) formed from a database that included all death-eligible defendants sentenced through July 31, 1997.

## II

### Proportionality Review

In our recent opinion in *State v. Loftin,* 157 *N.J.* 253, 266–77, 724 *A.*2d 129 (1999) (*Loftin II* ), we briefly summarized the history of proportionality review in the United States as well as in New Jersey. As noted in *Loftin II,* we trace our overview of the fundamental objectives of proportionality review back to this Court's seminal decision in *State v. Ramseur,* 106 *N.J.* 123, 524 *A.*2d 188 (1987):

Proportionality review has a function entirely unique among the review proceedings in a capital proceeding. Proportionality review, in the context of a capital sentencing scheme, is not appellate review to ensure that the aggravating factors

outweigh beyond a reasonable doubt all the mitigating factors, *L.* 1985, *c.* 178, or to determine if the death sentence is disproportionate to the crime in violation of the ban against cruel and unusual punishment. That death is not disproportionate in the sense of being a cruel and unusual punishment is presumed by the nature of the review. Rather, the·purpose of review here is "of a different sort.... It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime."

[*Id.* at 326, 524 *A.*2d 188 (quoting *Pulley v. Harris,* 465 *U.S.* 37, 43, 104 *S.Ct.* 871, 875, 79 *L.Ed.*2d at 29, 36 (1984)).]

Accordingly, the purpose of proportionality review is to determine whether a specific defendant's death sentence "is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *N.J.S.A.* 2C:11–3(e). In conducting proportionality review our principal inquiry is whether "the punishment fits the criminal," *State v. Marshall,* 130 *N.J.* 109, 129, 613 *A.*2d 1059 (1992) (*Marshall II* ), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L. Ed.*2d 694 (1993), and our objective is to "ensure that the death penalty is being administered in a rational, non-arbitrary, and evenhanded manner, fairly, and with reasonable consistency." *Id.* at 131, 613 *A.*2d 1059.

A collateral objective of proportionality review is to ensure that prosecutorial and jury decisions in capital causes are free from discrimination based on race, gender, socio-economic status or other impermissible factors. In *Ramseur, supra,* we observed:

Proportionality review further acts "as a check against the random and arbitrary imposition of the death penalty" by an aberrant jury. "[G]iven the emotions generated by capital crimes, it may well be that juries, trial judges, and appellate courts considering sentences of death [may be] affected by impermissible considerations." Discrimination on the basis of race, sex, or other suspect characteristic cannot be tolerated.... Proportionality review therefore is a means through which to monitor the imposition of death sentences and thereby to prevent any impermissible discrimination in imposing the death penalty.

[106 *N.J.* at 327, 524 *A.*2d 188 (citations omitted).]

In conducting proportionality review, we have relied substantially on the Final Report of our first Special Master, David C. Baldus, *Death Penalty Proportionality Review Project, Final Report to the New Jersey Supreme Court* (Sept. 24, 1991) (*Final Report* ). In *Marshall II, supra,* we explained the analytical

process underlying our selection of a pool of cases, out of the entire universe of death-eligible homicides, to be used as a basis of comparison with a specific death-sentenced defendant's case in determining whether that defendant's death sentence is disproportionate. 130 *N.J.* at 141–45, 613 *A.*2d 1059. We generally have adhered to the analytical framework set forth in *Marshall II* and in subsequent proportionality review decisions. *See, e.g., State v. Bey,* 137 *N.J.* 334, 343–65, 645 *A.*2d 685 (1994) (*Bey IV* ), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995); *State v. Martini,* 139 *N.J.* 3, 20–51, 651 *A.*2d 949 (1994) (*Martini II* ), *cert. denied,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995); *State v. DiFrisco,* 142 *N.J.* 148, 662 *A.*2d 442 (1995) (*DiFrisco III* ), *cert. denied,* 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996).

■ Our basic methodology for conducting proportionality review encompasses two distinct approaches: first, we use a frequency analysis that includes both mathematical and statistical calculations to compare defendant's case to other cases with similar fact patterns or similar levels of culpability in order to ascertain the rate of death sentencing in those similar cases; second, we engage in precedent-seeking review in which we compare all relevant factors in factually similar cases to determine whether defendant's death sentence appears to be disproportionate in comparison to the sentences imposed on other defendants who committed comparable homicides. In our prior proportionality review decisions we have found it appropriate to place greater reliance on precedent-seeking review than on frequency analysis, noting that the process of precedent-seeking review is one familiar to us as judges and is not vulnerable to the concerns about reliability that burden frequency analysis. *Loftin II, supra,* 157 *N.J.* at 277, 724 *A.*2d 129; *DiFrisco III, supra,* 142 *N.J.* at 184, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 46, 651 *A.*2d 949.

■ In its current formulation frequency analysis is a methodology that uses simple mathematical and complex statistical principles to determine the frequency with which defendants who

committed offenses similar to that committed by the subject defendant, or who possess a comparable level of blameworthiness to that defendant, are sentenced to death. Frequency analysis combines two different approaches, the salient-factors test and the index-of-outcomes test. Prior to *Loftin II, supra,* frequency analysis also included the numerical-preponderance-of-aggravating-and-mitigating-factors test, which compared a death-sentenced defendant's case to other death-eligible prosecutions having the same number of aggravating and mitigating factors. In *Loftin II,* the Court concluded that that test "has not contributed to the Court's proportionality reviews and, in light of its inherent flaws, cannot be expected to do so in the future." 157 *N.J.* at 295, 724 *A.2d* 129. Accordingly, the Court abandoned the numerical-preponderance-of-aggravating-and-mitigating-factors test. *Ibid.*

The salient-factors test uses the AOC's database in which the universe of death-eligible cases is subdivided into various categories and subcategories, ranked in descending order of blameworthiness, and derived from the statutory aggravating factors.[1] *Final Report* at 81–82. The AOC assigns each defendant to one of the thirteen major categories. Each of these categories includes two to seven subcategories that aggravate or

---

[1] The thirteen basic categories are:

(A) Multiple victims;
(B) Prior Murder Conviction without A above;
(C) Sexual Assault without A–B above;
(D) Victim a Public Servant without A–C above;
(E) Robbery without A–D above;
(F) Arson without A–E above;
(G) Burglary without A–E [sic] above;
(H) Kidnapping without A–G above;
(I) Pecuniary Motive without A–H above;
(J) Torture/aggravated assault without A–I above;
(K) Depravity of Mind without A–J above;
(L) Grave risk of death as primary statutory aggravating circumstance without A–K above;
(M) Escape Detection, etc., as sole factor without A–L above.
 [*DiFrisco III, supra,* 142 *N.J.* at 166–67 n. 2, 662 *A.2d* 442.]

mitigate the blameworthiness of defendants included in the primary category.

In applying the salient-factors test, we compare defendant's death sentence to the sentences imposed in factually similar cases within the same primary category in order to ascertain the frequency with which death sentences generally are imposed in such cases. A demonstration that the death sentence is regularly or frequently imposed suggests that there may exist a societal consensus that the death penalty is an appropriate punishment for that category of homicides. Although we consider the salient-factors test to be the most persuasive of the frequency tests, *DiFrisco III, supra,* 142 *N.J.* at 173, 662 *A.2d* 442; *Martini II, supra,* 139 *N.J.* at 33, 651 *A.2d* 949; *Bey IV, supra,* 137 *N.J.* at 353, 645 *A.2d* 685, we are aware that the small sample sizes of the comparison groups, a consequence of the Special Master's decision to create a relatively large number of comparison groups, limits the value and significance of the salient-factors test. *Loftin II, supra,* 157 *N.J.* at 293, 724 *A.2d* 129; *DiFrisco III, supra,* 142 *N.J.* at 174, 662 *A.2d* 442; *Martini II, supra,* 139 *N.J.* at 37–38, 651 *A.2d* 949.

The index-of-outcomes test attempts to compare the death-sentenced defendant's case to other cases involving defendants with comparable qualities of blameworthiness, taking into account both statutory and non-statutory factors. The blameworthiness of defendants is compared on the basis of "statistically-relevant measures of culpability found in the circumstances of their cases, such as the infliction of severe pain or suffering, the existence of a contemporaneous sexual assault or robbery, or the prior commission of murder." *Martini II, supra,* 139 *N.J.* at 42, 651 *A.2d* 949. The AOC prepares tables grouping cases in five levels of culpability based on statistically-predicted probabilities of a return of a death sentence. We then derive the actual probabilities of death sentences for cases in each culpability level, and apply that statistical data to assess the proportionality of the subject defendant's death sentence. However, the Court has

recognized that "the small sample size of cases with similar levels of blameworthiness and the great ranges in the confidence intervals preclude[ ] us from giving weight to these findings." *DiFrisco III, supra*, 142 *N.J.* at 182, 662 *A.*2d 442. Moreover, the AOC's memorandum to the Court accompanying the *CCH Report* cautions us that "the culpability estimate which purports to give a 'predicted probability of a death sentence' is often still too soft, and little substantive reliance should be given to this statistic in the *Chew, Cooper,* and *Harvey* cases." As noted in *Loftin II, supra*, "we are uncertain whether we will soon reach a sample size capable of supporting reliable results in these models." 157 *N.J.* at 296, 724 *A.*2d 129.

A. *The Universe of Cases*

In order to conduct proportionality review we must establish the universe of cases to which defendant's case will be compared. In 1992, the Legislature amended *N.J.S.A.* 2C:11–3e to restrict the comparative group to only those cases in which a jury had imposed a death sentence. *L.* 1992, *c.* 5, § 1. In previous proportionality review cases in which defendants' appeals from death sentences were pending prior to the Legislature's enactment, we declined to apply the amendment. See *State v. Harvey III,* 159 *N.J.* 277, 291, 731 *A.*2d 1121; *DiFrisco III, supra,* 142 *N.J.* at 162–63, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 23, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 343–44, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 119, 613 *A.*2d 1059. Instead, we applied the pre–1992 proportionality review provision of *N.J.S.A.* 2C:11–3e, pursuant to which we held that the appropriate universe included all cases in which a death penalty had been sought or imposed and also "clearly death eligible homicides in which the prosecutor elected not to seek the death penalty." *Marshall II, supra,* 130 *N.J.* at 137, 613 *A.*2d 1059.

However, in *Loftin II, supra,* we were confronted with a defendant who, as in this case, was convicted of capital murder after the effective date of the 1992 amendment. We addressed in

*Loftin II* the potential conflict between the 1992 amendment and this Court's constitutionally prescribed duty to define the appropriate scope of appellate review in capital causes. We explained that although the determination of the appropriate scope of appellate review in death penalty cases is "an unqualified and exclusive function of the judiciary," *Loftin II, supra,* 157 *N.J.* at 284, 724 *A.2d* 129, the exclusivity of the Court's power need not necessarily preclude an accommodation of the views of the Legislature. *Id.* at 284–87, 724 *A.2d* 129. We observed that the critical issue to be determined was whether the Legislature's limitation on the size of the universe for proportionality review would prevent effective appellate review of death penalty cases. Because we decided in *Loftin II* to refer various issues concerning proportionality review to Judge David Baime to make fact findings and recommendations to the Court by May 14, 1999, we deferred any decision concerning the application of the 1992 amendment until the Court received Judge Baime's report. In the interim, the Court has decided to continue to use the full universe of death-eligible cases in its conduct of proportionality review. *Id.* at 287, 724 *A.2d* 129.[2]

We also continue to adhere to our determinations in earlier proportionality review cases that death-sentenced cases reversed on appeal because of procedural, burden-of-proof, or *Gerald*-type errors should be included in the category of death-sentenced cases. (A *Gerald* error is one in which a death sentence followed a conviction of capital murder that, because of an imprecise jury charge, could have been based on a jury finding that the defendant purposely or knowingly caused serious bodily injury that resulted in death, instead of a finding that defendant purposely or knowingly caused death. *See State v. Gerald,* 113 *N.J.* 40,

---

[2] The Court has received Judge Baime's report. See the Honorable David S. Baime, *Report to the New Jersey Supreme Court: Proportionality Review Project* (April 28, 1999) (*Special Master Report* or *Report*). The Court has scheduled oral argument on the *Special Master Report* and subsequently will render a decision concerning whether and to what extent the recommendations in the *Report* will be implemented. Based on its review of the *Special Master Report,* the Court is satisfied that its contents do not warrant deferral of this opinion.

90, 549 *A*.2d 792 (1988)). We explained that such errors "affect the procedural fairness of the trial, not the substance of the crime, [and] 'do not necessarily bear on the jury's determination of deathworthiness.'" *Martini II, supra*, 139 *N.J.* at 26, 651 *A*.2d 949 (quoting *Bey IV, supra*, 137 *N.J.* at 347, 645 *A*.2d 685). For the reasons detailed in our earlier cases we continue to include those reversed death-sentenced cases as death-sentenced cases for purposes of proportionality review. See *Harvey III, supra*, 159 *N.J.* at 291–92, 731 *A*.2d 1121; *DiFrisco III, supra*, 142 *N.J.* at 164–65, 662 *A*.2d 442; *Martini II, supra*, 139 *N.J.* at 25–27, 651 *A*.2d 949; *Bey IV, supra*, 137 *N.J.* at 345–47, 645 *A*.2d 685; *Marshall II, supra*, 130 *N.J.* at 194 n. 10, 613 *A*.2d 1059.

 For purposes of frequency review, we present two sets of calculations of the rate of death sentencing, one calculation including the defendant, and the other excluding him. "Using two sets of data, one including defendant's case and one excluding it, will give us the broadest picture of societal standards while alerting us to the bias produced by including defendant's case." *DiFrisco III, supra*, 142 *N.J.* at 165, 662 *A*.2d 442 (quoting *Martini II, supra*, 139 *N.J.* at 28, 651 *A*.2d 949).

 The universe of cases, however, excludes the twenty-three cases that were not death-eligible but nevertheless proceeded to a penalty-phase hearing. *Marshall II, supra*, 130 *N.J.* at 138, 613 *A*.2d 1059; *CCH Report*, tbls. 2,3.

B. *Adjustments in Comparison Group*

The AOC has grouped the death-eligible defendants that comprise our proportionality-review database into various categories and subcategories, on the basis of the aggravating factors found by the jury in those cases tried to a penalty phase, or on the basis of the aggravating factors alleged or apparently present in cases not tried to a penalty phase. *See CCH Report*, tbl.7. The basic categories and subcategories are derived from the first Special Master's report adopted by the Court. *Final Report* at 80–84.

We previously have acknowledged that we will "defer generally to the AOC's expertise, and particularly to its unique assignment of defendants to only one comparison category." *DiFrisco III, supra,* 142 *N.J.* at 167, 662 *A.*2d 442.

■ The AOC has assigned defendant to subcategory C–1, which comprises murders committed in conjunction with sexual assaults characterized by particular violence and terror, but excludes homicides by prior murderers or those involving multiple victims. That subcategory includes forty defendants, a relatively large comparison group. Defendant contends that for purposes of the salient-factors evaluation, as well as for purposes of precedent-seeking review, the defendants in the C–2 subcategory (entitled "other with one or more additional statutory aggravating circumstances") are virtually indistinguishable from those in the C–1 category. We note that nine defendants are included in the C–2 subcategory, and an additional three defendants are included in the C–3 subcategory (entitled "other"), the last of the subclassifications in the composite "C" category of sexual assaults without multiple victims or prior murder convictions. We previously have performed the salient-factors test using both the assigned subcategory as well as the composite category, see *DiFrisco III, supra,* 142 *N.J.* at 174, 662 *A.*2d 442; *Bey IV, supra,* 137 *N.J.* at 353–58, 645 *A.*2d 685, and we will do so in this appeal. Concerning defendant's contention that the pool of comparison cases for purposes of precedent-seeking review also should be expanded, we address that question in the course of our discussion of precedent-seeking review. *Infra* at 92–94, 731 *A.*2d at 1021–22.

■ The State objects to the inclusion of four defendants in the subcategory to which defendant is assigned: James Koedatich 2, James Henry Hampton, James Zola 1B, and Kevin Jackson 1B. We agree with the State's contention that Koedatich and Hampton should be excluded. Although in its prosecution of Koedatich for murder and kidnapping the State alleged as aggravating factors that defendant murdered the victim in the course of a sexual assault, as well as to escape detection for sexual assault, the jury

found neither of those aggravating factors. Accordingly, that case should not have been assigned to the sexual assault-murder category. Similarly, defendant James Henry Hampton murdered his victim after she apprehended him in an attempt to burglarize a horse barn, but the State did not allege that he sexually assaulted the victim. His case also should be excluded from the sexual-assault murder category.

Concerning defendant Kevin Jackson, after this Court reversed his murder conviction and death sentence he was retried and convicted of murder, theft, and aggravated sexual assault, although the State alleged only the c(4)(c) (torture and depravity) aggravating factor. We are satisfied that the strong evidence that defendant attempted to sexually assault his victim warrants inclusion of his case in the sexual-assault murder category. Similarly, in the James Zola case there was conflicting evidence on whether defendant sexually assaulted the victim, but this Court affirmed Zola's conviction for capital murder and aggravated sexual assault. We will not disturb the AOC's assignment of Zola to the sexual-assault murder category.

## C. *Salient–Factors Test*

As noted, the salient-factors test attempts to measure the proportionality of a defendant's death sentence by determining the frequency with which factually similar cases culminate in a death sentence. We generally have regarded the salient-factors test as the most persuasive of the frequency-analysis tests because the cases compared are factually analogous to the case of the defendant seeking review. *Harvey III, supra,* 159 N.J. at 301, 731 A.2d 1121; *DiFrisco III, supra,* 142 N.J. at 173, 662 A.2d 442; *Martini II, supra,* 139 N.J. at 33, 651 A.2d 949; *Bey IV, supra,* 137 N.J. at 353, 645 A.2d 685; *Marshall II, supra,* 130 N.J. at 168, 613 A.2d 1059.

Defendant Cooper has been assigned to subcategory C–1, designated "sexual assault with particular violence/terror" (but exclud-

ing defendants who murdered multiple victims or who were previously convicted of murder). *CCH Report*, tbl. 7. Of the thirty-eight death eligible cases in that subcategory, nineteen proceeded to the penalty phase and eight defendants, including Cooper, were sentenced to death. Accordingly, including defendant, the death-sentencing rate for all sexual-assault murders that we include in the C–1 subcategory is twenty-one percent, and for those advancing to a penalty phase the rate is forty-two percent. Those percentages may be compared with the overall death-sentencing rate of twelve percent for all death-eligible cases in the universe, and the death-sentencing rate of thirty-one percent for all death-eligible cases that advance to the penalty phase. Repeating the same comparisons without including defendant's case in the C–1 category does not significantly affect the death sentencing rates. The following table summarizes the result of the salient-factors test as applied to the C–1 category:

### SALIENT–FACTORS TEST: C–1 SUBCATEGORY
#### (data from *CCH Report*, tbl. 7)

| | Death–Sentencing Rate at Penalty Trial | Death–Sentencing Rate for All Eligible Cases | Proportion of Cases Advancing to P–Trial |
|---|---|---|---|
| C–1 Incl. D | 42% ($8/19$) | 21% ($8/38$) | 50% ($19/38$) |
| C–1 Excl. D | 39% ($7/18$) | 19% ($7/37$) | 49% ($18/37$) |
| All Ds | 31% ($50/163$) | 12% ($50/401$) | 41% ($163/401$) |
| All Ds but D | 30% ($49/162$) | 12% ($49/400$) | 41% ($162/400$) |

Applying the salient-factors test to the composite "C" category results in the addition of twelve cases (nine cases from subcategory C–2 and three cases from subcategory C–3). The resulting death-sentencing rate at penalty-trial cases is thirty-eight percent and the death-sentencing rate for all death-eligible cases is eighteen percent, both percentages being slightly lower than the analogous death-sentencing rates for the C–1 category. The following table depicts the result of the salient-factors test as applied to category "C" death-penalty cases:

## SALIENT-FACTORS TEST: "C" CATEGORY
### (data from *CCH Report,* tbl. 7)

| | Death–Sentencing Rate at Penalty Trial | Death–Sentencing Rate for All Eligible Cases | Proportion of Cases Advancing to P–Trial |
|---|---|---|---|
| C Incl. D | 38% ($\frac{9}{24}$) | 18% ($\frac{9}{50}$) | 48% ($\frac{24}{50}$) |
| C Excl. D | 34% ($\frac{8}{23}$) | 16% ($\frac{8}{49}$) | 47% ($\frac{23}{49}$) |
| All Ds | 31 ($\frac{50}{163}$) | 12% ($\frac{50}{401}$) | 41 ($\frac{163}{401}$) |
| All Ds but D | 30 ($\frac{49}{162}$) | 12% ($\frac{49}{400}$) | 41 ($\frac{162}{400}$) |

The foregoing charts summarizing the application of the salient-factors test to defendants who sexually assault and murder their victims demonstrate that such defendants often are sentenced to death, and that their rate of death-sentencing significantly exceeds the death-sentencing rate for all death-eligible homicides, and also significantly exceeds the death-sentencing rate for all homicides that advance to a penalty trial. Moreover, we note that the result of the salient-factors test as applied to defendant is comparable to the results obtained from that test in other proportionality review cases in which we found no disproportionality. See *DiFrisco III, supra,* 142 *N.J.* at 172–74, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 33–38, 651 *A.*2d 949. We are unable to conclude that application of the salient-factors test to defendant Cooper demonstrates that his death sentence is disproportionate.

### D. *Index–of–Outcomes Test*

The index-of-outcomes approach attempts "to identify those characteristics that establish the degree of a defendant's blameworthiness," considering both statutory and non-statutory factors. *Martini II, supra,* 139 *N.J.* at 41, 651 *A.*2d 949. In applying this test we seek "to identify the characteristics common to the cases in terms of their degree of blameworthiness as perceived by prosecutors and juries." *Marshall II, supra,* 130 *N.J.* at 172, 613 *A.*2d 1059. To facilitate application of this test,

the AOC "organizes cases according to statistically-relevant measures of culpability, such as the infliction of severe physical pain or mental suffering on the victim, a contemporaneous sexual assault or robbery, and the commission of a prior murder." *Bey IV, supra*, 137 *N.J.* at 362, 645 *A.*2d 685. In contrast to the salient-factors test, "in the index-of-outcomes test we compare cases that are factually dissimilar but that are nevertheless comparable from the perspective of the defendants' blameworthiness." *Martini II, supra*, 139 *N.J.* at 42, 651 *A.*2d 949. Moreover, unlike the salient-factors test in which the AOC simply calculates and compares death-sentencing ratios, the index-of-outcomes test uses a multiple-regression analysis, a process we explained in *Martini II, supra*, 139 *N.J.* at 31–32, 651 *A.*2d 949:

> We pause here for a brief explanation of some technical terms. A regression analysis uses an algebraic model to represent a decision-making process by showing the influence of an independent variable on a dependent variable. Here, the decision-making process represented is the sentencing determination. The independent variable, which, once designated, does not change, represents a factor such as a prior murder or a contemporaneous sexual assault that is believed to influence the result of the decision-making. The dependent variable is influenced by the presence or absence of an independent variable, and here represents the decision whether to sentence capitally. A multiple regression analysis simply includes more than one independent variable in the algebraic model.
>
> Because the results produced by the regression models are of uncertain reliability, we use the predicted probability of death sentences that those models generate only for purposes of comparison and guidance. We do not accord them final or determinative weight.

On the basis of its multiple-regression analysis, the AOC has prepared tables that group defendants in five levels of culpability based on the predicted probability of the imposition of a death sentence. Each defendant receives a culpability score ranging from a low of .00 to a high of .99, and based on that score the defendants are assigned to one of the five culpability levels. Each level represents one-fifth of the range of culpability scores. Defendants with culpability scores that range between .00000 and .19999 comprise level one, those with scores between .20000 and .39999 form level two, and so forth.

■ Four multiple regressions encompass the index-of-outcomes test. See *DiFrisco III, supra,* 142 *N.J.* at 179–82, 662 *A.*2d 442. The first regression considers both statutory and non-statutory factors in the penalty-trial universe. *Id.* at 179–80, 662 *A.*2d 442. The second appraises the same factors but uses the full universe. *Id.* at 180–81, 662 *A.*2d 442. Statutory aggravating and mitigating factors are the only variables in the other regressions. *Id.* at 181–82, 662 *A.*2d 442. Like the first two regressions, the third and fourth regressions employ the penalty-trial universe and the full universe, respectively. *Ibid.*

Preliminarily, we take note of several deficiencies in the index-of-outcomes test. Perhaps the most troublesome deficiency is the inconsistency of the results of the four regressions. Defendant Cooper's culpability scores range from a ten percent predicted probability of a death sentence in the death-eligible universe considering both statutory and non-statutory factors to a forty-three percent predicted probability of a death sentence in the penalty-trial universe considering only statutory factors. We previously have taken note of the inconsistent results of the four regressions in other proportionality-review decisions. See *DiFrisco III, supra,* 142 *N.J.* at 182, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 45, 651 *A.*2d 949.

In addition, the large confidence intervals applicable to defendant's culpability scores substantially qualify the accuracy of the predicted probability that defendant would be sentenced to death. Accordingly, those culpability scores may not accurately reflect the likelihood that defendant would receive a death sentence. As we explained in *DiFrisco III, supra,* 142 *N.J.* at 179–80, 662 *A.*2d 442:

> The probability range, or more appropriately, the confidence interval, is delineated by upper and lower limits and is established by a ninety-five percent confidence interval. That means we are ninety-five percent certain that all defendants with characteristics similar to [defendant] will have a predicted probability of receiving a death sentence [within the probability range]; the smaller the confidence interval, the more reliable the predicted probability.

Thus, in the first regression that considers statutory and non-statutory factors for the penalty-trial universe, the reliability of defendant's thirty-five percent predicted probability of a death sentence is undermined by the large confidence interval range of nine percent to seventy-five percent. The range of the confidence intervals in the other regressions is significantly smaller.

A more fundamental flaw in the index-of-outcomes test is that the AOC's models do not take into account the fact that the victim of defendant's homicide was a six-year-old girl. None of the statutory aggravating factors focus on the age of a victim, and the non-statutory factors included in the AOC's models do not evaluate a defendant's blameworthiness on the basis of the victim's age. Accordingly, the value of the index-of-outcomes test in assessing the proportionality of defendant's death sentence is limited by the recognition that the test undoubtedly underestimates defendant's predicted probability of a death sentence.

The results of the index-of-outcomes test are reported on two charts. The first chart reports the results for defendant Cooper, and defendants Harvey, Chew, Loftin, DiFrisco, Martini, Bey, and Marshall under the *CCH Report* database. The results for all four regressions are reported for each defendant. For each regression, the table shows the culpability score, the confidence interval, the culpability level, and the death-sentencing rate that corresponds to the culpability level.

The second chart differs from the first chart in one respect: it does not use the same database for every defendant. Instead, in the second chart, the data reported for each defendant is the data this Court had used at each defendant's proportionality review. For example, the data used for Martini is derived from the *Martini Report.*

The index-of-outcome test results are as follows:

## INDEX–OF–OUTCOME TEST RESULTS CHART I
### (data from CCH Report, tbls. 13–14, 21–25

| | Statutory & Nonstatutory Factors | | Statutory Factors Only | |
|---|---|---|---|---|
| | Penalty Trial | Death–Eligible | Penalty Trial | Death–Eligible |
| **Cooper** | | | | |
| Predicted Probability of Death Sentence | .35 | .10 | .43 | .19 |
| Range | (.09 to .75) | (.03 to .30) | (.23 to .65) | (.08 to .38) |
| Culpability Level | 2 | 1 | 3 | 1 |
| Death–Sentencing Rate | .26 (6/23) | .05 (18/34) | .45 (13/29) | .05 (15/318) |
| **Harvey** | | | | |
| Predicted Probability of Death Sentence | .35 | .13 | .43 | .19 |
| Range | (.12 to .69) | (.05 to .32) | (.23 to .65) | (.08 to .38) |
| Culpability Level | 2 | 1 | 3 | 1 |
| Death–Sentencing Rate | .26 (6/23) | .05 (18/34) | .45 (13/29) | .05 (15/318) |
| **Chew** | | | | |
| Predicted Probability of Death Sentence | .67 | .19 | .90 | .47 |
| Range | (.22 to .94) | (.02 to .72) | (.51 to .99) | (.09 to .88) |
| Culpability Level | 4 | 1 | 5 | 3 |
| Death–Sentencing Rate | .75 (9/12) | .05 (18/34) | .76 (13/17) | .52 (9/17) |
| **Loftin** | | | | |
| Predicted Probability of Death Sentence | .21 | .44 | .72 | .53 |
| Range | (.01 to .92) | (.12 to .83) | (.26 to .95) | (.17 to .85) |
| Culpability Level | 2 | 3 | 4 | 3 |
| Death–Sentencing Rate | .26 (6/23) | .55 (6/11) | .63 (12/19) | .52 (9/17) |
| **DiFrisco** | | | | |
| Predicted Probability of Death Sentence | .68 | .19 | .46 | .19 |
| Range | (.24 to .93) | (.02 to .78) | (.08 to .89) | (.01 to .84) |
| Culpability Level | 4 | 1 | 3 | 1 |
| Death–Sentencing Rate | .75 (9/12) | .05 (18/34) | .45 (13/29) | .05 (15/318) |
| **Martini** | | | | |
| Predicted Probability of Death Sentence | .81 | .09 | .26 | .12 |
| Range | (.36 to .97) | (.02 to .32) | (.09 to .55) | (.04 to .31) |
| Culpability Level | 5 | 1 | 2 | 1 |
| Death–Sentencing Rate | .77 (23/30) | .05 (18/34) | .31 (10/32) | .05 (15/318) |
| **Bev** | | | | |
| Predicted Probability of Death Sentence | .65 | .38 | .74 | .40 |
| Range | (.22 to .93) | (.12 to .74) | (.40 to .92) | (.18 to .68) |
| Culpability Level | 4 | 2 | 4 | 3 |
| Death–Sentencing Rate | .75 (9/12) | .33 (10/30) | .63 (12/19) | .52 (9/17) |
| **Marshall** | | | | |
| Predicted Probability of Death Sentence | .68 | .19 | .46 | .19 |
| Range | (.15 to .95) | (.00 to .87) | (.12 to .94) | (.03 to .82) |
| Culpability Level | 4 | 1 | 3 | 2 |
| Death–Sentencing Rate | .75 (9/12) | .05 (18/34) | .45 (13/29) | .26 (12/45) |

# INDEX–OF–OUTCOME TEST RESULTS CHART II
## (data from CCH Report, tbls. 13–14, 21–25
## Loftin Report, tbls. 13–14, 21–25, DiFrisco
## III, Martini II, Bev IV, and Marshall II Report

| | Statutory & Nonstatutory Factors | | Statutory Factors Only | |
|---|---|---|---|---|
| | Penalty Trial | Death–Eligible | Penalty Trial | Death–Eligible |
| **Cooper (CCH Report)** | | | | |
| Predicted Probability of Death Sentence | .35 | .10 | .43 | .19 |
| Range | (.09 to .75) | (.03 to .30) | (.23 to .65) | (.08 to .38) |
| Culpability Level | 2 | 1 | 3 | 1 |
| Death–Sentencing Rate | .26 ($\frac{6}{23}$) | .05 ($\frac{18}{334}$) | .45 ($\frac{13}{29}$) | .05 ($\frac{16}{318}$) |
| **Harvey (CCH Report)** | | | | |
| Predicted Probability of Death Sentence | .35 | .13 | .43 | .19 |
| Range | (.12 to .69) | (.05 to .32) | (.23 to .65) | (.08 to .38) |
| Culpability Level | 2 | 1 | 3 | 1 |
| Death–Sentencing Rate | .26 ($\frac{6}{23}$) | .05 ($\frac{18}{334}$) | .45 ($\frac{13}{29}$) | .05 ($\frac{16}{318}$) |
| **Chew (CCH Report)** | | | | |
| Predicted Probability of Death Sentence | .67 | .19 | .90 | .47 |
| Range | (.22 to .94) | (.02 to .72) | (.51 to .99) | (.09 to .88) |
| Culpability Level | 4 | 1 | 5 | 3 |
| Death–Sentencing Rate | .75 ($\frac{9}{12}$) | .05 ($\frac{18}{334}$) | .76 ($\frac{13}{17}$) | .52 ($\frac{9}{17}$) |
| **Loftin (Loftin Report)** | | | | |
| Predicted Probability of Death Sentence | .14 | .38 | .66 | .46 |
| Range | (.00 to .94) | (.09 to .81) | (.21 to .93) | (.13 to .82) |
| Culpability Level | 1 | 2 | 4 | 3 |
| Death–Sentencing Rate | .07 ($\frac{3}{44}$) | .38 ($\frac{14}{37}$) | .70 ($\frac{14}{20}$) | .57 ($\frac{8}{14}$) |
| **DiFrisco (DiFrisco Report)** | | | | |
| Predicted Probability of Death Sentence | .74 | .11 | .43 | .23 |
| Range | (.29 to .95) | (.00 to .86) | (.09 to .87) | (.03 to .76) |
| Culpability Level | 4 | 1 | 3 | 2 |
| Death–Sentencing Rate | .57 ($\frac{4}{7}$) | .04 ($\frac{1}{260}$) | .61 ($\frac{11}{18}$) | .52 ($\frac{11}{21}$) |
| **Martini (Martini Report)** | | | | |
| Predicted Probability of Death Sentence | .88 | .05 | .15 | .08 |
| Range | (.25 to .99) | (.01 to .30) | (.03 to .51) | (.02 to .27) |
| Culpability Level | 5 | 1 | 1 | 1 |
| Death–Sentencing Rate | .88 ($\frac{23}{26}$) | .04 ($\frac{10}{248}$) | .05 ($\frac{3}{58}$) | .05 ($\frac{12}{249}$) |
| **Bev (Martini Report)** | | | | |
| Predicted Probability of Death Sentence | .81 | .47 | .62 | .33 |
| Range | (.35 to .97) | (.10 to .88) | (.16 to .94) | (.10 to .68) |
| Culpability Level | 5 | 3 | 4 | 2 |
| Death–Sentencing Rate | .75 ($\frac{9}{12}$) | .33 ($\frac{10}{30}$) | .63 ($\frac{12}{19}$) | .52 ($\frac{9}{17}$) |
| **Bev (Bev Report)** | | | | |
| Predicted Probability of Death Sentence | .76 | .51 | .67 | .25 |
| Range | (.13 to .99) | (.09 to .92) | (.14 to .96) | (.07 to .61) |
| Culpability Level | 4 | 3 | 4 | 2 |
| Death–Sentencing Rate | .43 ($\frac{3}{7}$) | .57 ($\frac{4}{7}$) | .83 ($\frac{10}{12}$) | .58 ($\frac{11}{19}$) |

| Marshall (Marshall Report) | | | | |
|---|---|---|---|---|
| Predicted Probability of Death Sentence | .50 | .17 | .52 | .27 |
| Range | (.04 to .96) | (.00 to .92) | (.10 to .92) | (.02 to .86) |
| Culpability Level | 3 | 1 | 3 | 2 |
| Death–Sentencing Rate | .67 ($\frac{8}{12}$) | .03 ($\frac{5}{178}$) | .71 ($\frac{12}{17}$) | .52 ($\frac{12}{23}$) |

In the regression that considers both statutory and non-statutory factors for cases in the penalty-trial universe, defendant's predicted probability of receiving a death sentence is thirty-five percent. *CCH Report*, tbl. 22. The confidence interval extends from nine percent to seventy-five percent. *Ibid.* In other words, we are ninety-five percent certain that a defendant with characteristics identical to defendant's would have an actual, rather than predicted, probability of receiving a death sentence of between nine percent and seventy-five percent. Defendant's culpability score of thirty-five percent places him in culpability level two. *Ibid.* Defendants in that culpability level have received a death sentence twenty-six percent ($\frac{6}{23}$) of the time. *CCH Report*, tbl. 21.

Although most defendants whose cases were not found to be disproportionate have had higher scores on this regression than defendant, *see DiFrisco III, supra*, 142 *N.J.* at 180, 662 *A.*2d 442 (reporting seventy-four percent predicted probability of death sentence); *Martini II, supra*, 139 *N.J.* at 43, 651 *A.*2d 949 (reporting eighty-eight percent predicted probability); *Bey IV, supra*, 137 *N.J.* at 362–63, 645 *A.*2d 685 (reporting eighty-one percent predicted probability in *Martini Report* and seventy-six percent predicted probability in *Bey Report*); *Marshall II, supra*, 130 *N.J.* at 173, 613 *A.*2d 1059 (reporting fifty percent predicted probability), defendant's culpability score exceeds Loftin's, *see Loftin II, supra*, 157 *N.J.* at 331, 724 *A.*2d 129 (reporting fourteen percent predicted probability in *Loftin Report* and twenty-one percent predicted probability in *CCH Report*), and equals Harvey's score, *see Harvey III, supra*, 159 *N.J.* at 304, 731 *A.*2d 1121 (reporting thirty-five percent predicted probability).

When the same variables are considered in the full universe, defendant's culpability score falls to ten percent, and the confi-

dence interval ranges from three percent to thirty percent. *CCH Report*, tbl. 14. Accordingly, defendant's case occupies culpability level one, at which only five percent ($\frac{18}{334}$) of the defendants have been sentenced to death. *CCH Report*, tbl. 13. That result reveals a low probability of death. The five percent rate at which those in defendant's culpability level receive death sentences is less than half the overall death-sentencing rate.

However, this Court has found not disproportionate Martini's death sentence although his culpability score in the same regression was lower than defendant's. *See Martini II, supra*, 139 *N.J.* at 43, 651 *A.*2d 949 (reporting five percent predicted probability). Moreover, this Court upheld the death sentences of two other defendants who had culpability scores that were very similar to defendant's. *See Harvey III, supra*, 159 *N.J.* at 305, 731 *A.*2d 1121 (reporting thirteen percent predicted probability of death sentence); *DiFrisco III, supra*, 142 *N.J.* at 180–81, 662 *A.*2d 442 (reporting eleven percent predicted probability). That one component of a frequency-analysis test suggests that there may be disproportionality does not establish that a death sentence is disproportionate. *DiFrisco III, supra*, 142 *N.J.* at 182–83, 662 *A.*2d 442 ("Though defendant's predicted probability of death sentence was low under some of the scenarios, they do not evidence disproportionality or any aberration in [his] case."). Hence, the second regression of the index-of-outcomes test does not establish that defendant's death sentence is disproportionate. Nonetheless, the low predicted value requires this Court to scrutinize carefully defendant's sentence in our precedent-seeking review.

The third regression of the index-of-outcomes test uses only statutory aggravating and mitigating factors. Moreover, that regression is run with data from the penalty-trial universe. In that regression, the predicted probability of defendant's death sentence is forty-three percent. *CCH Report*, tbl. 24. Defendant's confidence interval ranges from twenty-three to sixty-five percent. *Ibid.* In this regression, defendant falls into culpability level three, at which defendants are given a capital sentence at a forty-five percent ($\frac{13}{29}$) rate. *CCH Report*, tbls. 23–24. Defen-

dant's forty-three percent culpability score does not show disproportionality. This Court has already upheld the death sentences of two defendants with the same score. *See Harvey III, supra,* 159 *N.J.* at 307, 731 *A.*2d 1121 (reporting forty-three percent predicted probability of death sentence); *DiFrisco III, supra,* 142 *N.J.* at 181, 662 *A.*2d 442 (same). The Court found Martini's sentence not disproportionate despite his fifteen percent culpability score. *Martini II, supra,* 139 *N.J.* at 44, 651 *A.*2d 949.

When a regression is run with data from the death-eligible universe and the same variables as in the prior regression, defendant's predicted probability of death is nineteen percent. *CCH Report,* tbl. 25. The confidence interval ranges from eight percent to thirty-eight percent. *Ibid.* Defendant is in culpability level one. *Ibid.* Defendants are sentenced to death five percent ($^{15}\!/_{318}$) of the time at this culpability level. *CCH Report,* tbl. 23. Defendant's culpability score for this regression mirrors Harvey's, *see Harvey III, supra,* 159 *N.J.* at 306, 731 *A.*2d 1121 (reporting nineteen percent predicted probability of death sentence), and exceeds Martini's, *see Martini II, supra,* 139 *N.J.* at 44, 651 *A.*2d 949 (reporting eight percent predicted probability). Moreover, defendant, because his culpability score is nineteen percent, narrowly evades culpability level 2, at which twenty-six percent ($^{12}\!/_{45}$) of defendants are sentenced to die. *CCH Report,* tbl. 23. Consequently, despite defendant's low culpability score, this regression does not support a finding that defendant's death sentence is disproportionate.

 As indicated, our discussion of the results of the four regressions reflects our conclusion that the index-of-outcomes test does not demonstrate that defendant's death sentence is disproportionate. Although defendant's relatively low culpability scores in two of the regressions are troublesome, the wide variations in defendant's culpability scores, the large confidence intervals, and the AOC models' inability to take into account the age of Cooper's victim significantly diminish the value of the index-of-outcomes test results as applied to defendant.

We conclude that the two enduring frequency-review tests—the salient-factors test and the index-of-outcomes test—do not demonstrate that defendant's death sentence is disproportionate. However, the defendant's relatively low culpability scores in two regressions of the index-of-outcomes test, and that test's diminished reliability, require that we give enhanced weight to the process of precedent-seeking review. *See Loftin II, supra,* 157 *N.J.* at 334, 724 *A.*2d 129 (questioning frequency review and reaffirming primacy of precedent-seeking review).

## III

### Precedent–Seeking Review

We characterize the second component of proportionality review as the precedent-seeking approach, in which we attempt to determine whether defendant's death sentence is excessive by comparing defendant's case with similar cases of other life-sentenced and death-sentenced defendants. *DiFrisco III, supra,* 142 *N.J.* at 184, 662 *A.*2d 442. The precedent-seeking process engages the Court in a "traditional case-by-case review in which we compare similar death-eligible cases, considering the cases individually." *Id.* at 183, 662 *A.*2d 442; *Bey IV, supra,* 137 *N.J.* at 366, 645 *A.*2d 685. Although we would not necessarily expect identical sentences to be imposed even in substantially similar cases, our review seeks to ensure that the defendant has not been "singled out unfairly for capital punishment." *Martini II, supra,* 139 *N.J.* at 47, 651 *A.*2d 949. In prior proportionality-review cases, we consistently have accorded greater significance to precedent-seeking review than to frequency review. *Id.* at 28–29, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 350, 645 *A.*2d 685.

### A. *Analysis of Defendant's Culpability*

In comparing defendant's case to similar cases involving other death-eligible defendants, we begin with an evaluation of defendant's own culpability, focusing on three elements: (1) defendant's moral blameworthiness; (2) the extent of victimization; and

(3) defendant's character. *Loftin II, supra,* 157 *N.J.* at 336, 724 *A.*2d 129; *Harvey III, supra,* 159 *N.J.* at 309, 731 *A.*2d 1121; *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059. In performing that evaluation, we consider objective criteria that were presented to the penalty-phase jury, *id.* at 156, 613 *A.*2d 1059, "as well as all statutory and nonstatutory aggravating and mitigating factors that are 'rooted in traditional sentencing guidelines, were clearly presented to the sentencing jury, and are likely to influence a jury's sentencing decision.'" *Loftin II, supra,* 157 *N.J.* at 336, 724 *A.*2d 129 (quoting *Bey IV, supra,* 137 *N.J.* at 368, 645 *A.*2d 685).

### 1. Blameworthiness

In evaluating defendant's moral blameworthiness, "we examine such characteristics as motive, premeditation, justification or excuse, evidence of mental defect or disturbance, knowledge of helplessness of the victim, defendant's age or maturity level, and defendant's involvement in planning the murder." *Loftin II, supra,* 157 *N.J.* at 336, 724 *A.*2d 129. Those factors demonstrate defendant's substantial moral blameworthiness.

The jury found that defendant murdered the victim to escape detection for sexually assaulting her, a motive relatively common for defendants whose homicides occur in conjunction with the commission of a felony.

Defendant's murder was not significantly premeditated. At the earliest, he may have first decided to commit the homicide when he observed the victim playing in M.W.'s yard. At the latest, he may have decided to murder the victim after the sexual assault. In either event, the premeditation was minimal, involving no more than a matter of several minutes.

The record reflects some evidence of excuse or justification. Although defendant drank an unknown quantity of beer on the day of the homicide, its effect on defendant's behavior is undetermined. Defendant did not allege intoxication as a mitigating factor at the penalty phase, nor did defense counsel contend at

either the guilt or penalty phase that the effect of his alcohol consumption excused or mitigated the crimes.

At the penalty phase, defendant presented extensive and compelling evidence of a devastating childhood characterized by sustained abuse and neglect by his parents and other caregivers. Findings of numerous mitigating factors by some jurors in the penalty phase verified that the childhood neglect and deprivation experienced by defendant resulted in emotional and psychological problems during his childhood that were untreated and unresolved. *Cooper, supra,* 151 *N.J.* at 345–46, 700 *A.2d* 306. However, defendant presented no evidence in the penalty phase indicating that he suffered from a mental disease or defect at the time of the homicide, nor did he rely on the c(5)(a) (extreme emotional disturbance) or c(5)(d) (diminished capacity) mitigating factors.

Among the most aggravating aspects of defendant's crimes was his knowledge of the six-year-old victim's helplessness. Obviously well aware of her vulnerability, defendant promised her ice cream to lure her to the place where he lived. He then sexually assaulted and strangled her, knowing that she was incapable of resisting his attacks.

That defendant was only twenty-two years old at the time of the homicide diminishes his blameworthiness to some extent. Because defendant did not rely on his age as a mitigating factor at the penalty phase, the jury made no such finding.

Defendant was solely responsible for planning the crimes. The fact that the crime scene contained substantial evidence of defendant's identity and responsibility for the murder demonstrated that defendant did not engage in substantial planning prior to commission of the sexual assault and homicide.

In sum, defendant's moral blameworthiness is quite substantial. Although there was limited premeditation, the extreme vulnerability of the victim and the absence of proof of a mental disease or defect are primary factors that support a finding of high moral blameworthiness.

### 2. Degree of Victimization

The extent of victimization in defendant's case is extremely high. Defendant kidnapped, raped, and strangled his six-year-old victim. The record indicates that there was neither torture, aggravated battery nor mutilation of the victim. The incident was relatively brief, but there was evidence that defendant choked the victim for four to six minutes. Although her suffering was not prolonged, the victim undoubtedly was terrified and obviously suffered physically and emotionally before her death.

### 3. Character of Defendant

In evaluating defendant's character, we consider his prior record, previous unrelated acts of violence, cooperation with authorities, remorse, and capacity for rehabilitation. *Bey IV, supra*, 137 *N.J.* at 366, 645 *A.2d* 685. Defendant's prior record consists of a drug distribution conviction, for which he was imprisoned, and a disorderly persons offense. He was on parole for the drug distribution offense at the time of the homicide. He engaged in no other unrelated acts of violence. Defendant initially denied responsibility for the crimes but ultimately confessed to raping and killing the victim, although he contended that the homicide was unintentional. He also assisted police officers in locating evidence material to the crimes. Although defendant told police officers that he was sorry for murdering the victim, he did not express remorse over the homicide during his trial. His rehabilitation potential is unknown. As a whole, the available facts concerning defendant's character neither enhance nor diminish his culpability.

We conclude that defendant's culpability is quite substantial. The degree of victimization was extreme, and his moral blameworthiness is very high.

### B. *Defendant's Comparison Group*

The beginning point of the comparative-culpability analysis is the comparison group used in the salient-factor test. *Martini II, supra*, 139 *N.J.* at 51, 651 *A.2d* 949; *Bey IV, supra*, 137 *N.J.*

at 369, 645 *A*.2d 685. As noted, the AOC placed defendant in the C–1 subcategory, consisting of sexual-assault murders accompanied by particular violence or terror. We previously have discussed our determination to exclude two cases from the C–1 subcategory, *supra* at 74–75, 731 *A*.2d at 1010–11. Excluding those two cases and defendant's case, there are thirty-seven cases in the C–1 subcategory to be compared with defendant's case. Of those cases, eighteen involved a penalty trial.

Defendant contends that for purposes of comparative culpability the nine cases in the C–2 subcategory (entitled "other with one or more additional statutory aggravating circumstances") are virtually indistinguishable from those in the C–1 subcategory. Defendant does not advance the same argument concerning the three cases in the C–3 subcategory (entitled "other"). Defendant's specific position concerning the cases to be included in his comparison group is uncertain because defendant's brief to this Court specifically discusses only six cases in the C–1 subcategory, two cases in the C–2 subcategory, no cases in the C–3 subcategory, and four cases from other categories. In performing the salient-factors test for purposes of defendant's appeal we used the cases in the assigned C–1 subcategory and also used the cases in the composite C category that included twelve additional sexual assault homicides. To ensure that our precedent-seeking review is complementary to our salient-factor test results, see *DiFrisco III, supra,* 142 *N.J.* at 185, 662 *A*.2d 442; *Bey IV, supra,* 137 *N.J.* at 366–67, 645 *A*.2d 685, we will include the cases in the composite C category in performing the comparative-culpability analysis. In the interest of completeness, we also will consider the two cases defendant relies on from other categories.

Preliminarily, we acknowledge that the process of conducting precedent-seeking review is inherently subjective and does not lend itself to any analysis based on prescribed standards or factors. In comparing homicides from the standpoint of a defendant's blameworthiness or the extent of victimization, there obvi-

ously will be ample room for disagreement over which defendant was more culpable and which homicide was more violent and horrific. Similarly, disagreement is inevitable concerning our effort to distinguish defendants on the basis of their characters and backgrounds. The virtue of precedent-seeking review is that it impels the Court to examine, evaluate, and compare homicides committed by defendants whose crimes were similar to the homicide committed by the defendant whose death sentence is under review, analyze the resulting sentences, and determine whether, in that unique context, the defendant's death sentence is aberrational. The fallibility of the process is that it depends almost exclusively on imprecise, subjective reactions by the Court to the comparison cases. Despite its flaws, we remain convinced that the process is an indispensable component of proportionality review and that, properly applied, it can assist the Court in identifying and isolating disproportionate sentences of death.

## C. *C–1 Cases That Proceeded to Penalty Trial*

The comparison cases are described in the Appendix to this opinion. We begin by comparing defendant's case with eighteen cases in the C–1 subcategory that proceeded to a penalty trial. Of those cases, penalty trials culminated in death sentences for six defendants: Kevin Jackson 1A, Jesse Timmendequas, Joseph Harris, James Williams 1A, James Zola 1A, and Marko Bey 2A. Accordingly, no issue of disproportionality is presented by those defendants.

The life sentences imposed on defendants Bruce Cunningham, Keith Dickerson, Kevin Jackson 1B, Christopher Thomas, Richard Chippero, Craig Blackmon, Scott Johnson, Michael Prater, and Benjamin Lodato appear to be reconcilable with defendant's death sentence primarily on the basis of mitigating evidence accepted by the jury tending to show mental or emotional disturbance, diminished capacity or a connection between the homicide and a defendant's history of substance abuse. Moreover, none of those

defendants murdered child victims or victims as vulnerable as defendant's victim.

Bruce Cunningham raped and murdered a woman he had met on a bus. He had a history of drug and alcohol abuse and drank heavily on the day of the homicide. He had been diagnosed with a paranoid personality disorder. The jury found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) mitigating factors.

Keith Dickerson, a twenty-year-old drug abuser, was high on cocaine when he sexually assaulted, robbed, and murdered a fifty-six-year-old neighbor. Expert testimony verified that he experienced paranoia and hallucinations when abusing cocaine. The jury found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), and c(5)(d) (diminished capacity) mitigating factors.

Kevin Jackson 1B pled guilty to capital murder during his first trial and was sentenced to death, but this Court reversed his conviction because his plea did not establish that he purposely or knowingly caused the victim's death. This twenty-five-year-old defendant entered a neighbor's home, attempted unsuccessfully to rape her, and then murdered her, inflicting fifty-three stab wounds in the process. During his second trial, penalty-phase witnesses testified that he had an emotionally impoverished background and a substance abuse problem and that he had been diagnosed with an attention deficit/hyperactivity disorder and a personality disorder that caused him to confuse reality with fantasy. The two daughters of his deceased fiancée offered highly favorable testimony about his compassion for their mother and the positive caretaker role he had assumed for them. The jury, after convicting him of capital murder, found the c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors.

Christopher Thomas, a thirty-one-year-old defendant who attempted to sexually assault and then murdered a woman in her tailor shop, had a long history of drug and·alcohol abuse. He was admitted to Trenton Psychiatric Hospital after an attempted suicide in 1990 and was diagnosed as a paranoid schizophrenic.

Thomas waived a jury trial, and the trial court convicted him of capital murder. After finding the c(5)(a) (extreme emotional disturbance) and c(5)(d) (diminished capacity) mitigating factors, the court sentenced Thomas to life plus thirty years' imprisonment with forty-five years' parole ineligibility.

Richard Chippero, a twenty-three-year-old defendant, raped and murdered his victim twenty-five days after being paroled from a prison sentence for other serious offenses. After graduating from a school for emotionally disturbed students, Chippero was admitted to psychiatric hospitals on four occasions for bizarre behavior and was diagnosed with a bi-polar affective disorder and manic behavior. The jury found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) mitigating factors.

Craig Blackmon, a twenty-two-year-old defendant, raped, severely beat, stabbed, and murdered his twenty-three-year-old victim after ingesting an unknown quantity of PCP. His post-homicide behavior was bizarre. He was apprehended by a neighbor of the victim when, completely unclothed, defendant tried to break into a parked car; he behaved violently at police headquarters and occasionally spoke with a foreign accent. Experts at trial differed about the extent to which the ingestion of PCP affected defendant's behavior. The jury found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history), and c(5)(h) (catch-all) mitigating factors.

Michael Prater, a twenty-nine-year-old defendant, and a co-defendant raped and murdered a drug-addicted prostitute. While the co-defendant strangled the victim Prater stabbed her several times, and both men then smothered her with a pillow. Defendant, a drug and alcohol abuser, was diagnosed with an attention deficit disorder and limited intelligence. The jury found the c(5)(h) (catch-all) mitigating factor.

Scott Johnson kidnapped the victim and her three-year-old daughter. After releasing the child unharmed and unattended on

the premises of a closed day care center, defendant raped, robbed, and murdered the victim, stabbing her more than thirty times and leaving her body in a drainage ditch. Defendant had a history of drug abuse and had consumed an unknown quantity of heroin and cocaine on the day of the murder. Defendant was diagnosed with a developmental disorder, a borderline I.Q., and organic brain damage. Defendant expressed remorse at trial, and his daughter testified about her love for defendant. The jury found the c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) mitigating factors.

Benjamin Lodato, a thirty-three-year-old defendant with a prior history of institutionalization and violent behavior, raped and murdered his thirty-eight-year-old victim. Defendant had been institutionalized or imprisoned for most of his life since the age of thirteen. He had been diagnosed with organic brain damage and dementia, and was described as functioning on the intellectual level of an eight- or nine-year-old child. The jury found the c(5)(a) (extreme emotional disturbance) and c(5)(d) (diminished capacity) mitigating factors. Although the jury found the aggravating and mitigating factors to be in equipoise, the trial court erroneously imposed a death sentence. This Court reversed and remanded for resentencing to life imprisonment.

The reconciliation with defendant's death sentence of the life sentences of defendants Charles Darrian, John Seymour Reese, and Rafael Rivera, is somewhat more difficult. Neither Darrian, Reese, nor Rivera had significant histories of emotional disturbance or mental disease. Darrian, twenty or twenty-two years old (the AOC's summary uses both ages), raped and murdered his eighteen-year-old girlfriend who wanted to date other men and refused to engage in sexual relations with defendant. Based on evidence of his jealous nature and immaturity, the jury found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(f) (no significant criminal history), and c(5)(h) (catch-all) mitigating factors. In addition, his victim was less vulnerable than defendant's victim.

John Seymour Reese, a thirty-three-year-old defendant, had a history of alcohol abuse and was known to be violent toward women when he was intoxicated. After an evening's drinking, defendant raped and murdered a neighbor, striking her seventeen times with a claw hammer. At his penalty trial a prison official testified that he was a model inmate who kept other inmates in line. The jury found the c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors. Reese's history of violence when drunk and the fact that his victim was less vulnerable than defendant's victim are factors that arguably may account for the difference in their sentences.

Rafael Rivera raped, attempted to rob, and murdered a seventy-eight-year-old widow who was his next-door neighbor and frequently cared for his three children. The victim had neck and facial bruises, two fractured ribs, and vaginal tears and bruises. Defendant, who was seen drunk on the day of the murder, had a long history of alcohol and drug abuse. The jury found the c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors. Except for the age of defendant's victim, reconciliation of defendant's death sentence with Rivera's life sentence is difficult.

We find no significant evidence of disproportionality on the basis of the comparison of defendant and the subcategory C–1 defendants whose cases proceeded to a penalty trial.

### D. C–1 Cases That Did Not Proceed to Penalty Trial

We next compare defendant's case with nineteen cases in the C–1 subcategory. Of those, sixteen never proceeded to penalty trials. Two cases, James Williams 1B and James Edward Zola 1B, initially were tried to a penalty-phase jury that imposed the death penalty. This Court reversed Williams's convictions and his death sentence and also reversed Zola's death sentence. On remand, life sentences with thirty years' parole ineligibility were imposed on both defendants after they pled guilty to felony murder and murder, respectively. Alphonso Timpson pled guilty to capital murder, aggravated sexual assault, and kidnapping, but

his plea was conditioned on the trial court sentencing him to life imprisonment after a non-jury penalty hearing. The court sentenced Timpson to life plus fifty years' imprisonment with fifty-five years' parole ineligibility.

The difficulty inherent in the process of precedent-seeking review is exacerbated when the Court attempts to compare defendant's case to the cases of other defendants whose ultimate sentences were imposed as a result of a guilty plea or a conviction following a non-penalty phase trial. In some cases, the AOC's summary is sufficiently detailed to permit the Court to deduce by inference what considerations may have persuaded the prosecutor to forego a penalty trial. In other cases, the reasons why the prosecutor elected to forego a capital prosecution are less apparent. The lack of a contemporaneous and reliable summary by the prosecutors of the various factors that were considered in arriving at the decision to forego capital prosecution diminishes the effectiveness and reliability of our precedent-seeking review. We anticipate that the Special Master appointed by the Court in *Loftin II, supra*, 157 *N.J.* at 287–91, 724 *A.*2d 129, will address that concern.

In six of the comparison cases the basis for the decision to forego capital prosecution is readily inferable from the AOC's summary. Michael Relford was convicted of the murder and attempted aggravated sexual assault of a forty-four-year-old neighbor and friend of his grandmother. On a prior occasion two years earlier defendant had attempted to sexually assault the victim but she elected not to press charges because of her relationship with defendant's grandmother. The victim was stabbed twenty-five times. Factors that may have affected the decision to forego capital prosecution include the defendant's history of drug and alcohol abuse, his consumption of alcohol, heroin, and cocaine on the day of the murder, and the ambiguous evidence concerning the nature and extent of defendant's prior relationship with the victim.

Morey Marcus murdered a thirty-two-year-old victim he met at a neighborhood bar. After drinking together, defendant and the victim proceeded to a second bar; when that bar closed, they left together in defendant's van. Early the next morning the victim was found, stabbed eleven times and left unclothed. Defendant, an honorably discharged Vietnam War veteran who had been hospitalized for post-traumatic stress disorder, was convicted by a jury of murder, felony murder, and attempted aggravated sexual assault. He was sentenced to life plus ten years' imprisonment with thirty years' parole ineligibility. Factors that may have contributed to the non-capital prosecution decision include the fact that the origin of defendant's relationship with the victim was consensual, defendant's exemplary military record, and the absence of proof that the sexual assault was consummated.

Defendant Sharob Clowney was convicted of murder, felony murder, aggravated sexual assault, two counts of attempted murder, and various possessory offenses. His aggregate sentence was life plus twenty years with forty years' parole ineligibility. Defendant sexually assaulted and inflicted multiple stab wounds on his twenty-eight-year-old victim and also stabbed her five- and nine-year-old sons, both of whom survived the attack. Clowney claimed that the victim frequently purchased drugs from him. Defendant's history of emotional disturbance was evidenced by three suicide attempts at ages twelve, eighteen, and nineteen, as well as a suicide attempt in prison after his arrest for this homicide. His school records reflected low I.Q. scores and a diagnosis of emotional disturbance. Defendant's history of emotional instability and the evidence suggesting that the victim may have purchased drugs from defendant were factors likely to affect the prosecutor's decision to forego a capital prosecution.

Alphonso Timpson was permitted to plead guilty to capital murder, aggravated sexual assault, and kidnapping; the plea was conditioned on the trial court's imposition of a life sentence after a non-jury penalty-phase hearing. His sentence was life plus fifty years' imprisonment with fifty-five years' parole ineligibility. His

victim, a twelve-year-old girl, was severely and viciously beaten, sexually assaulted, and murdered by suffocation in January 1984. Defendant ultimately confessed to the crimes. Timpson was diagnosed as borderline mentally retarded with severe developmental disabilities, and although nineteen years of age when he committed the murder, he was characterized as possessing the mental development of a twelve-year-old. As a juvenile offender, Timpson had been sentenced in November 1982 to an indeterminate term at Jamesburg for a similar attack on a school girl. Both defendant and his mother requested that he remain institutionalized because of his inability to control his assaultive tendencies, but defendant was paroled in August 1983, five months prior to the homicide. Despite the aggravated circumstances of the assault on defendant's victim, defendant's prolonged history of emotional disturbance and retarded development undoubtedly influenced the prosecutor's decision to proceed non-capitally.

Frederick Ritchie pled guilty to aggravated manslaughter, kidnapping, two counts of aggravated sexual assault, and hindering apprehension; he received an aggregate sentence of life plus thirty years with thirty-seven years' parole ineligibility. Defendant's victim, who was a twelve-year-old boy, was enticed into defendant's trailer, induced to consume a substantial quantity of alcoholic beverages, and sexually assaulted by defendant. Defendant maintained that the victim injured himself when he staggered into a washing machine and later fell backwards after striking his head on a tree. The victim was found facedown and unclothed in a creek, having died from drowning and head injuries. The absence of direct evidence that the homicide was purposeful or knowing was a factor that probably influenced the prosecutor's decision to forego capital prosecution.

Samuel Mincey beat, raped and strangled a seventy-three-year-old woman in November 1982. He also stole two oriental dolls and a television set. In November 1988, six years later, police recovered one of the oriental dolls while investigating a burglary. The victim of the burglary told police that defendant had given

her the doll in 1982. An investigation implicated defendant in the 1982 assault and homicide, and a jury convicted him of murder and felony murder. The AOC's summary surmises that the prosecutor may have concluded that the statute of limitations barred reliance on any aggravating factor that could have provided a basis for a capital prosecution.

Factors present in a number of other cases in this group may explain the decisions to prosecute non-capitally, but the decisive factors are less apparent and more speculative than in the preceding cases. As presently compiled, the AOC summaries do not include the specific reasons for the prosecutor's decision to forego capital prosecution, nor do the summaries refer to the factors that may have contributed to that decision. More specific information on why a death-eligible homicide was not prosecuted capitally would enhance the Court's ability to conduct precedent-seeking review. Under the circumstances, we must base our comparison on the information presently available.

Lester Allen Wilson resided in the same hotel as the fourteen-year-old victim and her sister, often spending time with them in their room. The victim's sister apparently had rebuffed Wilson's sexual advances. Wilson strangled and sexually assaulted the victim who was found with a pillow over her face. Defendant, who had no prior convictions and who was mildly retarded, unsuccessfully attempted to escape from police custody by jumping through a bathroom window at police headquarters. A jury convicted defendant of murder and aggravated sexual assault, and defendant was sentenced to life imprisonment with thirty years' parole ineligibility. Other than defendant's mental retardation, no apparent circumstances concerning this homicide and aggravated sexual assault explain the determination to forego capital prosecution of Wilson.

Isaac Fullard was convicted of murder, felony murder, attempted aggravated sexual assault, and possession of a weapon for an unlawful purpose; he was acquitted of burglary. The victim was the best friend of defendant's sister. Defendant, who was sen-

tenced to seventy years' imprisonment with thirty years' parole ineligibility, maintained that he and the victim were attacked by two men who broke into the apartment. Defendant's version of the crime was supported by a witness who came forward after defendant's trial. Defendant had a history of narcotics abuse but displayed no symptoms of mental health problems. The lack of incriminating forensic evidence and defendant's insistence that other persons committed the murder may have contributed to the decision to prosecute Fullard non-capitally.

In retaliation for his girlfriend's involvement with another man, Leroy Taylor, in November 1986, entered her apartment and sexually assaulted and strangled his girlfriend's thirteen-year-old niece. Taylor fled to California and was arrested there in 1987. Because Taylor previously had been convicted as a juvenile of murdering a four-year-old girl, he was charged after his arrest with violating parole and sentenced to an indeterminate term. Taylor was charged in New Jersey with murder, felony murder, aggravated sexual assault, hindering prosecution, and witness tampering. His guilty plea to felony murder, first-degree aggravated sexual assault, and witness tampering was accepted by the trial court and Taylor was sentenced to life imprisonment with thirty years' parole ineligibility. The prosecutor's decision to accept Taylor's guilty plea could have been influenced by uncertainty over whether Taylor's prior murder conviction as a juvenile could constitute an aggravating factor in a murder prosecution.

Robert Bolinger, a thirty-six-year-old Vietnam War veteran with a history of drug and alcohol abuse, burglarized the apartment of his twenty-three-year-old victim. When the victim returned home, defendant attempted to leave. Once observed, however, he sexually assaulted and stabbed the victim, removed money from her wallet, and escaped through the window. After being apprehended for another sexual assault, defendant confessed to the homicide, stating that he murdered the victim because she resembled his stepmother who sexually abused him. Charged with capital murder, felony murder, aggravated sexual assault,

robbery, burglary, and possession of a weapon for an unlawful purpose, defendant was permitted to plead guilty to felony murder and aggravated sexual assault. The decision to accept defendant's guilty plea may have been influenced by the impulsive rather than premeditated nature of the homicide and by defendant's drug and alcohol addiction.

David Collins severely beat, stabbed, sexually assaulted, and tried to drown the mother of his girlfriend in retaliation for her refusal to permit him to see his girlfriend's baby. Defendant, an unemployed twenty-one-year-old high school dropout, confessed to the murder. He required and received some form of mental health treatment while incarcerated. Defendant was charged with purposeful and knowing murder, robbery, burglary, possession of a weapon for an unlawful purpose, and hindering apprehension. He was permitted to plead guilty to those charges and received an aggregate sentence of life plus twenty years' imprisonment with forty years' parole ineligibility. Defendant's mental health problem, combined with the circumstances giving rise to defendant's hostility toward the victim, may have contributed to the prosecutor's decision to proceed non-capitally.

James Zola 1B was fired from his maintenance job at the apartment complex where his victim resided, in part because of her complaint about his poor workmanship. Defendant broke into her apartment and beat, scalded, and strangled her. A jury convicted Zola of capital murder, burglary, aggravated sexual assault, kidnapping, and robbery, and sentenced him to death. This Court reversed the death sentence because of an improper instruction on aggravating and mitigating factors. On remand, the trial court granted Zola a new trial on the basis of newly discovered evidence. That factor, combined with defendant's extreme emotional disturbance, probably contributed to the prosecutor's decision to permit Zola to plead guilty to murder and receive a life sentence with thirty years' parole ineligibility.

Gary Lippen, age nineteen, was indicted for the murder of his seventeen-year-old victim, as well as for aggravated sexual assault,

conspiracy, hindering apprehension, and possession of a weapon for an unlawful purpose. Allowed to plead guilty to aggravated manslaughter, hindering apprehension, and conspiracy, Lippen was sentenced to thirty years' imprisonment on the manslaughter charge and a consecutive five-year term with two and one-half years' parole ineligibility on the hindering apprehension conviction. The aggravated manslaughter sentence subsequently was reduced to twenty years with ten years' parole ineligibility.

Lippen and his twenty-seven-year-old co-defendant, James Henderson, beat, raped, stabbed, strangled and tortured the victim. After the assaults, Henderson hoisted the victim into a tree and, using the branches as leverage, broke the victim's legs. Lippen acknowledged his complicity in the offenses and admitted that he participated in the assaults on the victim, but claimed that he feared Henderson would kill him if he refused to assist and participate in the assault. Lippen had no prior convictions and no history of emotional disturbance but had a history of alcohol and drug abuse. After the victim's body was discovered, Lippen initially denied any involvement in her death, but he quickly retracted his denial and gave police a voluntary and detailed statement concerning his and Henderson's complicity in the murder. Lippen's cooperation with law enforcement authorities, combined with the likelihood that Henderson was the dominant actor, probably accounts for the prosecutor's decision to forego capital prosecution of Lippen.

The explanation for the non-capital prosecution of the remaining cases in the C–1 subcategory is more elusive. For example, James Henderson, Lippen's co-defendant, primarily was responsible for the murder, aggravated sexual assault, and ferocious beating of their victim. The savagery of Henderson's crimes was extreme. Although Henderson was illiterate and had a history of treatment for an undesignated mental illness, emotional disturbance, and drug abuse, the extent of his emotional instability is not set forth in the AOC's summary with sufficient detail to support the conclusion that that condition justified the prosecutori-

al determination to proceed non-capitally. Henderson was permitted to plead guilty to murder and two counts of hindering apprehension, resulting in a sentence of life imprisonment with thirty years' parole ineligibility on the murder conviction and a consecutive sentence of five years with two and one-half years' parole ineligibility on the hindering apprehension charge.

Frank Masini (1 and 3), within a two-week period in 1991, raped and murdered his eighty-five-year-old aunt and also raped and murdered an eighty-year-old woman related to him by marriage. Both victims were sexually assaulted and received multiple stab wounds in the neck. In addition, approximately one year later Masini murdered an elderly couple for whom he had done carpentry work. Because there was no sign of forced entry at any of the homes of the homicide victims, suspicion focused on Masini who knew or was related to all the victims. Masini lived with his wife and two adult children. He was a self-employed carpenter with no history of drug or alcohol abuse. He claimed that in the months preceding the homicides he experienced "detachments from reality," for which he sought no treatment. In April 1990, he pled guilty to the murder of his aunt and of the elderly couple and pled guilty in another county to the murder of his eighty-year-old relative by marriage. Masini was sentenced to two consecutive life terms, each with thirty years' parole ineligibility, and to two concurrent terms of life with thirty years' parole ineligibility. Other than the reference in the AOC's summary to Masini's experiencing "detachments from reality," no other factors surrounding those four homicides suggest an explanation for the prosecutorial decision to proceed non-capitally against Masini.

Jerome Dennis committed five homicides within a four-month period, two of which (Dennis 1 and 2) are included in the C-1 subcategory. Dennis was permitted to plead guilty to felony murder to those two homicides. Dennis entered guilty pleas to murder, felony murder, and manslaughter for the other homicides and also pled guilty to two counts of aggravated assault. The victim in Dennis 1 was a fourteen-year-old girl whom he abducted

at knife point while she was walking along the street. He sexually assaulted her, inflicted multiple stab wounds, and covered the body with leaves and twigs. The thirty-year-old victim in Dennis 2 also was abducted at knife point, forced to undress, sexually assaulted, and stabbed multiple times. Defendant explained that in committing the Dennis 1 homicide he was influenced by a "demon." Two weeks prior to that offense he was paroled from Yardville State Prison and admitted into the Intensive Supervision of Probation Program. He had several prior adult convictions, including three for sexual assault. Dennis was sentenced to two consecutive life terms with thirty years' parole ineligibility and two concurrent life terms with thirty years' parole ineligibility. No explanation for the prosecutor's decision to forego capital prosecution can be inferred from the AOC summaries.

James Williams 1B raped and murdered a twenty-three-year-old receptionist in a Trenton nursing home. Defendant took the victim's pocketbook after stabbing her more than thirty times. Prosecuted capitally, defendant was convicted by a jury of murder, felony murder, aggravated sexual assault, armed robbery, and burglary. In the penalty phase, the jury found the c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(h) (catch-all) mitigating factor; the jury rejected the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), and c(5)(d) (diminished capacity) mitigating factors. Defendant was sentenced to death. This Court reversed defendant's convictions and death sentence primarily because of the inadequacy of the jury *voir dire* and the erroneous refusal to excuse a prospective juror for cause. *State v. Williams*, 113 *N.J.* 393, 436, 438, 550 *A*.2d 1172 (1988). On remand, Williams pled guilty to felony murder and was sentenced to life imprisonment with thirty years' parole ineligibility. No factors other than the mitigating evidence offered in the penalty phase, but substantially rejected by the jury, explain the prosecutor's decision to forego a capital prosecution on remand. That mitigating evidence included testimony reflecting an unstable childhood, numerous foster care placements, emotional instability, intoxication and, at age nine, the accidental

shooting of his younger brother. There was also testimony that defendant's behavior shortly before the murder began to deteriorate following an incident in which he was struck in the head by a falling cinder block. Nevertheless, that mitigating evidence did not deter the penalty-phase jury from imposing the death sentence.

Summarizing our comparison of defendant's death sentence with the sentences imposed on the nineteen defendants in the C–1 subcategory whose sentences were not determined in a penalty-phase trial, we do not find significant evidence of disproportionality. We discern from the AOC summaries ample bases to conclude that persuasive reasons existed to justify the State's decision to proceed non-capitally against defendants Relford, Marcus, Clowney, Timpson, Ritchie, and Mincey. Similarly, but with somewhat less assurance, we also infer that reasonable grounds existed to support the State's determination to proceed non-capitally against defendants Wilson, Lippen, Fullard, Taylor, Bolinger, Collins, and Zola 1B. We lack adequate information to conclude that there was sufficient justification to forego capital prosecution of defendants Masini (1 and 2), Dennis (1 and 2), Henderson and, on remand, Williams 1B. Although the victims of those defendants were not as young as Cooper's victim, the multiple homicides committed by Masini and Dennis and the viciousness of the homicides committed by Henderson and Williams suggest that the culpability of those defendants is comparable to, if not in excess of, that of defendant Cooper. Perhaps additional information, presently unavailable, would clarify the reasons for the non-capital prosecutions in those cases. But our aim in conducting proportionality review is not to insure symmetry, or even a high degree of correlation, in the sentences imposed on comparable defendants. Our primary objective is the detection and prevention of aberrational sentences. *Loftin II, supra,* 157 *N.J.* at 322, 724 *A.*2d 129. Despite our concerns over the non-capital prosecution of four of these defendants, we are not left with a sense that defendant Cooper's death sentence is aberrational when compared to the C–1 defendants who were not prosecuted capitally.

## E. *C–2 Cases*

This subcategory consists of nine cases, five of which concern defendants who were prosecuted capitally: Ralph Edwards, Mark Luciana, Ambrose Harris, Jerry Spraggins, and Michael Manfredonia. Of those defendants, only Ambrose Harris was sentenced to death.

Defendant Edwards, then eighteen years old, attempted to sexually assault a nine-year-old girl he saw on the platform of an abandoned railroad station. When she attempted to flee, he restrained and strangled her with a plastic strap. Edwards was charged with purposeful and knowing murder, felony murder, and attempted aggravated sexual assault. The jury acquitted him of purposeful murder, but convicted him on all other charges. The penalty-phase jury found the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no prior criminal history), and c(5)(h) (catch-all) mitigating factors. Evidence was presented concerning Edwards's history of psychological and mental problems and that he functioned on the emotional level of a nine-year-old. The penalty jury deliberations resulted in a non-capital sentence. Defendant was sentenced to life imprisonment with thirty years' parole ineligibility on the murder count and a consecutive ten years with five years' parole ineligibility on the aggravated sexual assault conviction.

Mark Luciana, a twenty-year-old defendant, left a party with two male friends, a twelve-year-old girl, and the fifteen-year-old victim and went to a nearby wooded area. Defendant sexually assaulted and strangled the victim, later retrieving her body from the woods and placing it in the trunk of his car. Luciana was apprehended after a friend told police about the body. Defendant was charged with and convicted of murder, felony murder, aggravated sexual assault, hindering apprehension, and endangering the welfare of a child. In the penalty phase, defendant expressed contrition and asked the jury to spare his life. Witnesses testified to his immaturity, anti-social personality disorder, and his drug

and alcohol addiction. The jury found the c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no prior criminal history), and c(5)(h) (catch-all) mitigating factors. After the jury could not decide whether the aggravating factors outweighed the mitigating factors, Luciana was sentenced to life imprisonment with thirty years' parole ineligibility for the murder, and to a consecutive term of nineteen years' imprisonment for aggravated sexual assault and hindering apprehension.

Jerry Spraggins broke into the apartment of his sixty-eight-year-old victim, sexually assaulted and suffocated her, and stole her pocketbook and a gold neck chain. He was arrested two years later and linked to the murders of two other women in the same building, one such homicide occurring prior to the enactment of the capital punishment statute. Defendant was acquitted of both homicides. In his capital prosecution for the murder of the sixty-eight-year-old victim, defendant was convicted of purposeful and knowing murder, felony murder, aggravated sexual assault, and burglary. At the penalty-phase trial, evidence of defendant's good character was offered by his mother, as well as testimony concerning prior mental health counseling and evidence of his compulsive and voyeuristic behavior toward women. The jury found the c(5)(d) (diminished capacity) and c(5)(f) (no prior criminal history) mitigating factors. Defendant's penalty trial resulted in a sentence of life imprisonment with thirty years' parole ineligibility plus a consecutive twenty-year term with ten years' parole ineligibility on the aggravated sexual assault charge, and a concurrent ten-year term for burglary.

Michael Manfredonia, then age nineteen, sexually assaulted and murdered his fourteen-year-old victim after she allegedly refused to go out with him, criticized his clothing and appearance, and generally ridiculed him. The victim's body had twenty-six stab wounds and was found buried in a ditch and covered with dirt, rocks, and sticks. Police apprehended Manfredonia at home after he attempted suicide by ingesting pills and trying to slit his wrists with a razor blade. In his capital trial defendant waived his right

to a jury trial and was found guilty of murder, felony murder, aggravated sexual assault, kidnapping, and possession of a weapon for an unlawful purpose. In the penalty phase, a psychiatrist testified that defendant was mentally retarded with an I.Q. of 78, that his brain appeared to be structurally abnormal, and that he was unable to control his emotions and anger. The trial court found the c(4)(f) (escaping detection) and c(4)(g) (commission of a felony) aggravating factors but treated them as a single factor. The court also found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), and c(5)(f) (no prior criminal history) mitigating factors, and concluded that the mitigating factors outweighed the aggravating factors. Defendant was sentenced to life imprisonment with thirty years' parole ineligibility for murder, plus consecutive terms of thirty years' imprisonment with fifteen years' parole ineligibility for kidnapping, and twenty years' imprisonment with ten years' parole ineligibility for aggravated sexual assault.

Ambrose Harris raped and murdered his twenty-two-year-old victim, stealing her automobile, money, and credit cards. Capitally prosecuted, he was convicted of murder, felony murder, kidnapping, robbery, aggravated sexual assault, theft, and possession of a weapon for an unlawful purpose. The jury found the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(h) (catch-all) mitigating factor. The jury sentenced Harris to death.

Defendants in the C–2 subcategory who were not capitally prosecuted were Vincent Marino, Vincent Brown, Gerald Williams, and Adam Marrero. Vincent Marino strangled and then sexually assaulted his twenty-three-year-old victim who voluntarily had gone to defendant's home intending to smoke crack cocaine with him. The evidence indicated that defendant had smoked crack cocaine throughout the day and evening with several people, including the victim. Defendant acknowledged that he lured the victim to his basement on the pretext that cocaine was hidden there, that the victim resisted his sexual advances, and that he strangled the victim with her lingerie. Defendant was addicted to

cocaine, had a prior alcohol addiction, and had been treated for mental health problems. Defendant was permitted to plead guilty to felony murder and was sentenced to thirty years' imprisonment without parole ineligibility. That the victim had shared cocaine with defendant on the day of the murder may have influenced the prosecutor's decision to forego capital prosecution.

Vincent Brown attempted to sexually assault the ten-year-old niece of Brown's girlfriend. The girl resisted his advances. When she threatened to inform her mother about defendant's attempted assault, Brown strangled her and left her body in a ditch. Brown was indicted for murder, felony murder, aggravated sexual assault, and sexual assault. While in prison he became suicidal and experienced hallucinations, resulting in his confinement in a psychiatric hospital where he was diagnosed with major depression with psychotic features. He also had a severe drug and alcohol addiction, and his competency to stand·trial was questioned. Ultimately, Brown pled guilty to murder and sexual assault, and was sentenced to life imprisonment with thirty years' parole ineligibility, and a consecutive ten years with five years' parole ineligibility on the sexual assault charge. Brown's serious mental health disabilities undoubtedly influenced the State's decision to forego capital prosecution.

Gerald Williams, then thirty-eight years old, was employed in the victim's apartment building for several months until his discharge, after which he lived in vacant apartments and stairwells in the building. He sexually assaulted and strangled the fifty-nine-year-old victim. In addition to a long history of ·depression, Williams had used alcohol and cocaine regularly for many years. Tried non-capitally, he was convicted by a jury of murder, felony murder, two counts of aggravated sexual assault, burglary, criminal restraint, and possession of a weapon for an unlawful purpose. Williams was sentenced to life imprisonment with thirty years' parole ineligibility for murder plus consecutive terms of twenty years for each sexual assault conviction, ten years for burglary, and five years each for criminal restraint and the weapons offense.

The AOC's summary includes no indication of why Williams was prosecuted non-capitally.

Adam Marrero, age twenty-three, met the victim, age thirty-four, at the home of a friend and offered to drive her home. They left together and stopped at a local restaurant for drinks and dancing. The victim was later reported missing. Her body was found unclothed in a nearby wooded area, and her death was caused by strangulation. Defendant was tried non-capitally and was convicted by a jury of murder, felony murder, kidnapping, and aggravated sexual assault. He was sentenced to concurrent life terms, each with thirty years' parole ineligibility, and to a consecutive twenty-year sentence for kidnapping. The fact that the homicide began as a consensual social encounter may have influenced the prosecutor's decision to forego a capital prosecution.

Summarizing our comparison of defendant's death sentence with the sentences of the nine defendants in the C–2 subcategory, we find no evidence of disproportionality. Of the five defendants prosecuted capitally, defendant Harris was sentenced to death. The life sentences of defendants Edwards, Luciana, Spraggins, and Manfredonia appear to be reconcilable with defendant's death sentence. Although Edwards's victim was a young girl, evidence in the penalty phase indicated that he functioned as the emotional equivalent of a nine-year-old and had a long history of psychological and mental problems. Luciana's victim was a fifteen-year-old girl, and his personality disorder apparently persuaded the jury to spare his life. Spraggins's victim was sixty-eight years old. His simultaneous acquittal of two other homicides and the evidence of his history of mental health problems may have influenced the jury's decision not to impose the death penalty. Defendant Manfredonia's mental retardation, emotional disturbance, and abnormal brain development were obviously factors that affected the jury's non-death sentence.

As noted, the non-capital prosecutions of defendants Marino and Marrero probably were influenced by the consensual nature of their relationships with their respective victims. Although his

victim was ten years old, Brown's attempted suicide, psychiatric hospitalization, and questionable competency undoubtedly influenced the State's decision to proceed non-capitally. No apparent circumstances explain the State's decision to forego capital prosecution of defendant Gerald Williams.

### F. *C–3 and Other Cases*

The three cases in the C–3 subcategory, and the other two cases relied on by defendant from the B–2 and G–1 subcategories, were all prosecuted non-capitally. Frederick Neuschwanter's victim was an eighteen-year-old acquaintance with whom he had gone to purchase liquor, after which he parked his car near a cemetery and he and the victim drank together. When he made unwelcome sexual advances, the victim grabbed a hunting knife to defend herself. A struggle resulted in the death of the victim due to a combination of stab wounds and blunt trauma. Neuschwanter had no prior record and no prior history of mental or emotional problems, other than alcohol abuse. He was permitted to plead guilty to aggravated manslaughter and sentenced to a thirty-year term with fifteen years' parole ineligibility.

Founcil Brockington sexually assaulted and strangled his thirty-four-year-old victim in her home. The AOC's summary is ambiguous on whether defendant and the victim were acquaintances or unknown to each other. Defendant was prosecuted non-capitally, and charged with murder, felony murder, aggravated sexual assault, aggravated assault, and possession of a weapon for an unlawful purpose. He was permitted to plead guilty to aggravated manslaughter, and sentenced to a term of twenty-five years with eight years' parole ineligibility.

Eugene Edwards and co-defendant Michael Prater lured a prostitute to Edwards's residence by offering her drugs in exchange for sexual relations. The two men sexually assaulted and murdered the victim, the co-defendant stabbing her numerous times and Edwards attempting to strangle her. Edwards had no prior record nor any history of mental problems. He was prose-

cuted non-capitally and pled guilty to murder, robbery, and aggravated sexual assault. Edwards was sentenced to life imprisonment with thirty years' parole ineligibility and a consecutive term with ten years' parole ineligibility for aggravated sexual assault.

Carlos Vasquez, who had been convicted of murder in Puerto Rico in 1975, sexually assaulted and asphyxiated his thirteen-year-old victim. Prosecuted non-capitally, defendant pled guilty to felony murder and aggravated sexual assault. He was sentenced to life imprisonment with thirty years' parole ineligibility on the felony murder charge and to a consecutive twenty-year term with ten years' parole ineligibility for aggravated sexual assault.

Kevin Aquino, age nineteen, abducted a six-year-old girl from a neighbor's home intending to sexually assault her. When the child awoke, she protested, and defendant killed her by smashing her head against a tree. As a child, Aquino was diagnosed as emotionally disturbed and neurologically impaired. Defendant had three prior sexual-assault convictions and had been receiving psychiatric counseling because of his underlying impulse control disorder. Defendant's psychiatrist had informed his parents that defendant needed constant supervision and should be placed in a residential treatment program. Aquino was prosecuted non-capitally and was permitted to plead guilty to murder, felony murder, and kidnapping. Defendant was sentenced to life imprisonment with thirty years' parole ineligibility on the murder charge and a consecutive life term with twenty-five years' parole ineligibility on the kidnapping charge.

We find no disproportionality between defendant's death sentence and the sentences of the defendants in the C–3 subcategory and the two additional defendants included in that discussion. That defendant Neuschwanter and his victim began their encounter consensually and that the victim first reached for the knife undoubtedly influenced the prosecutor to proceed non-capitally and to accept defendant's plea to aggravated manslaughter. Similarly, the apparent ambiguity concerning the origins of the encounter between defendant Brockington and his victim may have

affected the State's decision to proceed non-capitally and to accept Brockington's plea to aggravated manslaughter. The fact that the homicide committed by defendant Eugene Edwards originated as an exchange of drugs for sexual relations may have influenced the prosecutor's decision to forego capital prosecution of Edwards, despite the viciousness of the murder. The State's decision not to prosecute defendant Vasquez capitally is unexplained by the AOC's summary, in view of his prior murder conviction and the fact that his victim was only thirteen. Although defendant Aquino's victim was six years old and the killing was particularly brutal, Aquino's emotional instability and psychiatric disorders may have contributed to the State's decision to forego capital prosecution.

## G. *Precedent–Seeking Review Conclusion*

As we have emphasized, "[p]roportionality review seeks to determine only whether a particular death sentence is aberrational, not whether it compares perfectly with other sentences." *Bey IV, supra,* 137 *N.J.* at 352, 645 *A.*2d 685 (citing *Marshall II, supra,* 130 *N.J.* at 131, 613 *A.*2d 1059). Our careful review of defendant's death sentence, compared to the sentences imposed on defendants who committed comparable homicides, convinces us that defendant's death sentence is not aberrational, and with respect to almost all of the non-death-sentenced defendants, is reconcilable with their sentences and/or with the State's decision to forego capital prosecution. The cases concerning which reconciliation of sentences cannot readily be achieved on the basis of the AOC summaries are too few to diminish significantly our confidence in the conclusion that defendant's death sentence is not disproportionate.

## IV

### Other Arguments

Defendant, together with defendants John Chew and Nathaniel Harvey, have filed a joint brief challenging the constitu-

tionality of the death penalty on the basis of racial discrimination, geographic discrimination, the apparent aggravating effect of the extreme emotional disturbance mitigating factor, and the low overall death-sentencing rate. We recently reviewed thoroughly and rejected the claim of unconstitutionality based on racial bias in *Loftin II, supra,* 157 *N.J.* at 316, 724 *A.*2d 129, and no additional information in the statistical tables underlying this appeal impel us to alter that conclusion. We rejected the other asserted constitutional challenges in *State v. Chew II,* 159 *N.J.* 183, 220–27, 731 *A.*2d 1070 (1999), and adhere to those conclusions in rejecting the same contentions in this appeal.

Based on our conclusion that defendant Cooper's death sentence is not disproportionate, we affirm the sentence of death.

## *APPENDIX*

### COMPARISON CASE SUMMARIES

#### A. Penalty Trial Cases

*Marko Bey 2A*

Marko Bey raped and murdered Carol Peniston. Bey accosted her in front of her apartment and demanded money. When he heard someone approaching, he grabbed her and led her to a shed, where he repeatedly struck her, stomped on her, sexually assaulted her, strangled her, and stole eight dollars and her car keys. He subsequently drove her stolen car to Newark, where he abandoned it after getting into a one-car accident.

In the hours prior to the murder, Bey purportedly drank 120 ounces of malt liquor and smoked marijuana. Three and one-half weeks before this incident, Bey had committed another rape-murder. In the time between the two murders, Bey turned eighteen years old.

Bey was an illegitimate child whose father rejected him and whose mother was an alcoholic who brutally abused him. Bey

began abusing alcohol and marijuana when he was fourteen years old. At trial, Bey expressed remorse over the murder and stated "maybe if I never would have taken drugs it would never have happened."

A jury convicted Bey of capital murder, felony murder, kidnapping, aggravated assault, aggravated sexual assault, robbery, and theft. Bey's prior murder was inadmissible at the penalty phase because the conviction was under appeal. The jury found the c(4)(c) (extreme suffering) and c(4)(g) (contemporaneous felony) aggravating factors and rejected all of Bey's proposed mitigating factors. The rejection of the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) mitigating factors may be traced to an erroneous jury charge, which instructed the jury that it must find mitigating factors unanimously. The jury sentenced Bey to death, but this Court reversed the death sentence because of the flawed instructions. On retrial, the jury, despite finding the c(5)(a) and c(5)(h) mitigating factors, again sentenced Bey to death. That case, Marko Bey 2B, is not in defendant's comparison group because the second jury found the c(4)(a) (prior murder) aggravating factor.

*Craig Blackmon*

In the presence of the victim's two-year-old son, Blackmon abused, sexually assaulted, and stabbed the victim. Over a ninety-minute period, Blackmon stabbed, beat, and kicked her, tied her up, and urinated on her. Blackmon fractured her jaw, broke every bone in her neck, caused hematomas in her brain, and inflicted several stab wounds, including three in the vagina.

Blackmon, who was twenty-two years old, had ingested PCP prior to this incident. He exhibited bizarre behavior on the day of the murder. For example, after committing the murder and while still naked, he tried to enter a parked car. Later at the police station, he acted violently at times and occasionally began speaking with a West Indian accent.

A jury convicted Blackmon of purposeful or knowing murder (two counts), felony murder, aggravated sexual assault (two counts), and a weapons offense. The jury found the c(4)(c) (torture or depravity) and the c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history), and c(5)(h) (catch-all) mitigating factors. The jury found that the aggravating factors did not outweigh the mitigating factors. The court sentenced Blackmon to life imprisonment with a thirty-year parole bar for murdering the victim and to twenty years' imprisonment with a ten-year parole disqualifier for the aggravated sexual assault.

*Richard Chippero*

Chippero, who was twenty-three years old, entered the victim's home through the front door and asked her to have sex with him. She refused, and Chippero pulled out a pocket knife and chased the victim into the bedroom. He forced her to undress and raped her at knifepoint. After the victim stared at him, Chippero feared that she could identify him and stabbed her ten times. She died from the wounds. Chippero subsequently discarded the knife in a lake and washed his bloody shirt.

Chippero committed these offenses only twenty-five days after being paroled. He previously had been convicted of aggravated assault, aggravated arson, arson, burglary, and theft.

Chippero's two stepfathers were imprisoned for abusing him. His first stepfather physically abused him and his mother. His second stepfather physically and sexually abused him. When he was seven years old, Chippero was diagnosed as being hyperkinetic, emotionally disturbed, and mentally retarded. The year after graduating from a school for emotionally disturbed students, Chippero was admitted to a psychiatric hospital on four occasions. He suffered from bipolar disorder.

The jury convicted Chippero of capital murder, felony murder, aggravated sexual assault, hindering apprehension or prosecution,

and a weapons offense. The jury found the c(4)(f) (escape detection) and the c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) mitigating factors. The jury could not agree on defendant's sentence. Accordingly, Chippero was sentenced to life imprisonment with a thirty-year parole disqualifier on the murder conviction. The court sentenced him to a consecutive life sentence with a twenty-five-year parole disqualifier on the aggravated sexual assault conviction.

*Bruce Cunningham*

After a morning of drinking, Cunningham attempted to rape his former wife. Their son prevented him from sexually assaulting her.

Cunningham, who was thirty-four years old, then boarded a bus where he met the victim. He and the victim walked off the bus and drank rum together. He then kidnapped her and took her to a deserted area, where he hit her over the head with a rock, stabbed her, and sexually assaulted her. Realizing she was dead, Cunningham buried her body and fled.

Cunningham had prior convictions for disorderly persons offenses, aggravated assault, battery, and two burglaries. Cunningham had an abusive childhood. He is a Navy veteran and has a history of drug and alcohol abuse. He was diagnosed with paranoid personality disorder.

A jury convicted him of capital murder, felony murder, kidnapping, aggravated sexual assault, and aggravated assault. The jury found the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) mitigating factors. The jury rejected the c(4)(c) (torture or depravity) and c(4)(f) (escape detection) aggravating factors. The jury concluded that the aggravating factor did not outweigh the mitigating factors. For the murder, the court sentenced him to eighty years' impris-

onment, of which thirty were parole ineligible. If the nonmerged counts ran consecutively to each other (the AOC's narrative does not make this clear), the aggregate sentence was 130 years' imprisonment with a fifty-year parole bar.

### Charles Darrian

Darrian, who was twenty or twenty-two years old (the AOC's narrative is inconsistent on this point), and the victim, his eighteen-year-old girlfriend, had an ongoing dispute over her desire to date other men. They began to argue at the victim's apartment after she refused to have sex with him. He then beat her and anally raped her. Afterward, Darrian placed a coat hanger around her neck and twisted it six times. The victim died of asphyxiation, and Darrian fled.

Darrian had no prior criminal record. He had no history of mental illness, but his age, jealous nature, and immaturity were deemed to support the c(5)(a) (extreme emotional disturbance) mitigating factor.

A jury convicted Darrian of capital murder, felony murder, sexual assault, and a weapons offense. The jury found the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(f) (no significant criminal history), and c(5)(h) (catch-all) mitigating factors. The jury could not agree on whether to impose a death sentence, so the court sentenced Darrian to life imprisonment with a thirty-year parole bar on the murder conviction and to an additional ten years with a five-year parole disqualifier on the sexual assault conviction.

### Keith Dickerson

After returning home from an evening of free-basing cocaine, Dickerson, who was twenty years old, walked across the street to his neighbor's home. He entered her home through an unlocked front door, and he encountered her in the bedroom. She was partially undressed because she was preparing for bed. She yelled and cursed at him. He punched her in the face and beat

her unconscious. He then raped her. Afterward, he repeatedly stabbed her in the stomach, slit her throat, and strangled her with clothing. After killing her, Dickerson stole thirty dollars from her wallet. He ultimately confessed to committing the crimes.

Dickerson had prior convictions for aggravated assault and weapons possession and a prior violation of parole. He had a long history of drug abuse and often smoked free-based and crack cocaine in the six months leading up to the murder. He had underlying violent impulses, and his behavior changed markedly when he began abusing cocaine. As a result of being high on cocaine, Dickerson experienced paranoia and hallucinations.

A jury convicted him of capital murder, felony murder, aggravated sexual assault, robbery, and burglary. The jury found the c(4)(g) (contemporaneous felony) aggravating factor but rejected the c(4)(f) (escape detection) factor. The jury found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) mitigating factors. The jury found that the aggravating factor did not outweigh the mitigating factors. The court imposed a life sentence with a thirty-year parole disqualifier on the capital murder charge. Dickerson's aggregate sentence was life plus forty-five years' imprisonment, with fifty-two and one-half years of parole ineligibility.

*Joseph Harris*

Harris was bitter over losing the corpus of his $10,000 investment with Ron Ellison's company, which invested in precious metals and coins. The company ceased operations one year after Harris invested his money. Harris unsuccessfully tried to recover his initial investment.

Three years after losing his money, Harris sought revenge. Wearing a mask that covered his face, he went to Ellison's home. He handcuffed and blindfolded Ellison, his wife, and his two daughters, who were seven and nine years old. Harris demanded money, and Ellison's wife gave him $700. He then raped Ellison's wife and daughters. He unsuccessfully sought additional money

and raped Ellison's wife again. Harris then went outside toward Ellison, who screamed that Harris was going to kill him. Ellison's wife called out to a neighbor for help. Harris fatally shot Ellison, who was probably on the ground when Harris fired the shot. Harris then attempted to return to the bedroom, but Ellison's wife had barricaded the door with a dresser and prevented Harris from getting inside. Harris was not implicated in these crimes until three years later, when he was arrested for murdering three postal workers, with whom he used to work, and a former co-worker's fiancé.

Harris literally began his life in prison because his mother was incarcerated when she gave birth to him. He believed he was cursed because he was born in prison and his parents rejected him. When he was ten years old Harris was convinced that he was a warrior, and he heard voices of an Indian Chief. The voices ultimately subsided and were replaced by voices of a Ninja spirit. Harris joined the Navy because he believed the Ninja spirit directed him to travel to Asia. When employed by the United States Postal Service, Harris occasionally worked in Ninja garb or military camouflage outfits. Harris was diagnosed as a schizoid and with a severe personality disorder.

A jury convicted him of capital murder, felony murder, aggravated sexual assault (three counts), kidnapping (four counts), burglary, and a weapons offense. The jury found the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(f) (no significant criminal history) and c(5)(h) (catch-all) mitigating factors. The jury rejected the proposed c(5)(a) (extreme emotional disturbance) and the c(5)(d) (diminished capacity) mitigating factors and sentenced him to death.

*Kevin Jackson 1A & 1B*

Jackson, who was twenty-five years old, entered the victim's home through an unlocked door and attempted to rape her, but he could not achieve an erection. In a fit of rage, he stabbed the

victim fifty-three times, including eighteen times in the vagina. The victim died as a result of the wounds. After Jackson stabbed her, he stole the victim's car.

Jackson had prior convictions for public intoxication and burglary. He had an emotionally impoverished background and a substance abuse problem. He was diagnosed with attention deficit/hyperactivity disorder and borderline personality disorder, which caused him to confuse reality with fantasy. A defense psychologist theorized that after the death of Jackson's fiancée, Jackson created a delusional relationship with the victim and that the victim's rejection of him caused him to become temporarily insane.

Jackson pled guilty to capital murder. A jury found the c(4)(c) (torture or depravity) and the c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(a) (extreme emotional disturbance) and c(5)(e) (duress) mitigating factors. The jury rejected Jackson's proposed c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history), and c(5)(h) (catch-all) mitigating factors. The jury sentenced him to death.

Finding the factual basis elicited for the plea to be inadequate, this Court reversed the murder conviction. On remand, Jackson did not plead guilty. A jury convicted him of capital murder, attempted aggravated sexual assault, and theft. That jury found the c(4)(c) (torture or depravity) aggravating factor and the c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors. The jury rejected the proposed c(5)(a) (extreme emotional disturbance), c(5)(c)(age), and c(5)(e) (duress) mitigating factors. The jury could not agree on an appropriate sentence, and the court sentenced Jackson to life imprisonment with a thirty-year parole bar for the murder conviction.

*Scott R. Johnson*

Johnson, who was twenty-three years old, saw the victim loading groceries into her van. Though the victim's three-year-old daughter was with her, Johnson approached the victim with a

folding knife. He grabbed the victim by the hair and forced her to drive around for two hours. Johnson then dropped off the victim's daughter on the property of a day care center, which had closed for the day. Johnson raped and robbed the victim. In order to prevent her from identifying him, he stabbed her over thirty times and dumped her body in a drainage ditch.

Johnson's parents abused him, and his father was a drug addict who died of a drug overdose. Johnson also abused drugs, including heroin and cocaine, both of which he used on the day of the murder. He suffered from organic brain damage and borderline intelligence. His impaired mental development placed him at a mental age far younger than his chronological age of twenty-three. Johnson expressed his remorse for committing the crimes.

A jury convicted Johnson of capital murder, felony murder (four counts), aggravated sexual assault, kidnapping (two counts), robbery (two counts), burglary, and weapons offenses. The jury found the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors. The jury rejected the c(5)(c)(age) mitigating factor. At the penalty phase, the jury could not agree on Johnson's sentence, and the court sentenced him to life imprisonment with a thirty-year period of parole ineligibility for the murder. The court imposed an aggregate sentence of life plus seventy years' imprisonment with sixty-five years of parole ineligibility.

*Benjamin Lodato*

Lodato walked to the victim's home, where he had raked leaves weeks earlier. He asked her for a drink of water, and she let him in. He accosted her with a knife, forced her upstairs, tore her clothing off, and raped her. He then took her downstairs, made her lie facedown on her couch, bound her with an electrical cord, and gagged her. He beat her with a blunt instrument or his fist and inflicted sixteen nonlethal stab wounds before fatally stabbing her twice in the heart.

At the time of this murder, Lodato, who was thirty-eight years old, was on parole for committing a series of knifepoint sexual assaults. Between ages thirteen and thirty-eight, he spent fifteen years in prison or in institutions because he had a history of sexually assaulting and threatening women, and because he presented a threat to himself or others.

Lodato was mildly to moderately mentally retarded. He never tested higher than 69 on an I.Q. test. He suffered from an organic brain abnormality and dementia. He functioned on the level of an eight- or nine-year-old child. He had little capacity to think in abstract terms or conceive of the consequences of his acts and had poor control over anti-social impulses. His symptoms suggested psychomotor seizures that may have caused him to act violently.

Lodato pled guilty to murder and sexual assault. A jury found the c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(a) (extreme emotional disturbance) and c(5)(d) (diminished capacity) mitigating factors. The jury rejected the c(4)(f) (escape detection) aggravating factor and the c(5)(c)(age) and c(5)(h) (catch-all) mitigating factors. The jury concluded that the aggravating and mitigating factors were in equipoise. The trial court sentenced Lodato to death. Because the jury determined that the aggravating factors did not outweigh the mitigating factors, this Court reversed the death sentence and remanded for the trial court to resentence Lodato to life imprisonment with a thirty-year parole disqualifier.

*Michael Prater*

Prater and Eugene Edwards planned to offer a crack-addicted prostitute drugs in exchange for sex. They agreed to kill her if necessary.

Armed with a knife, Prater asked the victim if she wanted drugs. She agreed and went with the men inside Edwards's home. Prater brandished his knife, forced her to remove her clothes, and raped her. While Prater raped her, Edwards forced

his penis in her mouth several times. Edwards then raped her. Afterward, Prater stabbed her, and Edwards began strangling her. Prater stabbed her three more times. He grabbed a pillow and, with Edwards's assistance, smothered the victim until she died. Prater and Edwards took her to the basement where Prater hit her in the head with tin shears to ensure that she was dead.

Prater had a prior drug conviction and three disorderly persons convictions.

Prater was reared in a violent home, where his father emotionally, physically, and sexually abused Prater's mother and attempted to rape Prater's sister. Prater had borderline intelligence, a limited ability to exercise judgment, and impulsive tendencies. He was diagnosed with attention deficit disorder. He began abusing alcohol when he was eleven years old and started to abuse drugs five years later.

A jury convicted Prater of capital murder, felony murder (two counts), aggravated sexual assault (three counts), theft, and a weapons offense. The jury found the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(h) (catch-all) mitigating factor. The jury rejected the c(4)(c) (torture or depravity) and c(4)(f) (escape detection) aggravating factors. The jury could not determine whether the aggravating factors outweighed the mitigating factors. The court sentenced Prater to life imprisonment with a thirty-year parole disqualifier on the murder count. Prater's aggregate sentence was life plus twenty years' imprisonment with forty years of parole ineligibility.

*John Reese*

After an evening of drinking, Reese entered the victim's apartment. Finding her asleep, Reese tied her hands and placed a shirt over her head. He raped her and hit her over the head seventeen times with a claw hammer. She died from her injuries. The next day, Reese discarded the claw hammer. After initially denying involvement in the murder and subsequently claiming

that the victim was the aggressor, Reese ultimately confessed to the crime.

Reese had no prior convictions and was a model prison inmate. He was an alcoholic who became abusive toward women when he was intoxicated.

A jury convicted Reese of capital murder, felony murder, aggravated assault (two counts), kidnapping, criminal restraint, aggravated sexual assault (two counts), burglary, hindering apprehension, and a weapons charge. The jury found the c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors. The jury rejected the c(4)(f) (escape detection) aggravating factor. The jury could not agree on defendant's sentence. The court sentenced him to life imprisonment with a thirty-year parole disqualifier.

*Rafael Rivera*

Rivera lived next door and had a close relationship with the victim, a seventy-eight-year-old widow who often cared for Rivera's children. The children called the victim their grandmother. While the victim was visiting Rivera and his girlfriend, Rivera went into her apartment and looked for money. The victim returned to her apartment and surprised Rivera. A struggle between Rivera and the victim ensued. Rivera struck her many times in the face, forearms, ribs, and back. He tore her vagina with either his hand or her cane. He killed her by suffocating her with a pillow.

Rivera had prior convictions for possessing a stolen car, entry with intent to steal, receiving stolen property, weapons possession, and eleven disorderly persons offenses. He had a history of abusing cocaine, marijuana, and alcohol and was seen drunk shortly before the murder.

A jury convicted Rivera of capital murder, robbery, aggravated sexual assault, and burglary. The jury found the c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony) aggravating

factors and the c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors. It rejected the c(4)(f) (escape detection) aggravating factor and the c(5)(c)(age) mitigating factor. The jury could not agree on whether the aggravating factors outweighed the mitigating factors. The court sentenced him to life imprisonment with a thirty-year parole disqualifier for the murder and to an aggregate sentence of two life terms with a fifty-five-year period of parole ineligibility.

*Christopher Thomas 2*

Seven days after his release from prison, Thomas entered the victim's tailor shop. He fractured her skull with a heavy thirteen-inch steel wrench. The victim died from the head injuries. Thomas took items from her pocketbook and stole rings from her fingers. He also attempted to sexually assault her.

Thomas had prior convictions for robbery, aggravated assault, larceny (four convictions), shoplifting (two convictions), and tampering with an automobile. Over a year before this crime, he murdered an elderly woman.

Thomas was a paranoid schizophrenic who had auditory and visual hallucinations and was prone to fits of violence. He also had anti-social personality disorder. A year before this murder, he was admitted to Trenton Psychiatric Hospital after an attempted suicide. Thomas never knew his father and his mother was an alcoholic. As a child, Thomas was mentally abused. He had a long history of drug and alcohol abuse, for which he received treatment two years before the murder.

Thomas waived his right to a jury trial. The court convicted him of capital murder, felony murder (two counts), robbery (two counts), attempted sexual assault, and weapons offenses. It found the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(a) (extreme emotional disturbance), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) mitigating factors. The court sentenced him to life imprisonment with a thirty-year parole disqualifier for

the murder. Thomas's aggregate sentence was life plus thirty years' imprisonment with a forty-five-year parole bar.

*Jesse Timmendequas*

Jesse Timmendequas strangled and anally raped Megan Kanka, who lived across the street from him. The victim, who was seven years old, had walked to Timmendequas's next-door neighbor's home in order to visit a friend. After she learned that her friend was not home, she encountered Timmendequas and asked to see his new puppy. He told her that she would have to go inside his home in order to see the dog.

Timmendequas led Kanka to his bedroom, where he placed his hands on her back, shoulders, and anus. She screamed and tried to run, but Timmendequas corralled her with his belt, which he wrapped around her neck. Timmendequas tightened the belt so the victim could not escape. As she struggled with Timmendequas, she struck her head on the door frame and her face on the dresser. Timmendequas then twisted the belt around the victim's neck until she lost consciousness. He slapped her face, pulled her shorts down, and attempted to penetrate her vagina. Unable to do so, Timmendequas had anal intercourse with the unconscious seven-year-old girl.

Timmendequas then tied two plastic bags around the victim's head so she would not bleed on the rugs. He placed her in a toy chest and transported her dying body to Mercer County Park. He placed his finger in her vagina and then dumped her body in weeds. He returned home, ripped the victim's shorts, and disposed of them. He also cleaned the toy chest with ammonia.

Later that day, the victim's mother asked Timmendequas if he had seen the victim. He said he last saw her when she was walking to her friend's house. The following day, Timmendequas told police that the victim's body was in the park.

On two prior occasions, Timmendequas had sexually assaulted young girls.

Timmendequas had a history of drug and alcohol abuse. In addition, his childhood was replete with physical and sexual abuse. Timmendequas's father on occasion killed Timmendequas's pets in front of him in order to deter him from reporting the abuse. His mother once broke his arm. His parents, who were alcoholics and were promiscuous, often fought violently with each other. He made slow academic progress and was classified as educable mentally retarded. He also suffered from several head injuries resulting from car and motorcycle accidents.

A jury convicted Timmendequas of capital murder, felony murder (two counts), kidnapping, and aggravated sexual assault (four counts). The jury found the c(4)(f) (escape detection) and the c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(a) (extreme emotional disturbance), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) mitigating factors. The jury sentenced Timmendequas to death.

*James Williams 1A*

After drinking beer with his brother and some friends, Williams went to a nursing home. He approached the receptionist, pushed her into a back room, and closed the door. Williams ordered her to take off her clothes. She began to take off her clothes, but then stopped. Williams got angry and hit her. He forced her to the floor and raped her. After she screamed, he covered her mouth and stabbed her. She somehow rose to her feet, and Williams repeatedly stabbed her in the back. As she was dying from the stab wounds, Williams stole her pocketbook.

Williams's childhood was filled with instability and emotional trauma. When he was nine, he accidentally shot and killed his younger brother. During his youth, Williams was placed in several different foster homes and received inadequate psychiatric intervention. Less than two months before the murder, Williams, a construction worker, was hit over the head by a falling cinder block. His behavior markedly changed and he became paranoid after the head injury.

A jury convicted Williams of murder, felony murder (three counts), armed robbery, and aggravated sexual assault. The jury found the c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(h) (catch-all) mitigating factor. The jury rejected the proposed c(5)(a) (extreme emotional disturbance), c(5)(c)(age), and c(5)(d) (diminished capacity) mitigating factors. The jury sentenced Williams to death. After this Court reversed the convictions and sentence primarily on the basis of an inadequate jury *voir dire*, Williams pled guilty to felony murder, for which he received a life sentence with a thirty-year parole bar.

*James Zola 1A*

Zola had been a maintenance worker at the victim's apartment until he was fired, in part because of a complaint that the victim lodged against him regarding his poor installation of her new kitchen sink. Zola broke into the victim's apartment and tied her up; he then beat, scalded, and mortally strangled her. In addition, there was scientifically dubious evidence that he had sexually assaulted her. *See supra* at 91–92, 731 *A.2d* at 1021.

Zola had no prior convictions, but had two pending theft charges and one pending burglary charge. At the time of the murder, Zola purportedly had a paranoid delusion that he was being chased by police and police dogs. He claims he committed the crimes against the victim in order to prevent her from calling the police. When he was a child, Zola had been sexually abused. He was diagnosed as emotionally disturbed and was addicted to drugs.

A jury convicted Zola of capital murder, burglary, aggravated sexual assault, kidnapping, and robbery. The jury found the c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(a) (extreme emotional disturbance) and c(5)(h) (catch-all) mitigating factors. The jury rejected the proposed c(5)(c)(age) and c(5)(d) (diminished capacity) mitigating factors. The jury sentenced Zola to death, but this Court

reversed the sentence because of erroneous jury instructions in the penalty phase. The trial court granted a new trial based on newly discovered evidence. Zola pled guilty to murder and received a life sentence with a thirty-year period of parole ineligibility.

## B. Non–Penalty Trial Cases

### *Salient Factors Subcategory C–1*

#### *Robert Bolinger*

Bolinger broke into the victim's home through a fire-escape window. He heard her return to her apartment, and he attempted to leave without being seen. When the victim saw him, he attacked her. He grabbed her and stepped on her chest once. He then tied the victim's hands and feet with shoelaces, gagged her, and sexually assaulted her. Afterward, he took money from her wallet and left.

Bolinger ultimately confessed to committing this crime and said that he killed the victim because she reminded him of his stepmother, who had physically abused him. He subsequently committed another rape.

Bolinger is a Vietnam veteran who was addicted to alcohol and drugs and became intoxicated daily.

He was charged with capital murder, felony murder, aggravated sexual assault, robbery, burglary, and possession of a weapon for an unlawful purpose. He pled guilty to felony murder and aggravated sexual assault. Consequently, he avoided a death sentence. (The AOC narrative does not specify his sentence.)

The AOC coded as present the c(4)(c) (torture or depravity) and the c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history), and the c(5)(h) (catch-all) mitigating factors.

#### *Sharob Clowney*

Clowney, who was nineteen years old, raped the victim. He left her apartment and subsequently returned and chased her with a

knife. He then stabbed the victim thirty-nine times. He also stabbed her children, who were five and nine years old. The children survived, but their mother died from her wounds. Clowney recalled returning to the victim's apartment but had no recollection of the stabbings.

Clowney was a drug dealer and claimed to have sold drugs to the victim on numerous occasions. As an adult, he had a prior simple assault conviction. He also had an extensive juvenile record.

Clowney's parents were both alcoholics, and his father abused drugs. His mother once attempted suicide and was diagnosed with adjustment disorder and depression. Both his mother and her boyfriend physically and emotionally abused Clowney. Clowney's mother once cooked his pet hamsters in the oven and on another occasion she forced him to kill his dog.

Like his mother, Clowney was suicidal. He tried to cut his wrists when he was twelve. When he was eighteen years old, he severed his finger but refused to go to the hospital. One year later, he tried to kill himself by drinking bleach. After getting jailed for committing this murder, he attempted suicide by banging his head against the jail walls. He also burned his arm with cigarettes in order to alleviate his anger. He was diagnosed with intermittent explosive disorder and borderline personality disorder with anti-social features. He had been drinking beer since he was eleven years old. He also drank whiskey, smoked marijuana, and used cocaine.

The State did not prosecute Clowney capitally. A jury convicted him of murder, felony murder, attempted murder (two counts), aggravated sexual assault, and weapons offenses. The court sentenced him to life imprisonment with a thirty-year parole bar for the murder. His aggregate sentence was life imprisonment plus twenty years' imprisonment with a forty-year parole disqualifier.

The AOC coded as present the c(4)(b) (grave risk of death to another) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) mitigating factors.

### David Collins

Collins was angry at the victim, his girlfriend's mother, because she refused to permit him to see his girlfriend's baby. He waited in the victim's apartment for an hour. When she returned home, he beat her with a table leg, stabbed her, dragged her to the hallway, raped her, placed her in the bathtub, filled it with water, and left. She died of a fractured skull.

While incarcerated for this offense, Collins, who was twenty-one years old, received mental health treatment. This was his first conviction.

After the State served a notice of aggravating factors, Collins pled guilty to murder, robbery, burglary, aggravated sexual assault, possession of a weapon for an unlawful purpose, and hindering apprehension or prosecution. For the murder, the court sentenced him to life imprisonment with a thirty-year parole disqualifier. His aggregate sentence was life plus twenty years' imprisonment with a forty-year parole bar.

The AOC coded as present the c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(c)(age), c(5)(f) (no significant criminal history), and c(5)(h) (catch-all) mitigating factors.

### Jerome Dennis 1

Dennis, who was twenty-five years old, encountered a fourteen-year-old girl walking down the street. He forced her at knifepoint to go to the bushes along the side of the road. He stabbed her twenty-four times, raped her, tied her up with a sweatshirt, and covered her with leaves and twigs. Her dead body was found four months later.

Dennis had three prior sexual assault convictions, two prior criminal restraint convictions, and one prior robbery conviction. He had been paroled from Yardville State Prison only two weeks before this incident. In a four-month period, he committed this and four other homicides.

Dennis was charged with murder, but he pled guilty to felony murder, for which he received a life sentence with a thirty-year parole disqualifier.

The AOC coded as present the c(4)(g) (contemporaneous felony) aggravating factor and c(5)(h) (catch-all) mitigating factor.

*Jerome Dennis 2*

Six weeks after raping and murdering the fourteen-year-old girl described in Jerome Dennis 1, Dennis followed a thirty-year-old woman who was walking on the street. At knifepoint, he forced her down a stairway, made her undress, tied her up with shoe-strings, and raped her. He then stabbed her ten times and pushed her down a hill, where her body was found four months later.

The State charged Dennis with murder. Simultaneously with his plea of guilty to the first homicide, Dennis pled guilty to felony murder for this homicide and received a life sentence with a thirty-year parole disqualifier.

The AOC coded as present the c(4)(g) (contemporaneous felony) and c(5)(h) (catch-all) factors.

*Isaac Fullard*

Fullard sexually assaulted and stabbed his sister's best friend. She died from the seven stab wounds. Fullard had a puncture wound on his leg, which presumably was caused by a struggle with the victim.

Fullard had prior robbery and aggravated assault convictions. He had no mental ailments, but he did have a history of narcotics abuse.

The State prosecuted Fullard noncapitally. A jury convicted him of murder, felony murder, attempted aggravated sexual assault, and possession of a weapon for an unlawful purpose. The court sentenced him to seventy years' imprisonment, of which thirty were parole ineligible.

The AOC coded as present the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(h) (catch-all) mitigating factor.

*James Henderson*

Henderson, who was twenty-seven years old, and Gary Lippen, who was nineteen years old, were driving in Lippen's pickup truck when they saw the victim, their seventeen-year-old acquaintance. She accepted their offer for a ride, and they drove her to her home. The three entered her house, and they left in the truck shortly thereafter. The victim sat between Lippen, who was driving, and Henderson. Henderson bought a two-liter bottle of wine cooler, from which the three drank while Lippen drove around aimlessly. Lippen then drove to and stopped at a remote wooden area.

Henderson asked to see the victim's breasts. She refused, and Lippen told him to stop harassing her. Henderson complied for a minute and then threw her down and began to tear her shirt. Lippen then fondled her and held her down while Henderson raped her. Lippen also may have raped her.

Henderson and Lippen both struck the victim with a stick. Henderson then began choking her with his hands. Lippen handed Henderson the stick, which Henderson stuck into the victim's throat. Lippen put his hand on the stick, and the two men crushed the victim's throat. Henderson then stabbed her many times in the chest, genital area, neck, and back. Henderson and Lippen dragged her up a hill and hoisted her legs in a tree. Henderson twisted her legs around the tree, breaking them. Henderson put the knife in the victim's pocketbook and filled it with sand. They discarded the pocketbook in a lake. The victim's dead body was found three months later.

Henderson had one prior conviction for drug possession. He was illiterate and had a history of mental illness, for which he received treatment. (The AOC does not delineate the specific diagnosis.) His probation officer recognized that Henderson was emotionally disturbed.

Henderson pled guilty to murder and two counts of hindering apprehension. For the murder, the court sentenced Henderson to life imprisonment with a thirty-year parole disqualifier. The court imposed a consecutive five-year prison term with a two-and-one-half-year parole bar for the hindering apprehension convictions.

The AOC coded as present the c(4)(c) (torture or depravity) and the c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(d) (diminished capacity) and the c(5)(h) (catch-all) mitigating factors.

*Gary Lippen*

Lippen murdered the seventeen-year-old victim with codefendant James Henderson. Lippen claims he participated in the murder because he feared Henderson would kill him if Lippen refused to commit the crimes. The details of the crime are set forth in the summary of Henderson's prosecution. *Infra* at 139, 731 *A*.2d at 1046.

Lippen had no prior convictions. He also had no history of mental illness. Lippen abused alcohol, marijuana, and methamphetamines. After the victim's body was found, he was remorseful.

Lippen was charged with murder, but he pled guilty to aggravated manslaughter, hindering apprehension, and conspiracy. The court sentenced him to thirty years' imprisonment on the aggravated manslaughter conviction and five years' imprisonment with two and one-half years' parole ineligibility on the hindering apprehension conviction. The aggravated manslaughter sentence was subsequently reduced to twenty years' imprisonment with a ten-year parole disqualifier.

The AOC coded as present the c(4)(c) (torture or depravity) and the c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(e) (duress), c(5)(f) (no significant criminal history), and the c(5)(h) (catch-all) mitigating factors.

*Morey Marcus*

Marcus met the victim at a bar. They drank together and went to another bar. When that bar closed, Marcus and the victim left in his van. Marcus then attempted to rape her, and he stabbed her eleven times. The victim died from her stab wounds.

Marcus had prior convictions for assault, obstructing the mail, obtaining money under false pretenses, obtaining a debt due from the federal government, and conspiracy to engage in a theft of an interstate shipment.

Marcus was a Vietnam veteran. In combat, he was wounded by shrapnel. After receiving an honorable discharge, he was institutionalized for a month with post-traumatic stress disorder.

The State prosecuted Marcus noncapitally. A jury convicted him of murder, felony murder, and attempted aggravated sexual assault. The court sentenced him to life imprisonment with a thirty-year parole disqualifier for the murder and to a consecutive ten-year term for the attempted aggravated sexual assault.

The AOC coded as present the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors.

*Frank Masini 1*

Masini stopped at his eighty-five-year-old aunt's home purportedly to use her telephone. While washing out a soda glass in the kitchen sink, he saw a knife. He repeatedly stabbed his aunt in the neck, killing her. He also vaginally and anally raped her.

Masini had no prior criminal history, but this was one of four fatal stabbings he committed against elderly people in a short

timeframe. In the months before this murder, Masini claimed that he experienced detachments from reality.

Masini pled guilty to murder and received a life sentence with a thirty-year period of parole ineligibility.

The AOC coded as present the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors.

*Frank Masini 3*

Two weeks after killing his aunt, Masini was at the home of an eighty-year-old relative. After talking with her in the kitchen, he grabbed a knife from the kitchen counter, grabbed the victim from behind, repeatedly stabbed her in the neck, sexually assaulted her, and stole her ring. The victim died from the stab wounds.

Masini pled guilty to this murder and received another life sentence and thirty-year parole bar, which ran concurrently to the sentence he received for killing his aunt and to the consecutive life sentences he received for murdering an elderly couple.

The AOC coded as present the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors.

*Samuel Mincey*

Mincey broke into the home of the victim, who was seventy-three years old. He beat her severely, raped her, and strangled her. He stole two oriental dolls and a television set. Mincey was arrested six and one-half years later.

Mincey had sixteen prior convictions for aggravated assault, assault and battery, burglary, auto theft, receiving stolen property, and escape.

The State did not prosecute Mincey capitally, perhaps because the prosecutor believed that the statute of limitations barred a capital prosecution. A jury convicted Mincey of murder and felony murder. The court sentenced him to life imprisonment with a thirty-year parole disqualifier.

The AOC coded as present the c(4)(c) (torture or depravity), c(4)(f) (escape detection), and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(h) (catch-all) mitigating factor.

*Michael Relford*

Relford attempted to sexually assault the victim, who had awoken to find Relford, her neighbor, on top of her. Because of her friendship with Relford's grandmother, the victim decided not to pursue a prosecution against Relford.

Two years later, Relford returned. Despite the fact that the victim screamed for help and pled with Relford not to hurt or kill her, he punched her in the face, grabbed her neck, and fatally stabbed her twenty-five times in the shoulder, back, neck, and chest. He also removed her clothing from the waist down.

Relford had prior disorderly person convictions. The AOC summary does not reveal his age. He had a history of drug and alcohol abuse and claimed to have imbibed a pint of whiskey and used heroin and cocaine in the hours prior to the murder.

The State prosecuted Relford noncapitally. A jury convicted him of murder, felony murder, attempted sexual assault, and a weapons offense. The court sentenced him to life imprisonment with a thirty-year parole disqualifier for the murder and to an additional seven years' imprisonment for the sexual assault.

The AOC coded as present the c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history), and c(5)(h) (catch-all) mitigating factors.

*Frederick Ritchie*

Promising drinks and fun, Ritchie enticed the victim, a twelve-year-old boy, to sneak out of his parents' house. Ritchie and the victim went to Ritchie's trailer. Ritchie offered the victim alcoholic beverages and got him drunk. Ritchie and the victim removed their clothes. While perusing pornographic magazines, Ritchie

masturbated and inserted one dildo into his anus and another into the victim's.

Afterward, the victim severely injured his head twice. Ritchie claimed that the victim, staggering in a drunken stupor, struck his head on Ritchie's washing machine. The following morning, Ritchie took the victim, wrapped in a blanket, to a creek at a nearby wooded area. Ritchie maintained that the victim walked into a tree, struck his head, and fell backward. Ritchie fled. The victim was later found naked and facedown in a creek. The victim died from drowning and head injuries. Ritchie cleaned his trailer and discarded the dildos, blanket, and the victim's clothing. He confessed to committing this crime after being arrested for sexually assaulting a seven-year-old boy.

Ritchie had prior convictions for burglary, lewd and lascivious crimes against children, indecent exposure, and indecent proposal to a child. He was an Army veteran and was diagnosed with Crohn's disease. He was an alcoholic who had received treatment for alcohol abuse in the past.

The State charged Ritchie with murder, but Ritchie pled guilty to aggravated manslaughter, aggravated sexual assault (two counts), attempted aggravated sexual assault, kidnapping, and hindering apprehension. The court sentenced him to thirty years' imprisonment, of which eleven years were parole ineligible, for the aggravated manslaughter conviction. The court imposed an aggregate sentence of life plus thirty years' imprisonment with a thirty-seven-year parole disqualifier.

The AOC coded as present the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors.

### Leroy Taylor

Taylor got angry when his girlfriend told him that she was involved with another man. He had previously threatened to kill someone if she ever "put him down."

Taylor had the keys to his girlfriend's apartment, and he went to that apartment while his girlfriend was out with her paramour. Taylor raped and strangled his girlfriend's thirteen-year-old niece. Taylor's girlfriend found the victim, whose pants were removed and panties were torn and bloodstained, lying on the floor of the master bedroom.

Taylor's girlfriend told police that he admitted to her that he had raped and murdered the victim. She later retracted that statement.

Taylor gave police the clothes he had been wearing during the commission of the crimes. When the prosecutor's office sought his blood and hair samples, Taylor fled to California.

Taylor previously had been convicted of murdering a four-year-old girl in California who he had strangled. Because the victim's body had badly decomposed, it was impossible to determine whether Taylor had sexually assaulted her.

Taylor was on parole when he raped and murdered his girlfriend's niece. He was an airport maintenance serviceman. He had dropped out of high school, but he earned his G.E.D. He denied any history of drug or alcohol abuse.

Taylor was charged with capital murder, felony murder, aggravated sexual assault (three counts), threatening, hindering prosecution, and tampering with a witness. He pled guilty to felony murder, first-degree aggravated sexual assault, and witness tampering. Taylor was sentenced to life imprisonment with a thirty-year parole disqualifier on the felony murder conviction. The AOC coded as present the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(g) (catch-all) mitigating factor.

*Alphonso Timpson*

Timpson, who was nineteen years old, approached a twelve-year-old girl as she was walking home from school. He forced her into the woods and assaulted her. She fought back, and Timpson beat her severely and knocked her unconscious. He penetrated

her vagina with his fingers and penis. He also nearly bit off her breast. The victim screamed when she regained consciousness. He stuffed her panties in her throat, and she suffocated and died. As she was gasping for breath and dying, he continued to sexually assault her.

Timpson initially denied killing the victim but ultimately confessed to the kidnapping, rape, and murder. He blamed the killing on a series of arguments with his parents, his friend, former girlfriend, and his ex-girlfriend's brother.

Timpson had severe developmental disabilities and was borderline mentally retarded. At age nineteen, when he committed this crime, he had the mental development of a twelve-year-old. As a student, he acted violently when he became frustrated or angry. He was diagnosed as being highly impulsive and unable to exhibit emotional control. Moreover, he had a low frustration tolerance and responded to stress with quick and uncontrollable behavior. He smoked two marijuana cigarettes and drank two cases of beer each day. As a juvenile, he had attacked a girl under circumstances similar to those in this offense.

Timpson pled guilty to capital murder, aggravated sexual assault, and kidnapping. The plea was conditioned upon the trial court sentencing him to life imprisonment after a penalty hearing. In accordance with the terms of the plea agreement, the court sentenced Timpson to life imprisonment for the murder. The court found as present the c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) mitigating factors. The court found that the mitigating factors outweighed the aggravating factors and imposed an aggregate sentence of life imprisonment plus fifty years' imprisonment with a fifty-five-year parole disqualifier.

*James Williams 1B*

After drinking beer with his brother and some friends, Williams went to a nursing home. He approached the receptionist, pushed

her into a back room, and closed the door. Williams ordered her to take off her clothes. She began to take off her clothes but then stopped. Williams got angry and hit her. He forced her to the floor and raped her. After she screamed, he covered her mouth and stabbed her. She somehow rose to her feet, and Williams then repeatedly stabbed her in the back. As she was dying from the stab wounds, Williams stole her pocketbook.

Williams's childhood was filled with instability and emotional trauma. When he was nine, he accidentally shot and killed his younger brother. During his youth, Williams was placed in many different foster homes and received inadequate psychiatric intervention. Less than two months before the murder, Williams, a construction worker, was hit over the head by a falling cinder block. His behavior markedly changed, and he became paranoid after he injured his head.

A jury convicted Williams of murder, felony murder (three counts), armed robbery, burglary, and aggravated sexual assault. The jury found the c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(h) (catch-all) mitigating factor. The jury rejected the proposed c(5)(a) (extreme emotional disturbance), c(5)(c)(age), and c(5)(d) (diminished capacity) mitigating factors. The jury sentenced Williams to death. After this Court reversed the convictions and sentence, Williams pled guilty to felony murder, for which he received a life sentence with a thirty-year parole bar.

*Lester Wilson*

Wilson resided in the same hotel as the fourteen-year-old victim and often spent time in her hotel room. The victim's sister rebuffed Wilson's sexual advances. Wilson strangled and sexually assaulted the victim, who was found with a pillow covering her face. After he was brought in for questioning, Wilson unsuccessfully attempted to escape from the police station by jumping through a bathroom window. He confessed to killing the victim while waiting for an ambulance to transport him to the hospital.

Wilson was mildly retarded. He had no prior convictions.

The State did not prosecute Wilson capitally. A jury convicted him of murder and aggravated sexual assault. The court sentenced him to life imprisonment with thirty years of parole ineligibility for the murder and to a concurrent fifteen-year prison term for the aggravated sexual assault.

The AOC coded as present the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history), and c(5)(h) (catch-all) mitigating factors.

*James Zola 1B*

Zola had been a maintenance worker at the victim's apartment until he was fired, in part because of the victim's complaint against him regarding his poor installation of her new kitchen sink. Zola broke into her apartment, tied her up, beat her, scalded her, and mortally strangled her. In addition, there was some evidence indicating that he may have sexually assaulted her. *See ante* at 73–75, 731 *A.2d* at 1010.

Zola had no prior convictions, but one pending burglary and two pending theft charges. At the time of the murder, Zola purportedly had a paranoid delusion that he was being chased by police and police dogs. He claims he committed the crimes against the victim in order to prevent her from calling the police. When he was a child, Zola had been sexually abused. He was emotionally disturbed and addicted to drugs.

A jury convicted Zola of capital murder, burglary, aggravated sexual assault, kidnapping, and robbery. The jury found the c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(a) (extreme emotional disturbance) and c(5)(h) (catch-all) mitigating factors. The jury rejected the proposed c(5)(c)(age) and c(5)(d) (diminished capacity) mitigating factors. The jury sentenced Zola to death, but this Court reversed the sentence. The trial court granted a new trial based on newly discovered evidence. Zola pled guilty to murder and

received a life sentence with a thirty-year period of parole ineligibility.

<em>Salient–Factors Subcategory C–2</em>

*Vincent Brown*

The victim, a ten-year-old girl, went to the motel room where Brown had lived with the victim's aunt, who was Brown's girlfriend. Earlier that day, Brown and his girlfriend had had an argument, and she moved out. Afterward, Brown drank vodka and used cocaine throughout the day. Brown invited the victim, who did not know that her aunt no longer lived with Brown, into his room. He forced her to get on top of the bed and pulled down her pants and panties. Brown placed his penis against her vagina, but the victim cried and resisted him. Brown then lifted himself off of her and masturbated while the victim sat next to him. After they left the hotel room, the victim ran away from Brown and said that she was going to tell her mother about the sexual assault. Brown ran after and eventually caught up to her. He strangled the victim until she began foaming at the mouth two to three minutes later. When he let go of her, she fell to the ground. Brown left the victim in a ditch and ran away. After initially implicating a friend in the murder, Brown ultimately confessed to sexually assaulting and murdering the victim.

Brown had prior convictions for robbery, aggravated assault, simple assault, and resisting arrest. When he was a child, Brown's stepfather abused and raped him. At the time of the murder, Brown used alcohol and cocaine every day, and he had used heroin and LSD in the past. Brown was a reservist in the Army. While in jail after his arrest for the murder, Brown became suicidal and experienced hallucinations. He was sent to a psychiatric hospital, where he stayed for three and one-half months and was diagnosed as suffering from major depression with psychotic features. The court declared him incompetent to stand trial.

Brown eventually pled guilty to murder and sexual assault. The court sentenced him to life imprisonment with a thirty-year parole bar for the murder conviction and to a consecutive ten-year term with five years of parole ineligibility for the sexual assault conviction.

The AOC coded as present the c(4)(f) (escape apprehension) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors.

*Ralph Edwards*

Edwards, who was eighteen years old, was walking along railroad tracks when he saw the nine-year-old victim, who was on the platform of an abandoned railroad station, walk inside the station. Edwards went inside the station house to observe her. He asked her to sit with him on a mattress that was in the station. Edwards exposed himself to her and attempted to put her on her stomach so he could penetrate her anus. The victim kneed him in the groin and ran away. Edwards chased her and used a plastic strap he had found to restrain her. Edwards yanked the strap, which was wrapped around her neck. Dying from strangulation, the victim fell to the ground and hit her head. Edwards lifted her and placed her between two track railings. He retrieved a sheet from the mattress and covered her body with the sheet. The victim's body was discovered hours later. After Edwards was apprehended for raping a young boy near railroad tracks, he confessed to committing the murder of this victim.

Edwards had no prior convictions. He had a history of mental and psychological problems and functioned on the emotional level of a nine-year-old.

A jury acquitted Edwards of purposeful murder and convicted him of felony murder and attempted aggravated sexual assault. The jury found the c(4)(f) (escape apprehension) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal histo-

ry), and c(5)(h) (catch-all) mitigating factors. The jury rejected the c(4)(c) (torture or depravity) aggravating factor. The jury determined that the aggravating factors did not outweigh the mitigating factors. The court sentenced Edwards to life imprisonment with a thirty-year parole disqualifier on the murder conviction and to a consecutive ten-year term with five years of parole ineligibility for the attempted aggravated sexual assault conviction.

*Ambrose Harris*

Harris and his co-defendant, Gloria Dunn, met at a street corner to commit a robbery they had been planning for several weeks. Harris, who was carrying a revolver, decided to carjack a car to use in the robbery. Harris and Dunn observed the victim, a twenty-two-year-old female, drive a red sports car into a nearby driveway. Harris left and returned minutes later driving the car and holding the revolver. The victim was in the passenger seat.

Dunn entered the car and Harris drove to a secluded area. He forced the victim into the trunk and then drove back to the scene of the carjacking to retrieve and hide his bicycle, which he had left behind. When the victim made noise from inside the trunk, Harris stated to Dunn, "See, I should have popped her back then, she's making too much noise."

Harris drove back to the secluded area and made the victim get out of the trunk and remove her clothes. The victim reluctantly complied, and Harris sodomized her. After raping the victim, Harris put her back in the trunk and closed the hood. He told Dunn, who had witnessed the rape, to help the victim get out of the trunk. As Dunn helped the victim out of the trunk, Harris shot the victim in the back of the head. Harris then dragged her to a wooded area and covered her with a mattress.

Harris and Dunn drove to Harris's house to retrieve two shovels in order to bury the victim's body. When they returned to where they had left the body, Harris shot the victim in the face to "make

sure she's dead." Harris took the victim's money, identification, and credit cards, and he and Dunn buried the body.

At the time of the murder, Harris was forty years old and lived with his mother, who had a conviction for murder. His father was a heavy drinker and had left the household when Harris was three years old. Harris had an abusive childhood. As a juvenile, he was extremely violent and molested several girls. Consequently, he was committed to the State Psychiatric Hospital for a number of months.

Harris had a history of drug and alcohol abuse. He was diagnosed with mild mental retardation. He had an extensive criminal record, having been convicted of armed robbery, aggravated assault, attempted robbery, weapons offenses, terroristic threats, receiving stolen property, larceny, breaking and entering, assault, and shoplifting.

A jury convicted Harris of capital murder, felony murder, kidnapping, robbery, aggravated sexual assault, possession of a weapon for an unlawful purpose, theft by unlawful taking, credit card theft, and attempted unlawful use of a credit card. The jury found the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(h) (catch-all) mitigating factor. The jury also unanimously found that the aggravating factors outweighed the mitigating factors, and Harris was sentenced to death for the murder conviction. On the remaining convictions, the court sentenced Harris to an aggregate term of life plus fifty-five years' imprisonment, with fifty-two and one-half years' parole ineligibility.

### Mark Luciana

Luciana, who was twenty-years old, attended an evening party with two male friends, a twelve-year-old girl, and the fifteen-year-old victim. At approximately 12:30 a.m., the group left the party and headed for a nearby wooded area. Luciana walked into the woods with the victim. He sexually assaulted the victim and strangled her with her brassiere. Luciana left the victim's body

and rejoined the others, telling them that the victim left him for a moment but did not return. Luciana then pretended to look for the victim. Sometime later, he drove one of his male friends home and dropped the twelve-year-old girl off at the victim's home.

Luciana and his other male friend returned to the wooded area and retrieved the victim's body. Luciana put the victim's body into the trunk of the car. When his friend awoke early in the morning, Luciana showed him the victim's body. Luciana's friend informed police about the murder, and Luciana turned himself in to police headquarters two days later. Luciana's ex-girlfriend provided a statement indicating that Luciana would become violent after drinking and being refused sex. Luciana's jail cellmate told police that Luciana told him that "the bitch wouldn't give it up, so now she's not breathing," and that he enjoys inflicting pain on his partners during sexual encounters.

Luciana dropped out of high school after completing ninth grade, but he later received his G.E.D. and attended classes at a community college. At the time of the murder, Luciana was employed at his stepfather's paving business. There was evidence that Luciana had both an alcohol and drug problem and that he suffered physical and emotional abuse as a child. Luciana stated that he feels little empathy for those around him. In the year prior to the murder, Luciana was convicted of drug possession and receiving stolen property.

Luciana was charged with purposeful murder, knowing murder, felony murder, aggravated sexual assault, hindering apprehension, and endangering the welfare of a child. In a capital trial, Luciana was found guilty of all counts. At the penalty phase, Luciana asked the jury to spare his life, saying that although he could not undo the terrible thing he did, he was truly sorry and did not mean to kill the victim. A defense psychologist suggested that Luciana had an anti-social personality disorder as a result of being neglected as a child. The psychologist also testified that Luciana was very immature and that, on the night of the murder, Luciana's

mind was clouded by alcohol and marijuana. The jury found two aggravating factors—4(f) (escape detention) and 4(g) (contemporaneous felony)—and four mitigating factors—5(c)(age), 5(d) (mental disease), 5(f) (criminal history), and 5(h) (catch-all). The jury was unable to reach a decision regarding the weighing of the factors. Luciana was sentenced to life imprisonment, with thirty years' parole ineligibility. He was sentenced to a consecutive term of nineteen years' imprisonment for sexual assault and hindering apprehension.

*Michael Manfredonia*

Michael Manfredonia's fourteen-year-old victim was walking the three-mile distance between her high school and home after having missed the school bus. Unbeknownst to the victim, Manfredonia was watching her from a nearby gas station. As the victim passed, Manfredonia pushed her down on the ground, sexually assaulted her and stabbed her twenty-six times in the chest and back area. Fifteen of the twenty-six stab wounds did not penetrate deeply into the victim's body and were apparently inflicted to cause pain in a torture-like fashion. Manfredonia then dragged the victim's body through the woods, dropped her in a ditch and covered her body with a pile of dirt, rocks and sticks.

Two days after the murder, when the police arrived at Manfredonia's home to arrest him, they discovered Manfredonia in the bathroom with a razor blade trying to slit his wrists. Manfredonia told the police he also had taken some pills. In the ambulance and again at the hospital, Manfredonia admitted assaulting and stabbing the victim.

A psychiatrist testified that, according to Manfredonia, he had been talking to the victim and asked her to go out with him. The victim refused and began yelling at Manfredonia and making fun of the way he looked and dressed. Manfredonia told the victim to wait while he retrieved a knife from his car. When he returned, he told the victim he didn't like being made fun of and threatened to kill himself. The victim replied that he was acting like a little

kid and that she did not care what he did. Manfredonia remembered pushing the victim down, but he did not remember killing her. The psychiatrist also testified that Manfredonia's electroencephalogram suggested a possible structural abnormality in his brain.

Manfredonia, who was nineteen at the time of the murder, is mentally retarded with an I.Q. of 78. He had no prior criminal record.

Manfredonia waived his right to a jury trial at both the guilt and penalty phases. The trial court convicted Manfredonia of murder, felony murder, aggravated sexual assault, kidnapping, and possession of a weapon for an unlawful purpose. The judge found the c(4)(c) (extreme suffering), c(4)(f) (escaping apprehension), and c(4)(g) (contemporaneous felony) aggravating factors, but treated c(4)(f) and c(4)(g) as a single factor, finding them to be intertwined factors with overlapping motives. The judge found the c(5)(a) (emotional disturbance), c(5)(c) (age of defendant) and c(5)(f) (no significant prior criminal record), as mitigating factors. The judge found that the mitigating factors outweighed the aggravating factors. For the murder, the court sentenced Manfredonia to life imprisonment with a thirty-year period of parole ineligibility. The felony murder was merged with the murder count for purposes of sentencing. On the remaining counts, the court sentenced Manfredonia to thirty years' imprisonment with a fifteen-year parole ineligibility period for the kidnapping, and twenty years' imprisonment with a ten-year period of parole ineligibility for the aggravated sexual assault, both sentences to run consecutively with the term of life imprisonment.

*Vincent Charles Marino*

Marino, thirty-two years old, spent the afternoon at the home of the victim, a twenty-three-year-old woman who lived with her boyfriend and their four-year-old son. Throughout the afternoon, Marino smoked crack cocaine with several people, including the victim. Eventually, Marino left with the last vial of crack; Marino

later told police that he hoped to use the last vial of crack to lure the victim to his house for a sexual encounter.

The victim went to a bar with a friend, and Marino met up with the two women later that evening. The victim left the bar with Marino and went to his home. After Marino and the victim smoked the vial of crack, the victim's friend brought her home. Later that night, the victim told her boyfriend that she was going out for a few minutes. The victim did not return.

The victim's body was found by police in Marino's basement. Marino, who stood six feet tall and weighed 240 pounds, made a formal statement in which he stated that he smoked crack with the victim and then lured her into the basement on the pretense that additional cocaine was hidden there. Marino made sexual advances toward the victim, but she rejected his advances. Marino then strangled her with her lingerie, and engaged in sexual intercourse with the victim.

Marino pled guilty to felony murder and was sentenced to thirty years' imprisonment without parole. At the time of the murder, Marino was addicted to crack. In the past, he had attended a mental health program and Alcoholics Anonymous meetings. He had prior convictions of sexual assault and burglary.

*Adam Marrero*

Marrero, twenty-three years old, accompanied his uncle to a friend's home where he was introduced to the victim, a thirty-four-year-old woman. Later that evening, the victim left with Marrero, who had offered to drive her home. Marrero and the victim were seen at a local restaurant where they had a few drinks and danced. According to the bartender, Marrero and the victim left the restaurant at about 1:30 a.m. Twelve hours later, the victim was reported missing. After a preliminary investigation, Marrero was held in the county jail for the safety of the public, pursuant to a court order.

Less than forty-eight hours after she had been reported missing, the victim's body was found in a wooded area approximately

seventy yards from the road. The victim was naked and her body partially decomposed, but she was positively identified through dental records. An autopsy indicated that the cause of death was strangulation. Although it could not be determined whether the victim had been sexually assaulted, semen was found on the victim's clothing.

Marrero's cellmate at the county jail told police that he had a conversation with Marrero in which Marrero claimed that he went out with the victim for a few drinks and stopped to have sex on the way home. Marrero "grabbed" the victim after she smacked him. Eventually Marrero realized that the victim had stopped breathing.

Marrero grew up with an abusive alcoholic father and was beaten regularly. He is a high school dropout. Marrero claimed that prior to his arrest, he was drinking two to three eight-packs of beer a week, smoking marijuana once or twice a week, and using cocaine once a week. Marrero had worked as a carnival worker, diner employee, farm laborer, and security guard. Marrero had a previous conviction of sexual assault and terroristic threats. At the time of the murder, he was on bail awaiting sentencing.

Marrero was charged with purposeful murder, felony murder, kidnapping, aggravated sexual assault, and sexual assault, and a jury found Marrero guilty of all counts except sexual assault. Marrero was sentenced to two concurrent life terms, with thirty years' parole ineligibility, for purposeful murder and felony murder. He also received a consecutive sentence of twenty years' imprisonment for kidnapping and a concurrent sentence of twenty years for aggravated sexual assault.

*Jerry Jerome Spraggins*

Jerry Jerome Spraggins was driving home from work when he noticed an apartment with the window shade up. He removed a screen and climbed through the window. The victim, a sixty-eight-year-old woman, was lying on the couch. Spraggins put a

pillow over the victim's face to prevent her from screaming and sexually assaulted her. He took the victim's pocketbook and a gold chain before leaving through the window. An autopsy later confirmed that the victim was smothered and strangled.

When he was arrested, Spraggins confessed to the sexual assault. He admitted placing the pillow over the victim's face, but claimed that he was unaware that the victim was dead when he left the apartment. He denied taking any of the victim's possessions. Spraggins was eventually linked to the murders of two other women in the same apartment building.

Spraggins had prior convictions for invasion of privacy, larceny, criminal trespass, criminal sexual contact, and indecent exposure. He had undergone "minimal mental health counseling" in the past.

A jury convicted Spraggins of burglary, aggravated sexual assault, purposeful and knowing murder, and felony murder of the victim. He was acquitted of the other two homicides. At the penalty trial, a psychiatrist testified that Spraggins suffered from an uncontrollable need to view women. The jury found the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(d) (diminished capacity) and c(5)(f) (no significant criminal history) mitigating factors. The jury rejected the c(4)(c) (torture or depravity) aggravating factor and the c(5)(c)(age) and c(5)(h) (catch-all) mitigating factors. Spraggins was sentenced to a life term with a thirty-year parole disqualifier on the murder conviction, a consecutive twenty-year term with a ten-year parole disqualifier for the aggravated sexual assault, and a concurrent ten-year term for the burglary. The felony murder charge was merged with the murder charge.

*Gerald Williams*

Gerald Williams had been employed in the victim's apartment building for approximately four months. After he was fired, he began living in vacant apartments and stairwells in the building. The victim, a fifty-nine-year-old woman, was found dead in her apartment, lying naked on the floor with her right wrist and ankle

tied with a rope. An autopsy revealed that the victim had been strangled and sexually assaulted, both vaginally and anally, with a small white vase and a bottle of body oil. Williams's thumbprint was found on the bottle, and a yellow sock with semen on it was found at the crime scene. Williams had an unusual gene that matched semen samples taken from the sock.

Williams had prior convictions of assault and robbery. He had a history of depression and had been using cocaine and alcohol daily for fifteen years. He had graduated from high school and attended two years of college, had served in the Navy until he was honorably discharged, and had been most recently employed as a maintenance worker.

Williams was charged with burglary, two counts of aggravated sexual assault, criminal restraint, felony murder, murder, unlawful possession of a weapon, and possession of a weapon for an unlawful purpose; he was convicted by a jury on all counts. He was sentenced to life, with thirty years' parole ineligibility, for the murder conviction and received the following consecutive sentences: ten years' imprisonment for burglary; twenty years' imprisonment for each count of aggravated sexual assault; five years' imprisonment for criminal restraint; and five years' imprisonment for the weapons conviction. The balance of the charges were merged for sentencing purposes.

*Salient–Factors Subcategory C–3*

*Founcill Brockington*

The twelve-year-old son of the victim was awakened by what he believed was someone screaming. He went to his mother's room and saw Brockington kneeling on the floor next to the bed. Brockington appeared to be engaging in sexual activity. When the boy asked where his mother was, Brockington replied that she was sleeping and told the boy to leave the room. As the boy left, Brockington leaned over to close the door and the boy saw that Brockington was nude from the waist down. Brockington left the

building ten to fifteen minutes later, and the boy returned to his mother's room where he discovered her body. He immediately contacted the police.

The police arrived and found the victim lying on the floor with her pants and underwear pulled down. There was blood on the victim's face, in her hair, in each nostril, and on the wall, carpet, and bed sheets. An autopsy revealed that the victim had been strangled to death. Brockington admitted to police that he had struck the victim in the head with a pointed object, and that he had fondled and penetrated her vaginal area with his hands for sexual gratification.

Brockington had no prior criminal record or history of mental problems. He claimed that he used cocaine weekly.

Brockington pled guilty to aggravated manslaughter. The court sentenced him to a twenty-five-year term, of which eight years were parole ineligible.

*Eugene Edwards*

Eugene Edwards, thirty-years old, and co-defendant Michael Prater agreed to lure a prostitute to Edwards's house by offering her drugs in exchange for sex. They agreed that if the prostitute "got strange, they would eliminate her." To that end, Edwards directed Prater to a knife in a first-floor room. Prater lured in and took the twenty-three-year-old victim to a second-floor room where he produced the knife and order her to disrobe. Prater then raped her while holding the knife to her head. Edwards entered the room and watched the rape while the victim pleaded with the two men not to harm her. Edwards urged Prater to hurry up, then took his turn raping the victim. After Edwards left the room to clean himself up, he heard a thump and returned to find that Prater had stabbed the victim.

Edwards told Prater the killing need not be bloody and began to strangle the victim with his belt. Edwards then tried to asphyxiate the victim by covering her mouth with one hand and pinching her nose closed with the other. Meanwhile, Prater

stabbed her three or four more times. After she appeared dead, Prater and Edwards wrapped the victim's body in a quilt and carried her down to the basement. Edwards went upstairs to clean up the blood and returned to find Prater hitting the victim over the head with tin cutters, saying he wanted to make sure she was dead. Edwards told Prater to "let it rest."

Two days later Edwards wrapped the body in a different quilt and laid it alongside an outside wall of his residence. After the body was located and Edwards was arrested, he gave a voluntary statement implicating himself and Prater.

Edwards had no prior record and no history of mental problems.

Edwards pled guilty to murder, robbery and aggravated sexual assault. For the murder, the court sentenced him to a term of life imprisonment with thirty years' parole ineligibility. For aggravated sexual assault, the court sentenced him to a consecutive term with ten years' parole ineligibility. For the robbery, the court sentenced Edwards to a concurrent twenty-year term, of which ten years were parole ineligible.

*Frederick Neuschwanter*

While driving home from a party, Frederick Neuschwanter saw the victim, an eighteen-year-old acquaintance. He picked her up and proceeded to a liquor store where he purchased alcohol. Neuschwanter then parked his car near a cemetery and he and the victim began to drink. Neuschwanter attempted to remove the victim's pants but she told him to stop. When he persisted, the victim grabbed a hunting knife and the two began to struggle. Neuschwanter stabbed the victim eight times in the head, neck, and chest. He also beat her, causing bruises and breaking her jaw. The victim's body was found later that day. Neuschwanter initially gave police conflicting accounts of the incident, but later confessed.

Neuschwanter, a high school dropout, was employed by a heating and air conditioning company. He had no prior record and no

mental or physical health problems. He had a history of alcohol abuse.

Neuschwanter pled guilty to aggravated manslaughter. He received a thirty-year sentence with fifteen years of parole ineligibility.

## Other Defendants

### Kevin Aquino

Nineteen-year-old Aquino, "desperate for sex," broke the glass door of the family room at a neighbor's house, through which he could see the six-year-old victim and her sister sleeping. A third sister was upstairs asleep in her bed. The girls' parents were attending a neighbor's party and left their three children home. Aquino picked the girl up and carried her to his backyard where he intended to have sex with her. When the girl began to make a lot of noise, Aquino dragged her into the wooded area behind his home and "smashed her head against a tree." Aquino intended to kill the girl because "he didn't want to get caught."

At the age of seventeen, Aquino had been convicted of three counts of aggravated sexual assault for incidents involving his younger brother, a five-year-old girl, and a four-year-old boy. At eighteen, Aquino was arrested and convicted for two incidents of trespassing on school property. Approximately two weeks before the present offense, Aquino was charged with disorderly conduct after attempting to lure a thirteen-year-old into his home.

Aquino was placed in emergency foster care at the age of three after suffering an overdose of prescription medication. Aquino, who did not yet speak and was not then toilet trained, was found to be emotionally deprived. He was adopted by his parents at the age of four and one-half. Shortly after beginning school, Aquino was diagnosed as emotionally disturbed. After his convictions for aggravated sexual assault, Aquino was diagnosed with impulse control disorder and received psychiatric counseling up until three weeks before the present offense. Aquino's doctor concluded that

Aquino was dangerous because of his increasingly violent and sexual thoughts toward children. The doctor believed Aquino needed constant supervision and urged Aquino's parents to find him a residential treatment program.

Defendant pled guilty to murder, felony murder and kidnapping. For the murder, the court sentenced him to a term of life imprisonment with thirty years' parole ineligibility. For the kidnapping, the court sentenced defendant to a consecutive term of life imprisonment, with twenty-five years' parole ineligibility. The felony murder conviction merged for purposes of sentencing.

*Carlos Vasquez*

The body of Vasquez's victim, a thirteen-year-old neighbor, was found inside yellow plastic garbage bags placed in a box at the entrance of an alleyway. The victim's hands and feet were tied together behind her back with electrical cord and clothesline. The cause of death was asphyxia caused by strangulation; ligature strangulation; and fracture of the cervical spine.

Although initially denying involvement in the crime, Vasquez ultimately confessed to sexually assaulting and murdering the victim. Vasquez at first stated that the victim went to his house to wrestle with him, that the victim had the devil in her eyes, and that he tied her with a cord but did not rape her. He later indicated that he wished also to confess to the rape of the victim. In a pre-tape interview, Vasquez stated that he got the victim into his house through a discussion of religious matters. Once inside, Vasquez raped and then asphyxiated the victim with a towel. In the videotaped confession that followed, Vasquez stated that he began talking to the victim about the Bible. Without realizing it, they began to walk up the stairs towards his house. Once inside, they struggled and fell to the floor and began petting each other. They had intercourse and then the victim got up and began punching and smacking Vasquez. He put a gag in her mouth and a towel around her mouth and nose. Vasquez stated the victim may have banged herself on a piece of furniture.

Vasquez had been convicted of murder in his native Puerto Rico in 1975. He was paroled in 1982 and came to the United States in 1987. Vasquez denied any physical or mental health problems or any problems with substance abuse.

Vasquez pled guilty to felony murder and aggravated sexual assault. For the murder, the trial court sentenced him to a term of life imprisonment with a thirty-year period of parole ineligibility. For the aggravated sexual assault, the court sentenced Vasquez to a consecutive twenty-year term, ten years of which were parole ineligible.

HANDLER, J., dissenting.

Defendant David Cooper was convicted of the purposeful and knowing murder of L.G., a six-year-old girl, whom the jury concluded defendant kidnapped, sexually assaulted and then strangled. The jury found two aggravating factors, that defendant committed the murder to escape detection, *N.J.S.A.* 2C:11–3c(4)(f), and that he had done so in the course of committing an aggravated sexual assault and kidnapping, *N.J.S.A.* 2C:11–3c(4)(g). The jury rejected the State's submission of the c(4)(c) aggravating factor, that the murder had involved torture or aggravated assault to the victim.

The jury found numerous mitigating factors pursuant to the catch-all c(5)(h) factor, the sum of which provide a picture of a defendant who suffered throughout his youth from extensive abuse and neglect, as well as exposure to drug and alcohol addiction. *See ante* at 67–68, 731 *A.2d* at 1006–07. The jury found, however, that the aggravating factors outweighed the mitigating factors.

The jury sentenced Cooper to death on the capital murder charge. The trial court sentenced defendant to fifty years imprisonment with a twenty-five-year parole disqualifier on the kidnapping count and to twenty-five years imprisonment with a ten-year parole disqualifier on the aggravated sexual assault count. The

trial judge merged defendant's felony murder conviction with the purposeful or knowing murder conviction.

On direct appeal, this Court affirmed defendant's convictions and sentences for capital murder and kidnapping. The Court vacated defendant's sentence for aggravated sexual assault, merging that conviction with his kidnapping conviction. *State v. Cooper*, 151 *N.J.* 326, 406–07, 700 *A.*2d 306 (1997).

Defendant requested a proportionality review for his death sentence pursuant to *N.J.S.A.* 2C:11–3e, which we granted. The Court now finds that defendant's sentence is proportionate. I disagree, for several reasons.

First, the Court should not delay in declaring the 1992 amendment, which limits the universe of comparison cases in proportionality review to death-sentenced defendants, unconstitutional. *Accord State v. Harvey*, 159 *N.J.* 277, 354, 731 *A.*2d 1121 (1999) (*Harvey III* ) (Handler, J., dissenting); *State v. Loftin*, 157 *N.J.* 253, 373, 724 *A.*2d 129 (1999) (*Loftin II* ) (Handler, J., dissenting). The Court has stated very clearly that a universe consisting only of death-sentenced cases would be "inadequate," *State v. Marshall*, 130 *N.J.* 109, 136, 613 *A.*2d 1059 (1992) (*Marshall II* ), and that a universe of all death-eligible cases would best serve "the purposes to be achieved by proportionality review[,]" *id.* at 137, 613 *A.*2d 1059. This finding has now been validated by The Honorable David S. Baime, whom the Court, in *Loftin II, supra*, 157 *N.J.* at 265, 724 *A.*2d 129, appointed as Special Master to examine our proportionality review methodology and make recommendations for improvements. *See* The Honorable David S. Baime, *Report to the New Jersey Supreme Court: Proportionality Review Project* 10 (Apr. 28, 1999) (*Special Master Report* ) ("I emphasize that a universe limited to cases in which the death sentence was imposed cannot support a coherent proportionality review system."). Having stated that "[o]n our receipt of [the Special Master's report], we will be in a position to determine whether the statutory limitation on the proportionality review universe prevents meaningful appellate review[,]" *Loftin II, supra*,

157 *N.J.* at 287, 724 *A.2d* 129, the Court need not, and should not, wait any longer to declare the 1992 amendment unconstitutional, *see ante* at 73–74, 731 *A.2d* at 1009–10 (echoing *Loftin II, supra,* in which the Court deferred decision on 1992 amendment "until the Court [has] received Judge Baime's report").

Second, I disagree with the Court's application of existing proportionality review methodology to defendant's case. Given our acknowledgment that the current methodology is flawed in various important ways, evidenced most compellingly by the Court's decision to appoint Judge Baime to study the problems,[1] we cannot, in good conscience, ignore the Special Master's recommendations for improvement in our evaluation of defendant's claim. *Accord Harvey III, supra,* 159 *N.J.* at 352, 731 *A.2d* 1121 (Handler, J., dissenting).

Third, and most importantly, I disagree with the Court's rejection of defendant's claim that the death penalty statute must be invalidated because of the unconstitutional risk that race discrimination plays a role in the prosecuting and sentencing of death-eligible defendants in New Jersey. *See ante* at 115–16, 731 *A.2d* at 1034. I find that defendant, like those before him who presented the same compelling data, *see Harvey III, supra; Loftin II, supra,* has documented such an unconstitutional risk. We must no longer ignore the fact that our efforts to cleanse the justice system of race discrimination may well have failed. *See Harvey III, supra,* 159 *N.J.* at 366–68, 731 *A.2d* 1121 (Handler, J., dissenting) (examining Court's early use of extensive *voir dire* in racially charged cases to try to identify and eliminate racist jurors). When the final punishment is death, we cannot, in good conscience, keep postponing our acknowledgment that statistical data, along with what we know about history and our society, *see id.* at 361–74, 731 *A.2d* 1121 (Handler, J., dissenting) (detailing evidence

---

[1] Judge Baime was asked to explore eight substantive areas in his evaluation. *See Loftin II, supra,* 157 *N.J.* at 454–56, 724 *A.2d* 129.

of race discrimination in *CCH Report* from capital-sentencing database, as well as in larger society); *Loftin II, supra,* 157 *N.J.* at 405–409, 724 *A.*2d 129 (Handler, J., dissenting) (recounting history of race discrimination in the criminal justice system in New Jersey and United States), require us to declare the death penalty statute unconstitutional.

No evidence to date has demonstrated that race discrimination does *not* play a role in our prosecution and sentencing of capital cases. We must act now to invalidate the death penalty statute, or, at the very least, to place a moratorium on executions until we have such evidence. *Accord Harvey III,* 159 *N.J.* at 374, 731 *A.*2d 1121 (Handler, J., dissenting); *Loftin II,* 157 *N.J.* at 446, 724 *A.*2d 129 (Handler, J., dissenting).

In addition to my conclusions with regard to systemic issues, I disagree with the Court's final disposition on defendant's individual proportionality review claim under existing proportionality review methodology. I believe that defendant's sentence is disproportionate when his case is compared to those of other similarly situated defendants. I also maintain that the Court's approach to proportionality review remains unworkable due to its inherent potential for subjectivity and manipulation. The Court's proportionality review methodology yields results that "respond[ ] simply to considerations that 'are moral and hopelessly subjective and value-laden' in nature." *State v. DiFrisco,* 142 *N.J.* 148, 213, 662 *A.*2d 442 (1995) (*DiFrisco III* ) (Handler, J., dissenting) (quoting *Marshall II, supra,* 130 *N.J.* at 265, 613 *A.*2d 1059 (Handler, J., dissenting)); *see also State v. Martini,* 139 *N.J.* 3, 106–07, 651 *A.*2d 949 (1994) (*Martini II* ) (Handler, J., dissenting) ("Although originally designed as the more objective of the two methods that make up proportionality review, frequency analysis as applied by the Court does little more than set the stage for whatever subjective determinations or moral judgments might be made under the precedent-seeking approach.") (citing omitted).

Although these pitfalls in the majority's analysis are not as prevalent in the present case as in some other cases, they nevertheless exist, and the Court ought not delay its examination of the Special Master's recommendations and the construction of a more objective and methodologically sound review. Until we have established such a methodology, we should refrain from conducting proportionality reviews.

I, therefore, dissent.

I

I have already addressed in previous cases the systemic issues before the Court. *See Loftin II, supra,* 157 *N.J.* at 373, 724 *A.*2d 129 (Handler, J., dissenting) (criticizing Court's application of faulty methodology to defendant's case, Court's decision to defer judgment on 1992 amendment, and Court's failure to acknowledge presence of race discrimination in capital sentencing scheme); *Harvey III, supra,* 159 *N.J.* at 352–55, 731 *A.*2d 1121 (Handler, J., dissenting) (same); *DiFrisco III, supra,* 142 *N.J.* at 212–13, 662 *A.*2d 442 (Handler, J., dissenting) (citing coding problems, Court's refusal to quantify disproportionality in its frequency review, and "pervasive ambiguity" in precedent-seeking review); *Martini II,* 139 *N.J.* at 82–106, 651 *A.*2d 949 (Handler, J., dissenting). Here, I will focus solely on my objection to portions of the Court's analysis of defendant's individual proportionality claim.

A.

First, the Court has drastically, and without explanation, discarded the fundamental basis of its own original standard for measuring disproportionality. In its first proportionality review, the Court clearly stated:

We believe that the frequency approach will help us to review cases in terms of the substantive principle that we believe should be controlling in these cases, namely, "[a] death sentence is comparatively excessive if other defendants with similar

characteristics generally receive sentences other than death for committing factually similar offenses in the same jurisdiction."

[*Marshall II, supra,* 130 *N.J.* at 153–54, 613 *A.*2d 1059 (quoting *Tichnell v. State,* 297 *Md.* 432, 468 *A.*2d 1, 17 n. 18 (1983)).]

This standard, in and of itself, is one that fails to provide much guidance for the Court in the absence of some numerical guideposts to ensure consistency over time. In *Marshall II* and subsequent cases, however, the injection of a substantively different standard into the analysis, without explanation, only added to the difficulty in establishing a stable benchmark for disproportionality. The Court introduced the "aberrational" standard only in passing at first, *id.* at 167, 613 *A.*2d 1059 ("[B]ecause the case before the Court is a partial reflection of community values, even if aberrational, it should be considered."), and then more definitively: "[W]e conclude that capital death sentencing for contract murderers is not random or aberrational." *Id.* at 174, 613 *A.*2d 1059. Even in *Marshall II,* however, the Court did not engage in any discussion of how to reconcile the imposition of an "aberrational" standard with the Court's stated goal to measure disproportionality by a general imposition standard.

At the time, I criticized the Court for employing a "subjective intuitive examination of precedent," which allowed the majority to reach the conclusion that defendant Marshall's sentence was not disproportionate. *Id.* at 250, 613 *A.*2d 1059 (Handler, J., dissenting). I have since echoed this concern by noting the number of unquantifiable and substantively different *verbal,* rather than *numerical* standards the Court has employed over time to measure disproportionality. *Harvey III, supra,* 159 *N.J.* at 356–57, 731 *A.*2d 1121 (Handler, J., dissenting) (listing fourteen qualitatively different standards used by Court in its proportionality reviews to date). Unanchored to a quantifiable or numerical base, proportionality review continues to drift away from its goal.

The general imposition standard will never yield a proportionate death sentence because of our growing database and the remaining infrequency with which New Jersey juries sentence defendants

to death. *See Loftin II, supra,* 157 *N.J.* at 418 n. 18, 724 *A.*2d 129 (Handler, J., dissenting). Instead of acknowledging this development, the Court, accommodating the existing data, has changed the standard to produce findings of proportionality. *See ante* at 107, 731 *A.*2d at 1029 ("Our primary objective is the detection and prevention of aberrational sentences."); *id.* at 115, 731 *A.*2d at 1034 ("Proportionality review seeks to determine only whether a particular death sentence is aberrational . . . .") (citation omitted). "[T]he Court's review seems almost to be guided by an effort to find proportionality at all.costs, rather than to root out disproportionality." *Harvey III, supra,* 159 *N.J.* at 413, 731 *A.*2d 1121 (Handler, J., dissenting); *see also Chew II, supra,* 159 *N.J.* at 268, 731 *A.*2d 1070 (Handler, J., dissenting) (stating that proportionality review has been reduced to "whatever works" to justify a finding of proportionality).

The Court's failure over time to directly address the inseparable issues of subjectivity and broad application, as well as its subtle eradication here of all but the most narrow of standards, reveals its inability to grasp the need for a numerical preponderance standard, among other things, so that we can, finally, be sure what we mean by "disproportionality." *See Harvey III,* 159 *N.J.* at 412, 731 *A.*2d 1121 (Handler, J., dissenting) ("It is time for the Court to articulate what it means by disproportionate, rather than to continue to insist that it knows only when a sentence is *not* disproportionate."); *Loftin II,* 157 *N.J.* at 419, 724 *A.*2d 129 (Handler, J., dissenting) (calling for numerical majority or preponderance that can be equated with proportionality) (citing *DiFrisco III, supra,* 142 *N.J.* at 212, 662 *A.*2d 442 (Handler, J., dissenting); *Martini II, supra,* 139 *N.J.* at 90–91, 651 *A.*2d 949 (Handler, J., dissenting); *Bey IV, supra,* 137 *N.J.* at 408, 645 *A.*2d 685 (Handler, J., dissenting)).

If the Court is to ignore precedent in this dramatic way, it should do so in an overt manner by providing an explanation for its narrowing of the Court's standard for determining when a

sentence is disproportionate. It may be that after review of the Special Master's recommendations, the Court will want to start with a clean slate, clarifying not only our methodology, but also the very definition of disproportionality. At that point, we would be well-served to attack the issue of subjectivity head-on by establishing a realistically applicable standard by which to measure disproportionality, which the Court has so far failed to do.

In the meantime, we must ask, as the Nebraska Legislature recently did in its own state, why the individuals who now sit on death row—only thirteen out of a death-eligible universe of 433—are being treated differently from the others. *See* Dirk Johnson, *Legislature of Nebraska Votes Pause In Executions, N.Y. Times,* May 21, 1999, at A14 (Reporting Republican Nebraska Senator Kermit A. Brashear's statement, "[W]hen I see 165 murderers in Nebraska prisons and only 10 are on death row, I want to know, Why are some of these people treated differently?").[2] While our proportionality reviews have been more extensive than those in Nebraska, we have often been unable to articulate why certain defendants are sentenced to prison and others to death. *See ante* at 107, 111, 114–15, 731 *A.*2d at 1029, 1032, 1033 (stating that the AOC's summaries provide no explanation for the prosecutors' decisions to forego capital punishment in six cases in comparison group). As long as this is the case, we should take the Nebraska Legislature's lead in placing a moratorium on executions (and proportionality reviews) until we have an adequate system in place to gather the information that is necessary to prevent grave injustice.

### B.

Second, the Court, in my view, once again misinterprets the results in the salient-factors test. Here, as in past cases, *see*

---

[2] Republican Nebraska Governor Mike Johanns vetoed the Legislature's bill five days after it was passed, stating that "it would allow death row inmates to 'advance further unnecessary appeals.'" *Nebraska Leader Vetoes Suspension of Executions, N.Y. Times,* May 27, 1999, at A21.

*Harvey III, supra,* 159 *N.J.* at 301–03, 731 *A.*2d 1121; *Loftin II, supra,* 157 *N.J.* at 328–29, 724 *A.*2d 129; *DiFrisco III, supra,* 142 *N.J.* at 173–74, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 33–38, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 353–58, 645 *A.*2d 685, the majority compares the death-sentencing rate of defendant's salient-factors C–1 subcategory, murders involving "sexual assault with particular violence/terror" and that of his composite C category, with the overall death-sentencing rates for death-eligible defendants. *See ante* at 77–80, 731 *A.*2d at 1012–13.

The salient-factors test is designed to assign defendants to categories based on the essential elements of their crimes in order to identify the sentencing rate for similarly situated defendants. "Using the average death-sentencing rate as the benchmark of proportionality would defeat the purpose of dividing the death-eligible cases into subcategories at all ... [T]he court might as well be comparing defendant to all other death-eligible defendants who were not sentenced to death." *Harvey III, supra,* 159 *N.J.* at 380, 731 *A.*2d 1121 (Handler, J., dissenting). I believe, therefore, that we should simply evaluate the results of the groupings independently of the overall statistics.

In defendant's C–1 category, nineteen percent of the death-eligible defendants were sentenced to death and thirty-nine percent of the penalty-trial cases resulted in death sentences.[3] In the broader C category, sixteen percent of death-eligible defendants were sentenced to death, while thirty-four percent of penalty-trial cases resulted in death sentences. *See ante* at 78, 731 *A.*2d at 1012.

These numbers do not, in and of themselves, suggest "general imposition" of the death penalty in either the C category, or even

---

[3] Defendant's case is not included for analysis. "Placing defendant's case on both sides of the comparison, gauging the proportionality of a defendant's sentence by comparing it to a group of which he is a member, skews the analysis." *Loftin II, supra,* 157 *N.J.* at 420 n. 19, 724 *A.*2d 129 (Handler, J., dissenting).

the C–1 subcategory. However, we must use these findings to inform our precedent-seeking review, which attempts to add a more qualitative element to the analysis. *See Harvey III, supra,* 159 *N.J.* at 360, 731 *A.*2d 1121 (Handler, J., dissenting) ("Without linking the two analyses, the salient-factors test fails to inform the Court at all...."). There, we must look at whether defendant is among those whom we would expect to be sentenced to death within his salient-factors category. *Accord id.* at 359–60, 731 *A.*2d 1121 (Handler, J., dissenting).

### C.

The Court's index-of-outcomes test is also meant to inform our judgment of defendant's disproportionality. As the majority points out, however, the test is problematic because of the inconsistency of results across regressions and the large confidence intervals. *See ante* at 72–73, 731 *A.*2d at 1009–10. These two problems have plagued our index-of-outcomes model since its inception. *See Harvey III, supra,* 159 *N.J.* at 303–04, 731 *A.*2d 1121 (noting inconsistency in culpability scores in Court's preceding proportionality reviews and detailing wide range of confidence intervals in defendant's results); *Chew II, supra,* 159 *N.J.* at 205–06, 731 *A.*2d 1070 (urging caution in relying on results of index-of-outcomes analysis); *Loftin II, supra,* 157 *N.J.* at 422 n. 21, 724 *A.*2d 129 (Handler, J., dissenting) (noting wide range of confidence intervals). Therefore, I find the results suspect, at best. The Special Master agrees, recommending that for these reasons and others, the test be eliminated from our proportionality review. *See Special Master Report, supra,* at 76–107.

Defendant's results confirm these concerns, though not as starkly as in previous cases. His culpability level ranges from one to three and the confidence interval for the model examining both statutory and non-statutory factors with a penalty-trial universe ranges from nine to seventy-five percent. *Ante* at 83, 731 *A.*2d at

1015–16. It is worth noting that defendant's culpability score is lowest in the two models reflecting the smallest range of confidence intervals. In the model measuring statutory and non-statutory factors with a death-eligible universe, the test reveals that we are ninety-five percent certain that defendant's death sentencing rate falls between three percent and thirty percent. Cooper is assigned to culpability level one based on his ten percent predicted probability of death, giving his group a death-sentencing rate of five percent. In the model measuring only statutory factors with a death-eligible universe, the confidence interval is similarly low (and the range small): we are ninety-five percent certain that defendant's death-sentencing rate falls between eight and thirty-eight percent, and again he is assigned to culpability level one with a death-sentencing rate of five percent. *Id.* at 83, 731 *A.*2d at 1015–16.[4] These low scores, indications of disproportionality, are among the most reliable we have seen to date [5] because of the small range of the confidence intervals and the fact that they occur in the two models measuring both juries' and prosecutors' decisions—namely, those that employ the death-

---

[4] I maintain my objections to the majority's use of predicted probabilities as a basis for comparison of Cooper with other defendants, *ante* at 85–88, 731 *A.*2d at 1017–19. Our focus should be on actual, not predicted, sentencing rates. *Accord Harvey III,* 159 *N.J.* at 383, 731 *A.*2d 1121 (Handler, J., dissenting); *Loftin II, supra,* 157 *N.J.* at 423, 724 *A.*2d 129 (Handler, J., dissenting). Further, the Court's comparison of Cooper to defendants in different culpability levels, *ante* at 85–88, 731 *A.*2d at 1017–19, defeats the purpose of the index-of-outcomes test. *Accord Harvey III,* 159 *N.J.* at 383 n. 11, 731 *A.*2d 1121 (Handler, J., dissenting); *Loftin II, supra,* 157 *N.J.* at 423–24, 724 *A.*2d 129 (Handler, J., dissenting). As in the salient-factors test, the index-of-outcomes results should be used merely to tell us what level of culpability to attribute to defendant, and from that, what death-sentencing rate applies to *similarly situated* defendants.

[5] Only defendants Harvey and Martini have comparable confidence interval ranges. *See Harvey III, supra,* 159 *N.J.* at 305, 731 *A.*2d 1121 (reporting confidence interval ranges of .05 to .32 for model 2 and .08 to .38 for model 4); *Martini Report,* tbls. 14 and 15 (reporting confidence interval ranges of .01 to .30 for model 2 and .02 to .27 for model 4).

eligible universe. The other two models incorporate only defendants whose cases proceeded to a penalty trial, so prosecutors' charging decisions are not taken into account.

These results, almost identical to those received by defendant Harvey, *see Harvey III, supra,* 159 *N.J.* at 305, 731 *A.*2d 1121, suggest that Cooper is among the least blameworthy of all death-eligible defendants. The results, however, should make us question the viability of the test to accurately measure true culpability given the severity of the victimization in Cooper's case. The Court correctly points to the fundamental flaw most likely to skew the results here, namely, that the models "do not take into account the fact that the victim of defendant's homicide was a six-year-old girl." *Ante* at 82, 731 *A.*2d at 1014. This factor, likely to play a significant role in the jury's assessment of defendant's culpability, does not figure into the AOC's attempt to classify cases according to levels of victimization.

Given the methodological flaws evident in the index-of-outcomes test, both generally and with regard to defendant's cases specifically, as well as the Special Master's recommendation to eliminate the test, I hesitate to make much of the results. I therefore rely primarily on the salient-factors and precedent-seeking review results, to the extent possible, in finding defendant's sentence disproportionate. The index-of-outcomes test findings merely support this conclusion.

### D.

The Court's precedent-seeking review, while comprehensive, suffers from some of the same inadequacies of prior reviews. Following its litany of cases, in which the Court is often hard-pressed to find meaningful distinctions between life-sentenced defendants and Cooper, the majority concludes by finding defendant's sentence proportionate. *See id.* at 115–16, 731 *A.*2d at 1034. Pursuant to the general imposition standard on which our proportionality review was founded and, even, pursuant to the

Court's myopic "aberrational" standard, I cannot abide by such a conclusion.

In nine cases, I have been unable to find any adequate distinguishable feature to justify the disparity between the defendants' life sentences and Cooper's death sentence.[6] These cases account for over one-quarter of the thirty-eight life-sentenced cases in defendant's comparison group. Only six defendants in defendant's group have been sentenced to death and not one of them has received a proportionality review, so we have no basis on which to judge these sentences as valid. Contrary to the Court's assertion that the death-sentenced cases present "no issue of disproportionality" because they resulted in death, *see id.* at 93, 731 *A.*2d at 1022, these cases must be reviewed because they have not yet been declared proportionate. In addition, they have some value in helping us to better understand the reasons juries and prosecutors might opt for death instead of life. At their most instructive, these cases may call into question some of the Court's assumptions about why certain life-sentenced defendants might have been spared, thereby eviscerating the distinctions between those defendants and Cooper.

Marko Bey, for example, suffered from emotional disturbance; he was only seventeen when he committed his first murder; and his relationship with his victim was a consensual one (the victim actually had consensual sex with him first, and he did not rape and kill her until she refused to do so a second time). The Court, in justifying life sentences for several cases in Cooper's comparison group, cites the consensual or ambiguous nature of the relationship between the victim and the defendant in some of its discussions. *See id.* at 98–99, 103, 112–13, 114–15, 731 *A.*2d at 1024–25, 1027, 1032–33, 1033. Quite apart from the fact that I find offen-

---

[6] This group does not include some of the cases the majority characterizes as difficult to square with defendant's. *See ante* at 96–98, 731 *A.*2d at 1023–24. Although I find that those cases can, in fact, be distinguished from defendant's, they only add to the difficulty in making a finding on proportionality in this case.

sive any standard that would warrant diminished punishment for a defendant who sexually assaults and murders a woman, simply because he has a consensual relationship with her, I find that the Court's attempt to distinguish other life-sentenced defendants from Cooper on that basis cannot be squared with Marko Bey's death sentence. These cases may be distinguished on other bases, so are not discussed here. The Court, however, should be mindful of the facts in the death-sentenced cases when examining distinctions between Cooper and other defendants.

Joseph Harris, a death-sentenced defendant, is another example. Harris had a long history of psychiatric problems and reported hearing voices as early as age nine or ten. Some of his school teachers suggested that he have a psychological evaluation because they believed he was mentally disturbed. He never had an evaluation. Harris claimed he suffered from lapses of consciousness in his adult years. While in the Navy, he had three psychiatric evaluations in which he was diagnosed as being "schizoid" and as having an "inadequate personality." He received no treatment. While employed at a post office, Harris occasionally reported to work dressed in an imitation of "Ninja garb" or in a camouflage military outfit, performing martial-arts maneuvers in front of his co-workers. He believed he was the target of race discrimination and that he needed to defend himself in this manner. *State v. Harris,* 141 *N.J.* 525, 538, 662 *A.2d* 333 (1995). In spite of these facts, the jury failed to find the diminished capacity or mental disease or defect aggravating factors. Harris later committed suicide on death row.

In light of Harris's capital sentence, the Court's attempt to distinguish defendants Michael Prater, Sharob Clowney, Alphonso Timpson and David Collins from defendant by pointing out their emotional problems, *see ante* at 95, 99–100, 103, 731 *A.2d* at 1023, 1025, 1027, carries less weight. Harris is proof that juries are willing to sentence to death individuals who suffer from mental and emotional problems. Indeed, statistics demonstrate that even

defendants for whom juries have found the *N.J.S.A.* 2C:11–3c(5)(a) mental or emotional disturbance factor are more likely to be prosecuted capitally than others.[7] *See Chew II, supra,* 159 *N.J.* at 269, 731 A.2d 1070.

Harris's case warrants close analysis for another reason. The State offered Harris a plea agreement before the trial began, which the defendant turned down. The fact that the State would have declined capital prosecution of Harris in exchange for a life sentence undermines the usefulness of Harris's case as justification of Cooper's death sentence. The prosecutor, at least, believed capital prosecution of Harris was not warranted.

Finally, only three of the forty-five defendants who were capitally tried are currently on death row. Joseph Harris committed suicide, but the others' sentences have been reversed for varying reasons. These defendants were either not capitally prosecuted the second time around or were not sentenced to death by juries in their subsequent trials. Their death sentences, therefore, hold only minimal value.

1.

A close examination of the life-sentenced defendants confirms the disproportionality of defendant's death sentence. Many of the juries for C–1, life-sentenced defendants found the mitigating factors indicating that the defendants suffered from mental disease or defect, *N.J.S.A.* 2C:11–3c(5)(a) or c(5)(d) (extreme emotional disturbance or diminished capacity). In addition, the fact that Cooper's victim was a young child undoubtedly played a significant role in his sentence. *See Marshall II, supra,* 130 *N.J.* at 157, 613 *A.2d* 1059 (noting that Court has indicated that such factors as vulnerability of victim, not a statutorily-defined factor, might help explain jury judgments even though they might not make defendant death eligible). Cooper's case, however, is not

---

[7] The c(5)(a) factor was not found by the juries in the trial for defendants Prater, Clowney, Timpson and Collins.

the only one involving the sexual assault and murder of a young child. In addition, some of the other crimes in defendant's category involve similar degrees of victimization, even though a young victim was not involved. Many of the cases before the Court are difficult to square with defendant's. I discuss them here.

Defendant Rivera raped, attempted to rob, and murdered his next-door neighbor, a seventy-eight-year-old widow who often took care of defendant's children. The victim was badly beaten all over. Her face and neck were covered with bruises; hemorrhaging was found under her tongue, behind one of her eyes and underneath her cheek; she had bruises on her forearms and back, abrasions on her lips and two fractured ribs; and she had been strangled to death. The autopsy also revealed that the victim had been sexually assaulted. Her vagina was torn back and oozing blood. She suffered bruising of the mucous membrane and the area near the urethra, injuries believed to be caused by an object at least three inches in diameter, such as the victim's cane or the defendant's hand.

Rivera had a history of alcohol and drug abuse and was seen drunk on the day of the murder. Rivera was charged capitally and sentenced to life. The Court states, "Except for the age of defendant's victim, reconciliation of defendant's death sentence with Rivera's life sentence is difficult." *Ante* at 97, 731 *A.*2d at 1024. While an elderly woman cannot be compared to a six-year-old in many ways, does the case not present only another of many faces of evil? The age of Rivera's victim clearly and significantly increases his blameworthiness given the vulnerability of the elderly victim, especially in light of the extreme violence committed by the defendant. We should require more to distinguish Rivera from Cooper.

Defendant Lester Allan Wilson strangled and sexually assaulted a fourteen-year-old girl who lived in the same hotel as he. He attempted to escape from police custody after being arrested for the murder. Defendant's I.Q. qualifies him as mildly retarded.

He was sentenced to life. The Court states, "Other than defendant's mental retardation, no apparent circumstances concerning this homicide and aggravated sexual assault explain the determination to forego capital prosecution of Wilson." *Id.* at 101, 731 *A.*2d at 1026. Here, however, no evidence of emotional disturbance or diminished capacity was present—defendant suffers from mild retardation based solely on a somewhat low I.Q.

Leroy Taylor sexually assaulted and strangled his girlfriend's thirteen-year-old niece. When she was found, the victim's underwear was torn and contained blood and semen. The victim had a nylon stocking around her neck and froth and blood were coming from her nose and mouth. Defendant fled to California and was eventually picked up for violating his parole. He was charged with numerous offenses, including felony murder, sexual assault, hindering prosecution and witness tampering. Taylor was not charged capitally and was permitted to plead guilty. He was sentenced to life.

The Court states, "The prosecutor's decision to accept Taylor's guilty plea could have been influenced by uncertainty over whether Taylor's prior murder conviction as a juvenile could constitute an aggravating factor in a murder prosecution." *Id.* at 102, 731 *A.*2d at 1027. The Court's justification here is mere speculation, which crumbles when we realize that Taylor's death-eligibility does not rest on his prior murder conviction alone—indeed, most of the defendants in the C category do not have prior murder convictions. Taylor's sexual assault makes him death eligible. The Court is then left with no apparent reason to explain the prosecution's decision to forego capital prosecution.

Robert Bolinger, when his victim came home to find him burglarizing her apartment and attempting to leave, stabbed her, then tied her up on the bed, gagged her and sexually assaulted her. When arrested in connection with another rape and attempted murder, Bolinger confessed not only to the previous offense and the one discussed here, but also to a third rape and murder

that he committed in between the two others. Defendant pled guilty to the rape and attempted murder and was ultimately acquitted of the second rape and murder charge, but not until after he was prosecuted for the rape and sexual assault reviewed here. Defendant was not tried capitally and was permitted to plead guilty. He was sentenced to life.

The Court states, "The decision to accept [Bolinger's] guilty plea may have been influenced by the impulsive rather than premeditated nature of the homicide and by defendant's drug and alcohol addiction." *Id.* at 103, 731 *A*.2d at 1027. Any standard based solely on impulsivity, especially in the face of Bolinger's confession, is insupportable here. Had the defendant simply stabbed the victim and run away, one could argue that his murder was more impulsive than Cooper's, thereby perhaps making Bolinger less culpable. However, given that the defendant took the trouble to tie up his victim and rape her while she was still alive and suffering from a stab wound to the chest, the impulsivity argument loses all weight—is it really so meaningful to distinguish one defendant who lured his victim without having plotted his crime from another who, when surprised by his victim, carries out an equally sinister and prolonged brutal attack? Further, in light of the defendant's confession to two other rapes and attempted murders (one successful), Bolinger's apparent impulsiveness here cannot possibly make up for his severe culpability.

Gary Lippen and his co-defendant beat, raped, strangled, stabbed, and tortured a seventeen-year-old girl. After the two took turns raping the victim, Lippen beat her in the head with a stick, punched her in the jaw, and kicked her. The two co-defendants then hoisted her into a tree and broke her legs. Lippen had no history of emotional disturbance, but he had a history of drug and alcohol abuse and the jury found the diminished capacity mitigating factor. Although Lippen eventually confessed, he first denied all involvement in the murder and then, even in his confession, lied to the police. Both defendant and his co-defendant accused the other of playing a dominant role in the

crime. In addition to his capital charges, Lippen was charged with hindering apprehension, for which he was sentenced to five years. The State accepted Lippen's guilty plea and the defendant was sentenced to twenty years on his aggravated manslaughter conviction.

The Court states, "Lippen's cooperation with law enforcement authorities, combined with the likelihood that Henderson was the dominant actor, probably accounts for the prosecutor's decision to forgo capital prosecution of Lippen." *Id.* at 104, 731 *A.*2d at 1028. This conclusion is suspect given that Lippen was charged with and convicted of hindering apprehension. The AOC narrative states clearly that Lippen lied to law enforcement officers at first. Lippen eventually aided police in securing a conviction against his co-defendant, but the notion that this cooperation (which he clearly rendered in order to reduce his own sentence) formed the basis for his reduced culpability is feeble.

Frank Masini (I and III) raped and murdered his eighty-five-year-old aunt and an eighty-year-old woman within a two-week period. Both victims had been stabbed multiple times in the neck and had been sexually assaulted. Both women were found in a pool of blood, naked from the breast down. They also had stab wounds on their hands. Approximately one year later, Masini murdered an elderly couple for whom he had done carpentry work. Masini was not capitally charged in either sexual assault case.

The Court states, "Other than the reference in the AOC's summary to Masini's experiencing 'detachments from reality,' no other factors surrounding those four homicides suggests an explanation for the prosecutorial decision to proceed non-capitally against Masini." *Id.* at 105, 731 *A.*2d at 1028. This defendant murdered four elderly people, raping two of them. The prosecutor was aware of all of the murders when determining whether or not to capitally prosecute Masini for his first and third death-eligible crimes. Defendant's own unproven contention that he suffers "detachments from reality," in the face of these crimes, is

the only available information the AOC offers the Court to distinguish Masini's guilty plea from Cooper's death sentence. This case surely emphasizes the inability of our current system to answer the very question that proportionality review demands—are similarly situated defendants being treated differently?

Jerome Dennis (I and II) presents a similar scenario, only the inequity is even more glaring. Dennis committed five homicides in four months, two of which involved sexual assaults. Defendant abducted a fourteen-year-old girl at knife-point, sexually assaulted her and stabbed her three times in the neck, eleven times in the chest and ten times in the abdomen. Her body was found at the bottom of a hill four months later, tied up and naked under a pine tree. The second sexual assault victim was a thirty-year-old woman. She was also found naked and tied up at the bottom of a hill with ten stab wounds in her neck. Defendant had several prior convictions, including three for sexual assault. Defendant was not prosecuted capitally and was sentenced to life. The AOC summary makes no mention of any emotional or mental problems suffered by defendant. As the Court recognizes, "No explanation for the prosecutor's decision to forego capital prosecution can be inferred from the AOC summaries." *Id.* at 106, 731 *A*.2d at 1029.

James Williams (IB), at age twenty-one, raped and murdered a twenty-three-year-old woman who worked in a Trenton nursing home. The victim was found face down and naked, her clothing strewn about the room. There was blood on the floor, the walls, and the furniture. She had thirty-six stab wounds, bruises contusions and abrasions all over her body. Her throat had been slashed. The medical examiner testified that the victim remained conscious after seven frontal stab wounds were inflicted, and that she had lived several minutes after sustaining twenty-one fatal stab wounds to her back. In Williams's capital trial, the jury found that defendant had committed his murder with torture and depravity, but the jury rejected the emotional disturbance, diminished capacity, and reduced age mitigating factors and sentenced

defendant to death. Defendant's sentence was reversed by this Court because of the inadequacy of the *voir dire*. On retrial, the prosecutor declined to prosecute Williams capitally, and defendant was permitted to plead guilty in exchange for a life sentence. The Court states,

> "No factors other than the mitigating evidence offered in the penalty phase, but substantially rejected by the jury, explain the prosecutor's decision to forego a capital prosecution on remand. That mitigating evidence included testimony reflecting an unstable childhood, numerous foster care placements, emotional instability, intoxication and, at age nine, the accidental shooting of his younger brother."

[<em>Id.</em> at 106–07, 731 <em>A.</em>2d at 1029.]

Although worth noting, this is precisely the kind of mitigating evidence presented at trial by defendant Nathaniel Harvey and ignored by the Court in companion case *Harvey III, supra,* 159 *N.J.* at 390–91, 731 *A.*2d 1121 (Handler, J., dissenting). The majority in *Harvey* fails to point out the importance of the mitigating evidence that defendant Harvey was emotionally scarred from having lit a match and accidentally set his sister on fire, killing her, when he was a child. *See id.* at 391, 731 *A.*2d 1121 (Handler, J., dissenting). Harvey suffered other childhood abuse, including exposure to alcohol and drug addiction, also not considered by the Court. *See ibid.* Here, the Court's willingness to distinguish Williams's case—which involved a sexual assault with particular violence and terror—from Cooper's on the basis of mitigating evidence presented at trial regarding his traumatic youth cannot be reconciled with the Court's failure to acknowledge such evidence in Harvey's proportionality review, where the defendant's crime was significantly less egregious.

Carlos Vasquez, a defendant with a prior murder conviction in Puerto Rico, sexually assaulted and asphyxiated a thirteen-year-old girl who had gone out to buy bread for her family. The girl's body was found in yellow plastic garbage bags in a cardboard box. The victim's hands had been tied and pulled together behind her back with electrical cord and clothesline. Her spine was fractured and she had been strangled. Vasquez was not prosecuted capital-

ly and pled guilty, receiving a sentence of life. The Court offers no justification for the disparity between Vasquez's and Cooper's sentences.

### 2.

Despite the possible perceived difficulty in finding the death sentence for a crime so heinous as Cooper's to be disproportionate, we are obliged to compare Cooper to other similarly situated defendants, not to the group of death-eligible defendants as a whole. As long as this Court has no basis for distinguishing defendant from such a large group of similarly situated defendants, especially when the frequency analysis results confirm our expectation that defendants similar to Cooper will not be sentenced to death, we must consider Cooper's sentence to be an aberration and vacate it.

### II

Pursuant to existing proportionality review methodology, I find defendant's sentence to be disproportionate. I also maintain my contention that the current methodology is too inherently subjective to be reliable in cases that are not clear-cut. I find the Court's application of what it readily admits is a faulty system of proportionality review to defendant's case irresponsible in light of the availability of Judge Baime's report containing several recommendations for improvement.[8] Further, the Court's refusal to declare unconstitutional the 1992 amendment redefining our proportionality review universe of cases is unacceptable in light of the Court's own precedent and the Special Master's report.

---

[8] One of these improvements is, notably, to require prosecutors to provide this Court with more detailed reasons for their decisions to forgo capital prosecution. *See Special Master Report, supra,* at 6. This improvement would provide the very information the Court here acknowledges so often that it lacks. *See ante* at 107, 111, 114, 731 A.2d at 1029, 1032, 1033. Without such information, our proportionality review is inadequate and any conclusions regarding proportionality must therefore be postponed.

Finally, and most importantly, we must heed the warnings of the data before us indicating a risk that racism has infected our capital punishment scheme. When we supplement the consistent statistical models (all of which indicate that race is playing a role) with our common experience and knowledge, we can no longer conclude that such a risk is not present. We must declare the death penalty statute unconstitutional and vacate defendant's sentence until such time as we can be certain that we are not executing individuals on the basis of their race.

I, therefore, dissent.

*For affirmance*—Chief Justice PORITZ, and Justices POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*For reversal*—Justice HANDLER—1.